UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID HUDSON (#179401),

                                        CASE NO. 5:09-CV-14109
                    Plaintiff,          JUDGE JOHN CORBETT O'MEARA
                                        MAGISTRATE JUDGE PAUL J. KOMIVES

v.

WRIGHT WADE, SCOTT NOBLES,
RAYMOND BOOKER, LOIS ATCHER,
THOMAS RIDLEY, SHERRI CURETON,[1]
MARK MACKINTOSH, THOMAS GOULD,
and RICHARD GOLDBERG,

                    Defendants,

_____/

## REPORT AND RECOMMENDATION REGARDING DEFENDANTS DECEMBER 17, 2010 MOTION FOR SUMMARY JUDGMENT (Doc. Ent. 35)

I.      RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        A.  Plaintiff's Complaint Was Amended by Way of my January 13, 2011 Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        B.  There Are Four (4) Motions Pending before the Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        C.  Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
            1.   Plaintiff's October 3, 2008 transfer from RRF to ARF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
            2.   Plaintiff's December 17, 2008 major misconduct at ARF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
            **3.   Defendants' December 17, 2010 dispositive motion (Doc. Ent. 35)** . . . . . . . . . . . . . . . . . . . . . . . . . . 10
                a.   RRF Defendants Wade, Nobles, Cureton, Booker, Ridley and Archer . . . . . . . . . . . . . . . . . . 10
                    i.     First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
                    ii.    Eighth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
                    iii.   Fourteenth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
                    iv.    RLUIPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
                    v.     Qualified Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
                b.   ARF defendants Mackintosh, Gould and Goldberg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
                c.   Eleventh Amendment immunity and Fed. R. Civ. P. 12(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . 50
            **4.   Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

III.    NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

---

[1]The proper spelling of defendant's name is Sherry Cureton.  Doc. Ent. 46-3.

**I.**   **RECOMMENDATION:** The Court should grant defendants' December 17, 2010

motion for summary judgment (Doc. Ent. 35) which addresses plaintiff's October 21, 2010

amended complaint (Doc. Ent. 33).

**II.**   **REPORT:**

**A.**   **Plaintiff's Complaint Was Amended by Way of my January 13, 2011 Order.**

**1.**   Plaintiff David K. Hudson Bey is currently incarcerated at Lakeland Correctional Facility

(LCF) in Coldwater, Michigan where he is serving two life sentences for first-degree murder,

Mich. Comp. Laws § 750.316.[2]  On October 19, 2009, while incarcerated at LCF, plaintiff filed a

fee-paid prisoner civil rights complaint against nine (9) defendants:  Wade, Nobles, Booker,

Atcher, Ridley and Cureton, apparently employees at the Ryan Correctional Facility (RRF) in

Detroit, Michigan, and defendants Mackintosh, Gould and Goldberg, apparently employees at

the Gus Harrison Correctional Facility (ARF) in Adrian, Michigan.  Doc. Ent. 1 at 1, 14-15.

Plaintiff's claims consist of (I) retaliation in violation of the First and Fourteenth

Amendments; (II) defendants' personal participation in a 42 U.S.C. § 1983 conspiracy; (III)

intentional and malicious denial of access to the court; (IV) First Amendment retaliation,

including a claim that MDOC PD 03.03.105 ("Prisoner Discipline") is unconstitutional; (V)

retaliation for exercising his First Amendment right to petition the government for a redress of

grievances and continuing damages, and (VI) willful violation of a permanent injunction under

---

[2]*See* www.michigan.gov/corrections, "Offender Search," #179401.

2

the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA)[3] and the First and

Fourteenth Amendments.  Doc. Ent. 1 at 3-13.[4]

Judge O'Meara referred this case to me to conduct all pretrial proceedings.  Doc. Ent. 4.

On May 17, 2010, plaintiff filed a second amended complaint.  Doc. Entries 20 and 21.

Then, on June 10, 2010, eight (8) of the nine (9) defendants in this case filed a motion to

strike and dismiss the plaintiff's second amended complaint based on the plaintiff's

non-compliance with the applicable procedural rules; or alternatively for screening of the pro se

prisoner civil rights complaint under the provisions of the PLRA's screening provisions before

the defendants are required to file a responsive pleading.  Doc. Ent. 25.

Pursuant to my September 30, 2010 order (Doc. Ent. 32), plaintiff's June 18, 2010 (Doc.

Ent. 28) and July 23, 2010 (Doc. Ent. 31) amended complaints were stricken.  The order

provided, in part, that "[p]laintiff ha[d] thirty (30) days within which to file an amended

complaint which w[ould] supercede the original complaint and which may not incorporate by

reference a prior pleading."  Doc. Ent. 32 at 12-13.

**2.**      By way of my January 13, 2011 order (Doc. Ent. 41) granting plaintiff's October 21,

2010 motion (Doc. Ent. 33 at 1-3) to amend his May 17, 2010 complaint (Doc. Entries 20 and

21), the Court acknowledged the October 21, 2010 complaint and Exhibits A-E (Doc. Ent. 33 at

4-42) as plaintiff's amended complaint.[5]

---

[3]The Religious Land Use and Institutionalized Persons Act of 2000 is codified at 42 U.S.C. §§ 2000cc - 2000cc-5.

[4]Attached to the complaint are Exhibits A-J (Doc. Ent. 1 at 16-50; Doc. Ent. 1-2 at 1-10).

[5]Plaintiff has filed proofs of mailing with respect to the motion and the addendum.  Doc. Ent. 33 at 43, Doc. Ent. 34 at 4.  The addendum includes a list of previous lawsuits on the form "Prisoner Civil Rights Complaint," including *Hudson-Bey v. Zimmerman, et al.*, Case No. 2:94-cv-00277-

Plaintiff's amended complaint lists seven (7) defendants - Gould, Wade, Nobles, Curenton, Booker, Ridley and Archer - each of whom is sued in their individual and official capacities.  Doc. Ent. 33 at 5-6, 6 ¶ 3, 19 ¶ 88.  There are also seven (7) claims for relief and causes of action, including counts based upon First Amendment retaliation; First Amendment access to courts; conspiracy and RLUIPA.  Doc. Ent. 33 ¶¶ 81-87.  Plaintiff seeks injunctive, compensatory, and declaratory relief.  Doc. Ent. 33 at 21.

**B.    There Are Four (4) Motions Pending before the Court.**

**1.**    On December 17, 2010, defendants filed a motion for summary judgment (Doc. Ent. 35) with respect to plaintiff's October 21, 2010 amended complaint (Doc. Ent. 33).[6]  Defendants seek dismissal of this action with prejudice.  Doc. Ent. 35 at 2.  As framed by defendants, the concise issues are:

> I.    Whether the plaintiff has demonstrated a violation of clearly established federal rights;
>
> II.    Whether the Complaint states a claim against [ARF] Defendants Mackintosh, Gould, and Goldberg; and
>
> III.    Whether the plaintiff's official capacity claims are barred by the Eleventh Amendment.

Doc. Ent. 35 at 4.[7]  Attached to the motion are Exhibits A-F.  *See* Doc. Entries 35-2, 35-3, 35-4, 35-5, 35-6 and 35-7; *see also* Doc. Ent. 39.

---

RHB-TPG (W.D. Mich.); *Hudson-Bey, et al. v. McGinnis, et al.*, Case No. 1:98-cv-00722-RAE-DAR (W.D. Mich.); and *Hudson-Bey v. Martin, et al.*, Case No. 1:00-cv-00389-RAE-ESC (W.D. Mich.).  Doc. Ent. 34 at 2-3.  It also appears that plaintiff was a party to *Hudson-Bey v. Mohrman*, Case No. 2:94-cv-00227-RHB-TPG (W.D. Mich.).

[6]I entered an order setting the response deadline for January 25, 2011.  Doc. Ent. 36.

[7]The order actually lists the underlying motion as Doc. Ent. 25, instead of Doc. Ent. 35.

On January 20, 2011, plaintiff filed a response.  Doc. Ent. 43 at 1-29; Doc. Ent. 43 at 30-31 (Index of Exhibits);[6] Doc. Ent. 43 at 32-43 (Exhibits F-G, I-O); Doc. Ent. 43 at 44-46 (Plaintiff's Statement of Disputed Factual Issues); Doc. Ent. 43 at 47-50 (Plaintiff's Declaration [Exhibit H]); Doc. Ent. 43-1 at 1-8 (Plaintiff's Declaration [Exhibit H]); Doc. Ent. 43-1 at 9-10 (Exhibits H1- H20); Doc. Ent. 43-2 at 1-5 (Exhibits H21-H24).

**2.**     Previously, on December 30, 2010, plaintiff filed a motion (Doc. Ent. 38) for an enlargement of time within which to file a response to defendants' December 17, 2010 motion (Doc. Ent. 35) and limited discovery.  This motion will be addressed under separate cover.

**3.**     On January 7, 2011, defendants filed a motion to stay discovery (Doc. Ent. 40), to which they attached plaintiff's December 28, 2010 first request for production of documents (Doc. Ent. 40-2).  This motion will be addressed under separate cover.

**4.**     On January 13, 2011, I entered a report (Doc. Ent. 48) recommending that the Court deny as moot but without prejudice defendant Curenton's May 16, 2011 motion for summary judgment (Doc. Ent. 46).  Defendant Curenton filed another motion for summary judgment on September 19, 2011 (Doc. Ent. 49), which will be addressed under separate cover.

**C.     Analysis**

**1.     Plaintiff's October 3, 2008 transfer from RRF to ARF**

By way of background, plaintiff is the President of the National Lifers of America, Inc., Chapter #1009 (NLA), which was apparently incorporated during the 1980s.  *See* Doc. Ent. 43-1 at 9-13.  In Fall 2007, plaintiff participated in the Inside-Out Prison Exchange Program at RRF

---

[6]The Index describes Exhibits A-E as attached to his complaint.  Doc. Ent. 43 at 30; *see also* Doc. Ent. 33 at 22-42 [Exhibits A-E].

taught by University of Michigan-Dearborn Professor Lora Lempert.[7]  Doc. Ent. 43-1 at 14.[8]

During April and May 2008, Professor Lempert and five (5) students wrote letters in support of

plaintiff's petition for commutation.  Doc. Ent. 43-1 at 24-38.[7]

On September 20, 2008, plaintiff "organized and sponsored a Legislative Townhall

Meeting with State Representative Alma Wheeler Smith,[8] Chairperson of [MDOC] Legislative

Committee; State Representative Paul Condino; State Senator Hansen Clarke; MDOC

Legislative Liaison Bryan Crenshaw; and *Second Chance for Youth* Director Felicia Tyson-

Waters at [RRF] in the gym with the general population of prisoners."  Doc. Ent. 33 ¶ 5.

Plaintiff alleges that, prior to the start of the event, Curenton stated she could "get

[Hudson] transferred."  Doc. Ent. 33 ¶ 8.  During the meeting, plaintiff made complaints

"concerning Parole Board Policies and conflicts of interest between Warden Booker and the

Michgian Parole Board."  According to plaintiff, "Warden Booker's wife is/was a member of the

Parole Board[.]"  Doc. Ent. 33 ¶ 9.[9]  During the program, plaintiff was "summoned to Special

---

[7]Plaintiff has provided correspondence from Professor Lempert dated May 9, 2007 (Doc. Ent. 43-1 at 15), October 13, 2008 (Doc. Ent. 43-1 at 20-21); October 31, 2008 (Doc. Ent. 43-1 at 39).

[8]"College goes to prison", *Detroit Free Press*, Oct. 17, 2007.  Doc. Ent. 43-1 at 14.

[7]A July 14, 2008 Transfer Order indicates that plaintiff was transferred from RRF to Michigan Reformatory in Ionia, MI (RMI), "to accommodate [an] incoming MPRI [Michigan Prisoner ReEntry Initiative] prisoner."  Doc. Ent. 43-1 at 22.  Plaintiff contends that this transfer did not go through and was based on the "fraudulent pretense of a 'dining hall protest'."  Doc. Ent. 43 at 9.

[8]Plaintiff has provided correspondence from Representative Smith dated April 29, 2009 (Doc. Ent. 43-1 at 23); November 7, 2007 (Doc. Ent. 43-1 at 41).

[9]Plaintiff contends that Warden Booker's wife, Sherri Booker, resigned from the Michigan Parole Board in early October.  Doc. Ent. 33 ¶ 41.

6

Activities Director Steve Horton's location," who said among other things, "[w]e don't need this type of forum."  Doc. Ent. 33 ¶ 12.

On September 22, 2008, RRF Warden Booker electronically mailed RRF Deputy Warden Nobles for advice on "whether there have been any rumors circulating at RRF regarding a protest about the reduction in tobacco products."  The same day, Nobles replied.  Doc. Ent. 35-2 at 4.

On September 23, 2008, plaintiff noticed a private conversation between ADW Willis Chapman and Officer Curenton.  According to plaintiff, "Officer Currenton stared 'animus' at Plaintiff as he walked away."  Doc. Ent. 33 ¶ 15.

Then, plaintiff contends, on September 24, 2008, Deputy Warden Nobles told Warden's Forum Member Corbin-Bey (#136518)[10] that he (Nobles) and the Warden (Booker) had been "answering emails concerning the complaints made at your little townhall meeting all morning."  Doc. Ent. 33 ¶¶ 6, 16.  On September 26, 2008, ADW Chapman informed plaintiff that "Officer Currenton may talk to Wade or Nobles about you and the complaints made to the outside guest you had come in last Saturday."  Doc. Ent. 33 ¶ 17.

On September 30, 2008, the SCC requested that plaintiff be transferred due to security concerns at RRF.  The transfer appears to have been ordered on October 1, 2008, and plaintiff was transferred to ARF on October 3, 2008.  Doc. Ent. 35-2 at 5.  *See also* Doc. Ent. 35-6 at 5-6 (Log Book Excerpts); Doc. Ent. 35-5 at 14 (10/3/08 Notice of Intent to Conduct an Administrative Hearing - Excess Property, issued by RRF RUO L. Atcher); Doc. Ent. 35-5 at 15

---

[10]Corbin-Bey's January 1, 2009 affidavit is attached to plaintiff's response.  Doc. Ent. 43 at 40.

(10/6/08 Notice of Intent to Conduct an Administrative Hearing - Disposition of personal books, issued by RRF ARUS C. White); Doc. Ent. 35-5 at 16 (10/6/08 Notice of Intent to Conduct an Administrative Hearing - Catch-up personal property, issued by RRF RUO L. Atcher).

On October 3, 2008, plaintiff claims, he was awakened at 7:00 a.m. by Acting Sgt. Ridley and Officers Kirchoff and Smith, all of whom are Caucasian.  Doc. Ent. 33 ¶ 18.  He was transferred to ARF around 4:30 p.m.  Doc. Ent. 33 ¶ 34.

On October 5, 2008, while incarcerated at ARF, plaintiff completed a Step I grievance form about his transfer from RRF (Grievance Identifier RRF-08-10-00646-19z).  He appealed the grievance to Step II and Step III.  Warden Booker was the Step II grievance appeal respondent. Doc. Ent. 33 at 25-32; Doc. Ent. 39-1 at 5-11.

Plaintiff's initial program classification at ARF was signed on October 13, 2008.  Doc. Ent. 43-1 at 43.

**2.       Plaintiff's December 17, 2008 major misconduct at ARF**

On December 17, 2008, while incarcerated at ARF, plaintiff received an unsolicited visit from MDOC Internal Affairs Investigator Mane for an interview regarding RRF Administrators. Doc. Ent. 33 ¶ 64.

Plaintiff received a major misconduct report from Inspector Wright Wade and witnessed by Deputy Warden Scott Nobles for a December 17, 2008 charge of insolence.  Doc. Ent. 35-4 at 35; *see also* MDOC PD 03.03.105, "Prisoner Discipline," Doc. Ent. 35-4 at 14-34.  On December 22, 2008, plaintiff was summoned to meet with Sgt. Adams, who reviewed plaintiff on the misconduct ticket written by Wade and witnessed by Nobles.  Doc. Ent. 33 ¶¶ 65-66; *see also* Doc. Ent. 33 ¶ 67; Doc. Ent. 35-4 at 35.  The following day, on December 23, 2008,

8

plaintiff completed a Step I grievance form alleging that his major misconduct ticket was issued in retaliation (Grievance Identifier RRF-09-01-00032-27z). Doc. Ent. 33 at 36-39; Doc. Ent. 39-1 at 12-17.

On January 6, 2009, plaintiff was called to the ARF Property Room. Doc. Ent. 43-1 at 45. On January 14, 2009, a major misconduct hearing took place. Plaintiff claims the envelope for the letter at issue had on it a handwritten note by Thumb Correctional Facility (TCF) Officer Linda DeLosh to RRF Nobles which stated something like, "Here's something for your reading enjoyment." Doc. Ent. 33 ¶ 70. Ultimately, the charge was dismissed. Doc. Ent. 35-4 at 36-37; Doc. Ent. 43-1 at 44.

The following day, on January 15, 2009, ARUS Mackintosh issued two notices of intent to conduct an administrative hearing, wherein plaintiff was "ordered to cease and desist all communication including but not limited to written correspond[e]nce of a derogatory or slanderous nature regarding Deputy Scott Nobles [and Inspector W. Wade]." Doc. Ent. 33 at 41-42. Plaintiff was called to the ARF Property Room that same day. Doc. Ent. 43-1 at 46.

Grievance Coordinator M. Myles's January 22, 2009 Step I response in RRF-00032 rejected the grievance on the basis that it was non-grievable under MDOC PD 03.02.130, because the issue presented was the result of a major misconduct. Plaintiff appealed the grievance to Step II and Step III. Doc. Ent. 33 at 36-39; Doc. Ent. 39-1 at 12-17.[11]

On or about March 26, 2009, plaintiff received an MDOC Notice of Package/Mail Rejection regarding mail from Ruth Lewis containing two (2) employee disciplinary matters.

---

[11]On February 23, 2009, ARF Property Room Officer Thomas D. Gould issued a notice of intent to dispose of property, including a weight belt, KTV and excess legal property. Doc. Ent. 33 at 34.

Doc. Ent. 43-1 at 48.[12]  Booker's Step II grievance appeal response is dated March 31, 2009.

Doc. Ent. 39-1 at 14-16.  The Step III grievance response is dated April 9, 2009.  Doc. Ent. 39-1

at 17.

**3.      Defendants' December 17, 2010 dispositive motion (Doc. Ent. 35)**

As set forth by defendants, Booker is the RRF Warden; Nobles is the RRF Deputy

Warden; Wade is an RRF Inspector; Ridley is an RRF Corrections Officer; Atcher is an RRF

RUO; Curenton is a former RRF Corrections Officer; Gould is an ARF property room officer;

Mackintosh is an ARF ARUS; and Goldberg is an ARF ADW.  Doc. Ent. 35 at 6.

**a.      RRF Defendants Wade, Nobles, Curenton, Booker, Ridley and Archer**

Defendants address plaintiff's First Amendment claims (conspiracy, retaliation and

access to courts), his Eighth Amendment claims, his Fourteenth Amendment claims and his

RLUIPA claims.  Doc. Ent. 35 at 9-19.

**i.      First Amendment.**

**FIRST AMENDMENT RETALIATION**

Plaintiff contends that the administrative complaints he made at the September 20, 2008

meeting "were followed up with emails from the Regional Medical Administrators, and others,

to several Defendants[] named in this complaint."  Doc. Ent. 33 ¶ 40.  Furthermore, he

characterizes his October 5, 2008 grievance as filed against Wade, Nobles and other RRF staff

---

[12]Plaintiff contends this material was sent to him to "substantiate the facts of Wade's illicit behavior with male prisoners at the Mound [Correctional Facility (NRF)] and at his moonlighting job at Children's Village, Oakland Co. Where he was terminated after a similar illicit investigation."  Doc. Ent. 43 at 14.

"for [r]etaliation in violation of Plaintiff's First, Fourteenth and Eighth Amendment [r]ights."
Doc. Ent. 33 ¶ 61; Doc. Ent. 33 at 25-32 (RRF-00646).

Count I of plaintiff's complaint alleges that plaintiff's October 3, 2008 transfer from RRF
to ARF was in retaliation for "Plaintiff's involvement in the NLA's [October 20, 2008]
programming[.]" Doc. Ent. 33 ¶ 81; *see also* Doc. Ent. 33 ¶ 85 (Count V), Doc. Ent. 33 ¶ 86
(Count VI).

This report construes these claims as alleging a violation of plaintiff's First Amendment
right against retaliation for engaging in protected conduct. "A retaliation claim essentially
entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was
taken against the plaintiff that would deter a person of ordinary firmness from continuing to
engage in that conduct; and (3) there is a causal connection between elements one and two-that
is, the adverse action was motivated at least in part by the plaintiff's protected conduct."
*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

As plaintiff points out in his response (Doc. Ent. 43 at 4), "reasonable op[p]ortunities
must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and
Fourteenth Amendment without fear of penalty." *Cruz v. Beto*, 405 U.S. 319, 322 (1972). "[I]t
is constitutionally impermissible to terminate even a unilateral expectation of a property interest
in a manner which violates rights of expression protected by the First Amendment." *Newsom v.
Norris*, 888 F.2d 371, 375 (6th Cir. 1989) (external footnote omitted). Also, "[p]rison officials
are clearly free to punish inmate conduct that threatens the orderly administration of the prison.
But '[t]he State must ensure ... that [conduct-regulating] portions of the prison rules are not used
as a backdoor means of punishing inmates for exercising their right to criticize the legality of

11

officials' actions.  Any attempt to use the rules in this manner would result in an unconstitutional application of the rules.'"  *Brown v. Crowley*, 312 F.3d 782, 791 (6th Cir. 2002) (quoting *Clarke v. Stalder*, 121 F.3d 222, 230 (5th Cir. 1997), *vacated on other grounds by* 133 F.3d 940 (5th Cir.1997)).

**Protected conduct.**  According to plaintiff, the NLA at RRF "is the first organization under the leadership of Plaintiff to hold a Townhall Meeting in a prison setting with Michgian Lawmakers[,]" and his transfer "has impeded and/or effectively ended this forum of redress at RRF."  Doc. Ent. 33 ¶ 42.

Plaintiff's alleged protected conduct is his involvement in the NLA's September 20, 2008 program which sponsored State of Michigan Lawmakers (¶ 81) and complaining to state lawmakers on that occasion when they visited RRF (¶ 85, ¶ 86).  *See Gibbs v. Ball*, No. 07-15462, 2009 WL 331604, 6 (E.D. Mich. Feb. 11, 2009) (Rosen, J., adopting report and recommendation of Whalen, M.J.) ("under the first prong of *Thaddeus-X*, filing legitimate grievances regarding prison conditions is protected conduct[.]"); *Reaves v. Caruso*, No. 05-73820, 2006 WL 3782834, 4 (E.D. Mich. Dec. 21, 2006) (Duggan, J., opinion and order concurring with the conclusions in report and recommendation of Whalen, M.J.) ("Plaintiff's complaints about prison conditions giving rise to the allegedly retaliatory transfer constitutes protected conduct.").  Defendants do not appear to contest that this constitutes protected activity. Doc. Ent. 35 at 10.

**Adverse action.**  Plaintiff contends that ARF is known as being a disciplinary facility, having less law library access, and having a documented racist history, as well as a place where "all the prisoner telephone calls are made outside the housing units in zero below weather," and

12

where "minor rule violations are elevated to major misconduct reports by staff."  Doc. Ent. 33 ¶ 37; *see also* Doc. Ent. 33 ¶ 38.  Plaintiff claims he was singled out as "a friend of the Legislator who controls the MDOC 2006-2010 budget, and [with] whom MDOC staffers were feuding[.]" Doc. Ent. 33 ¶ 39.  Also, plaintiff claims he met with ARUS Mackintosh on January 15, 2009 regarding the notices of intent, and Mackintosh stated, "I have never heard of a Deputy and Inspector writing a misconduct and NOI for what someone may have [written] in a letter to another facility."  Doc. Ent. 33 ¶¶ 73-75.  Plaintiff claims he has "been subject[ed] to continued retaliatory harassment and false disciplinary charges although Plaintiff had been transferred from [RRF] for over 100 days."  Doc. Ent. 33 ¶ 78.

It is defendants' position that plaintiff's transfer from RRF to ARF did not constitute an adverse action.  Doc. Ent. 35 at 10.  "[A] transfer does not constitute an adverse action since a transfer is merely an ordinary incident of prison life."  *Siggers-El v. Barlow*, 412 F.3d 693, 704 (6th Cir. 2005).  A transfer or threat to transfer constitutes an adverse action only where the transfer will result in foreseeable negative consequences, such as more restrictive living conditions or impeding access to courts.  *See Hill v. Lappin*, 630 F.3d 468, 474-475 (6th Cir. 2010); *Hix v. Tennessee Dep't of Corrections*, 196 Fed.Appx. 350, 358 (6th Cir. 2006); *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005).

As noted above, plaintiff was transferred from RRF to ARF on October 3, 2008.  Doc. Ent. 35-2 at 5.  Attachment F of MDOC PD 05.01.140 ("Prisoner Placement and Transfer"), effective December 21, 2006, lists RRF and ARF as Level II institutions.  Doc. Ent. 35-4 at 11-

13.[13]  As for plaintiff's description of ARF as a "remote[,] higher security [p]sychiatric [f]acility[,]," which is "known as a disciplinary facility, with less law library access, a documented racist history . . . where all the prisoner telephone calls are made outside the housing units in zero below weather, [and] minor rule violations are elevated to major misconduct reports by staff[,]" Doc. Ent. 33 ¶¶ 34, 37), I note Nobles's attestation that "Plaintiff was transferred from one Level II facility to another. [ARF] is not a disciplinary or mental health facility."  Doc. Ent. 35-2 ¶ 6.  *See Ward v. Dyke*, 58 F.3d 271, 275 (6th Cir. 1995) ("The transfer here was to another level II facility; the fact that a prisoner may not like a certain prison location does not automatically transform a valid transfer into a constitutional violation.  Ward has no constitutional right to remain at a specific facility or to prevent a transfer to another level II facility for a permissible reason.");[14] *Siggers-El*, 412 F.3d at 702 ("the Defendant was not only transferred, but also suffered a number of foreseeable consequences that inhibited the Plaintiff's

---

[13]Attachment C to MDOC PD 05.01.140, effective June 29, 2009, lists ARF as a Level IV institution.  Doc. Ent. 43 at 34.

To be sure, it appears that ARF is currently a multi-security facility.  The current version of MDOC PD 05.01.140, effective March 8, 2010, provides, in part, that "[s]ubject to Paragraph JJ, male prisoners in institutions with multiple security levels shall not be allowed to have contact with prisoners of a different security level at that institution except [under six listed circumstances], unless otherwise approved by the CFA Deputy Director[.]"  *Id.* ¶ II.

The current version of MDOC PD 05.01.140C, effective December 1, 2010, lists ARF as a Level IV for "Males 17 years of age or older requiring security Level IV or V who are diagnosed as mentally ill and determined by a psychiatrist to be in need of RTP [Residential Treatment Program] services."  MDOC PD 05.01.140D & MDOC PD 05.01.140E, each effective December 1, 2010, list ARF as a Level II and a Secure Level I for "Males 17 years of age or older."  MDOC PD 05.01.150F, effective March 8, 2010, lists ARF as a Level I for "Males 17 years of age or older who are not diagnosed as mentally ill and are not serving for, and do not have a history of, a sexual offense or an offense connected with a sexual act."  Finally, MDOC PD 05.01.150G, effective May 3, 2010, lists ARF as an MPRI In-Reach Facility.

[14]On the other hand, attached to plaintiff's amended complaint is a February 21, 1997 MDOC Memorandum from ARF / Parr Highway Correctional Facility (ATF) Warden Elo to staff regarding Racist Behavior.  Doc. Ent. 33 at 23.

14

ability to access the courts. As a result of the transfer, the Plaintiff not only lost his high paying

job that he needed in order to pay his attorney, but the transfer also made it more difficult for his

attorney to visit with or represent him because he was moved further away from her.").

According to defendants, "[n]o such consequences stemmed from the plaintiff's transfer."  Doc.

Ent. 35 at 11.

Petitioner cannot show that his transfer amounted to an adverse action.  While the

adverse action inquiry is ordinarily a question of fact for the jury, some "adverse actions" are so

*de minimis* that they fail to state a retaliation claim as a matter of law.  *See Bell v. Johnson*, 308

F.3d 594, 603 (6th Cir. 2002); *Thaddeus-X*, 175 F.3d at 398-99.  A transfer or threat to transfer

constitutes an adverse action only where the transfer will result in foreseeable negative

consequences, such as more restrictive living conditions or impeding access to courts.  *See Hill*

*v. Lappin*, 630 F.3d 468, 474-75 (6th Cir. 2010); *Hix v. Tennessee Dep't of Corrections*, 196

Fed. Appx. 350, 358 (6th Cir. 2006); *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005).

Defendants' affidavits establish that both RRF and ARF were, as of October 2008, Level II

prisons.  *See* Doc. Ent. 35-2 ¶ 6 (Nobles Affid.);[15] Doc. Ent. 35-4 ¶ 5 (Wade Affid.);[16] Doc. Ent.

35-4 at 11-13 (MDOC PD 05.01.140F, effective December 21, 2006).  Plaintiff has presented no

evidence to support his claim that ARF is a "disciplinary/mental" facility, other than his

averment that ARF is "known as" being more restrictive.  *See*, *i.e.*, Doc. Ent. 33 ¶¶ 34, 37, 38;

---

[15]Nobles specifically attested that "Plaintiff was transferred from one Level II facility to another. [ARF] is not a disciplinary or mental health facility."  Doc. Ent. 35-2 ¶ 6.

[16]Wade specifically attested that he "cannot authorize prisoner transfers, including the plaintiff's transfer from [RRF] (a level II facility) to Level II at [ARF], because [MDOC PD] 05.01.140, 'Prisoner Placement and Transfer,' allows only the Deputy Director or designee to approve such transfers."  Doc. Ent. 35-4 ¶ 5.

Doc. Ent. 43 at 17, 34 (MDOC PD 05.01.140C, effective June 29, 2009). This supposition is insufficient to show that plaintiff's transfer, at the time it was made, would result in foreseeable negative consequences.

In his response, plaintiff describes other allegedly adverse actions, such as "denial of restroom," and "destroying, withholding and confiscation of Plaintiff's Legal and Religious property[.]" Doc. Ent. 43 at 5. He also claims to have been labeled a security threat and that, while at ARF, he was "subjected to fabricated major misconduct reports," hindered and impeded court access, and continuous harassment. Doc. Ent. 43 at 16-17. This report treats most of these actions as consequences of the transfer and not independent adverse actions.

However, plaintiff claims he was "subjected to a manufactured major misconduct report by defendant Wade (RRF) 100 or so days after being housed at [ARF]." Doc. Ent. 43 at 6. The issuance of the December 17, 2008 major misconduct constitutes an adverse action for purposes of the First Amendment retaliation analysis. *King v. Zamiara*, 150 Fed.Appx. 485, 494 (6th Cir. 2005) ("charging an inmate with major misconduct when the charges are subsequently determined to be unfounded could deter a person of ordinary firmness from exercising his First Amendment rights[.]").

**Causation.** In any event, plaintiff cannot show a causal connection between the alleged adverse actions (transfer to ARF and issuance of a misconduct ticket) and his protected activity. If the "defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X*, 175 F.3d at 399.

First, it is defendants' position that plaintiff "would have been transferred regardless of his exercise of protected conduct." Doc. Ent. 35 at 10. With respect to plaintiff's October 3,

16

2008 transfer from RRF to ARF, I begin with the September 22, 2008 e-mail from RRF Warden

Booker asking Nobles to "review attachment and advise today whether there have been any

rumors circulating at RRF regarding a protest about the reduction in tobacco products."  That

same day, Nobles responded:

> Prisoners have been discussing a planned "passive" protest to occur on [October
> 1, 2008].  Though the reduction of tobacco product plays a major role the
> population also appears to be focused on the 10% price increase relevant to store
> goods.  This information was presented by a reliable source however attempts to
> confirm the information w[ere] unsuccessful.  The information also indicated that
> the substance of the initial protest appeared to be actions such as boycotting the
> dining hall.  Organizers were said to be prisoners Moore #100885, Hudson-Bey #
> 179401 and Corbin-Bey 136518.  I will advise if further information is received.

Doc. Ent. 35-2 at 4.  On September 30, 2008, the SCC requested transfer "due to security

concerns at RRF[,]"[17] it appears that the transfer was ordered on October 1, 2008, and the

transfer took place on October 3, 2005.  Doc. Ent. 35-2 at 5.  Defendants contend that neither

Booker nor Wade authorized plaintiff's transfer.  Doc. Ent. 35 at 10-11.  According to

defendants, RRF Deputy Warden Nobles's authorization of plaintiff's transfer was based on

"legitimate security concerns."  Doc. Ent. 35 at 11; Doc. Ent. 35-2 at 5.  As Nobles attested, he

"authorized the plaintiff's transfer to ARF on October 3, 2008 due to security concerns after

receiving information that indicated that the plaintiff was one of the organizers of a possible

---

[17]Plaintiff's MDOC Transfer Order has a section labeled, "SPON," the notes regarding which
are crossed out, and there is a handwritten note, "not for distribution to grievant[.]" Doc. Ent. 35-2
at 5.  According to MDOC PD 03.03.110 ("Special Problem Offender Notice"), effective May 20,
2002, "[s]pecific information about dangerous or potentially dangerous offenders, and known or
potential conflict situations between offenders, shall be reported, investigated and documented as
a special problem offender notice (SPON), as set forth in this policy."  The policy further provides
that "[w]henever an offender for whom a SPON has been issued transfers, SPON information shall
be included in the appropriate transfer order." *Id.* ¶ H.

planned passive protest."  Doc. Ent. 35-2 ¶ 5; *see also* Doc. Ent. 39-1 ¶ 9;[18] Doc. Ent. 35-4 ¶¶ 4-5.[19]  Citing *Hewitt v. Helms*, 459 U.S. 460, 474 (1983), defendants contend that "prison officials do not have to wait for disruption to occur before taking action[.]" Doc. Ent. 35 at 11.

In response, plaintiff questions "whether defendant[s'] motives to transfer Plaintiff violat[ed] his Constitutional Rights[.]" Doc. Ent. 43 at 5 ¶ 3.  He claims that after ten (10) to fifteen (15) days of his complaints to Michigan State Legislators, defendants transferred him to "a higher multi-secure level Psychiatric facility 77 miles from Detroit[,] [w]hile similar[ly] situated prisoners Moore and Corbin Bey remain[] at RRF enjoying programs, visitation, etc." Doc. Ent. 43 at 17.

To begin, the September 22, 2008 electronic mail, the September 30, 2008 transfer order and Nobles's affidavit suggest that plaintiff's participation in the protected conduct of September 20, 2008 at RRF was not the impetus for plaintiff's October 3, 2008 transfer to ARF.  Instead, it appears that the news of the purported October 1, 2008 passive protest was the impetus to plaintiff's transfer.

---

[18]Booker attests that "[o]n September 22, 2008, [he] requested Deputy Warden Scott Nobles to assess information [Booker] received regarding rumors of a planned protest by prisoners at [RRF]. Upon inquiry, Deputy Nobles learned that the plaintiff was one of the organizers of the protest and advised [Booker] of the received information."  Doc. Ent. 39-1 ¶ 9.

[19]In his affidavit, Wade challenges plaintiff's contention that Wade is "responsible for supervising, investigating, and authoriz[ing] transfers as a member of the facility's Security Classification Committee." Doc. Ent. 35-4 ¶ 4.  Instead, Wade explains, he is "sometimes a member of the facility's [SCC], which reviews major misconduct guilty finding[s], conducts reviews of prisoners in segregation, and initiates transfers of prisoners." Wade asserts that he "cannot authorize prisoner transfers, including the plaintiff's transfer from [RRF] (a level II facility) to Level II at [ARF], because [MDOC PD] 05.01.140, "Prisoner Placement and Transfer," allows only the Deputy Director or designee to approve such transfers."  Doc. Ent. 35-4 ¶ 5; Doc. Ent. 35-4 at 5-13.

As to the news of the purported October 1, 2008 passive protest, the Sixth Circuit has

stated:

> In assessing the seriousness of a threat to institutional security prison
> administrators necessarily draw on more than the specific facts surrounding a
> particular incident; instead, they must consider the character of the inmates
> confined in the institution, recent and longstanding relations between prisoners
> and guards, prisoners inter se, and the like. In the volatile atmosphere of a prison,
> an inmate easily may constitute an unacceptable threat to the safety of other
> prisoners and guards even if he himself has committed no misconduct; rumor,
> reputation, and even more imponderable factors may suffice to spark potentially
> disastrous incidents. The judgment of prison officials in this context, like that of
> those making parole decisions, turns largely on "purely subjective evaluations and
> on predictions of future behavior," *Connecticut Board of Pardons v. Dumschat*,
> 452 U.S. 458, 464[] (1981); indeed, the administrators must predict not just one
> inmate's future actions, as in parole, but those of an entire institution.

*Hewitt v. Helms*, 459 U.S. 460, 474 (1983). Therefore, even though there may be a connection

between learning of the purported October 1, 2008 passive protest, which this report assumes

was protected conduct, and the ultimate October 3, 2008 transfer, there may have been an

overriding security concern. In other words, plaintiff may have been transferred because,

notwithstanding the assumed protected activity of planning a passive protest, a security concern

was presented.

Furthermore, to the extent plaintiff asserts that he was not involved in such a protest and

that no protest actually happened (Doc. Ent. 43 at 11-12), for purposes of plaintiff's retaliation

claim it is irrelevant whether defendant Nobles was correct in concluding that plaintiff was

involved in a planned protest. All that matters is that this was Nobles' subjective motivation.

Plaintiff's "conclusory allegations of retaliatory motive unsupported by material facts [are] not . .

. sufficient" to defeat defendants' motion for summary judgment. *Harbin-Bey v. Rutter*, 420

F.3d 571, 580 (6th Cir. 2005) (internal quotation omitted); *see also*, *Cox v. Jackson*, 579 F. Supp.

2d 831, 848 (E.D. Mich. 2008) (Rosen J., adopting Report of Komives, M.J.).

Second, with respect to the December 17, 2008 major misconduct for insolence,[20] Wade

reported:

> On [December 17, 2008], Deputy Warden Scott Nobles, RRF, received a faxed copy of a letter from mailroom staff at TCF while screening mail for any security threats. The letter was sent to prisoner [Darnell] Bates #180982 at TCF from Hudson-Bey at ARF. The letter states in part . . . "Who really knows with a homo and a wigga in charge of Ryan. You know how Nobles and Wade operate. The letter is prefaced with his letterhead. Hudson-Bey, Gus Harrison Correctional Facility. Hudson-Bey was here at [RRF] and transferred to [ARF]. Hudson-Bey wrote (typed) the letter that clearly berates and degrades the administrative staff [a]t RRF, particularly myself, and Deputy Warden Nobles. [Identified] by OMNI and previous contact.

Doc. Ent. 35-4 at 35. Defendants claim the "outside sources" referenced in Paragraph 72 of the

amended complaint (Doc. Ent. 33 ¶ 72) was MDOC Inmate # 180982. According to defendants,

plaintiff wrote to Bates, then confined at TCF, and "TCF mailroom staff screen[ed] incoming

prisoner mail for security threats[,]" and "forwarded a copy of the letter to Defendant Nobles."

Defendants contend that "[t]he content of the letter was demeaning, derogatory and

intim[id]ating toward RRF administrative staff." Doc. Ent. 35 at 12. Wade attests that the

December 17, 2008 major misconduct report for insolence "was not written in retaliation for the

plaintiff exercising his First Amendment rights." Doc. Ent. 35-4 ¶ 7. According to Wade, he

"issued the Major Misconduct Report charging the plaintiff with 'Insolence' because [Wade] had

received information from Deputy Warden Scott Nobles, who had received a faxed copy of a

---

[20]According to MDOC PD 03.03.105, effective November 1, 2010, insolence is defined as "[w]ords, actions, or other behavior which is intended to harass, degrade, or cause alarm in an employee[,]" examples of which include "[u]sing abusive language to refer to an employee; writing about or gesturing to an employee in a derogatory manner."

letter written by the Plaintiff from staff at [TCF] which contained demeaning language that

[Wade] believed was directed at [him]. The letter stated, in part '. . . [w]ho really knows with a

homo and a wigga in charge of Ryan. You know how Nobles and Wade operate.'" Doc. Ent. 35-

4 ¶ 8.[21]  Furthermore, Hearing Officer Falkenstein's January 14, 2009 report indicates:

> On the first page [of the letter] is heading, Hudson Bey, giving ARF address. At
> the bottom of the page appears "A179401.["]. . .
>
> Copy of envelop[e] . . . has [Jeffery] Turner 263868 on return address.

Doc. Ent. 35-4 at 36-37. And, before dismissing the misconduct for a procedural reason,

Falkenstein found:

> I find that prisoner's claims of retaliation and claim of First Amendment rights are
> baseless. The letter speaks for itself. The prisoner's name appears at the top of
> the letter, first page and his number appears at the bottom. He wrote the letter.
> The term 'homo' is an abbreviated and generally derogatory term applied to
> homosexual individuals. It is commonly known slang or vernacular language.
> The term 'wigga' refers to a white person who copies or emulates the speaking,
> dress, and cultural tastes in the arts of a black person, or a white person who
> seems to want to be a black person. This term is not as universally known as the
> term 'homo', but it is well known. Both terms are derogatory. The letter uses
> demeaning language about staff.

Doc. Ent. 35-4 at 36. In this regard, Wade contends, "[t]he misconduct was dismissed on

January 14, 2009 by Hearings Officer Falkenstein because the misconduct report had not been

reviewed within 24 hours of receipt by staff at [ARF], not because the misconduct was falsified

or exaggerated, as falsely alleged by the plaintiff." Doc. Ent. 35-4 ¶ 9. As Wade points out, HO

Falkenstein noted that plaintiff wrote the letter, noted that "homo" and "wigga" are derogatory

terms, and noted that "[t]he letter uses demeaning language about staff." Doc. Ent. 35-4 at 36.

---

[21]Perhaps this mail was intercepted in accordance with Paragraph CC of MDOC PD
05.03.118 ("Prisoner Mail"), effective January 1, 2006, a copy of which is circled and attached to
the motion. Doc. Ent. 35-4 at 38-48.

In the end, defendants contend that "plaintiff passed insolent material along to another inmate through the mails[,]" "[plaintiff's] actions constitute[d] a security threat warranting disciplinary action because the content of the mail could be shared with other prisoners, one or more of whom could have been transferred to RRF[,]" and "[i]nmates are expected to obey authority, and failing to take appropriate measures to deter insolent behavior could increase the risk of future inappropriate behavior by the plaintiff or by other prisoners." In sum, defendants argue that Wade "was not motivated by the exercise of protected conduct, but instead, to deter inappropriate behavior by prisoners and to maintain institutional control." Doc. Ent. 35 at 13.

Bates's January 11, 2010 declaration, signed under penalty of perjury (28 U.S.C. § 1746), is attached to plaintiff's response. Therein, Bates contends he was confined at TCF from 2000 until September 2009, he learned of plaintiff's transfer from RRF to ARF during October 2008, and Bates "went on a letter writing campaign and wrote letters to several prisoners at [RRF], Mound [Correctional Facility (NRF)], and [ARF] inquiring about [plaintiff]." According to Bates, one of the letters he received in October 2008 "mentioned several possible reasons why [plaintiff] was transferred from [RRF][,]" and "[t]he envelop[e] [Bates] received had the return name of Turner with no signature, but [it was] backed with information and allegations of amusement." Allegedly, plaintiff wrote to Bates in December 2008 and "inquired as to whom I may have received a letter from and what [were] its [contents]." Bates attests that he "was not aware that the mailroom staff at [TCF] copied a letter address[ed] to [Bates] in October 2008, held it for 2 months, then forwarded it to [RRF] for a misconduct on [plaintiff] [in] December 2008." Doc. Ent. 43 at 36-37 (Darnell Bates #180982).

22

Plaintiff's response takes issue with the delay between the October 2008 letter to Bates and the December 17, 2008 major misconduct report for insolence written by Wade and witnessed by Noble, notes that the envelope was from Turner and the letter was not signed by plaintiff. Plaintiff also contends, "[t]he letter obviously was not intended for RRF staff." Doc. Ent. 43 at 13-14. Furthermore, plaintiff contends that Wade at RRF could not genuinely have felt demeaned by comments "between two people at two different facilities [ARF and TCF], [at] neither of which Wade is employed." It is plaintiff's position that "Wade and Nobles abuse[d] their authority to fabricate the misconduct on Plaintiff for using the grievance process and being interviewed [at ARF] by Internal Affairs Investigator Mane [on December 17, 2008]." Doc. Ent. 43 at 14.

Still, the Court should conclude that plaintiff has no basis for his belief that Wade would not have issued the December 17, 2008 insolence misconduct ticket to plaintiff on December 18, 2008 in the absence of plaintiff's September 20, 2008 protected conduct, or even in the absence of plaintiff's prosecution of his November 24, 2008 Step II Grievance Appeal in RRF-08-10-00646-19z (regarding which plaintiff contends that Mane's visited ARF on December 17, 2008) to which ARF Warden Booker responded on December 31, 2008 (Doc. Ent. 33 at 25-32).

To be sure, the record does not contain evidence of the letter underlying plaintiff's misconduct ticket, other than the portions quoted in the December 2008 misconduct report. However, even though Bates appears to attest that the letter he received in October 2008 is the one underlying plaintiff's December 2008 misconduct ticket (Doc. Ent. 43 at 37 ¶ 11), plaintiff's own December 23, 2008 Step I grievance in RRF-00322 admits that the envelope of the offending letter was postmarked November 2008 (Doc. Ent. 33 at 36). Furthermore, this

23

postmark lends support to Wade's December 18, 2008 statement that Nobles received the letter

by fax at RRF from TCF on December 17, 2008 (Doc. Ent. 35-4 at 35).  And, beyond the issue

of timing, Hearing Officer Falkenstein's January 14, 2009 hearing report - which eventually

dismissed the major misconduct on procedural grounds - found that "prisoner's claims of

retaliation and claim of First Amendment rights [we]re baseless[,]" Doc. Ent. 35-4 at 36.[22]

## CONSPIRACY

Plaintiff's complaint describes "[d]efendants' individual participation in the 42 [U.S.C.] §

1983 conspiracy[.]"  Doc. Ent. 33 ¶¶ 44-60.[23]  Furthermore, Count II alleges that Booker,

Nobles, Wade and Curenton conspired to transfer plaintiff to ARF, described by plaintiff as "a

mental facility known for its racism."  Doc. Ent. 33 ¶ 82.

"A civil conspiracy is an agreement between two or more persons to injure another by

unlawful action. Express agreement among all the conspirators is not necessary to find the

existence of a civil conspiracy. Each conspirator need not have known all of the details of the

---

[22]In his original complaint, plaintiff contended that MDOC PD 03.03.105 ("Prisoner Discipline") is unconstitutional.  Doc. Ent. 1 at 11.  In his January 20, 2011 response, plaintiff questioned "[w]hether [the] prison regulation and attachment [were] vague and over broad."  Doc. Ent. 43 at 5 ¶ 6; *see also* Doc. Ent. 43 at 14, 17.

[23]Plaintiff's complaint alleges that he "had transfer holds on him for the University of Michigan and Chance for Life Classes, by Warden Booker[.]"  Doc. Ent. 33 ¶ 26.  According to plaintiff, on October 3, 2008, he informed Atcher that "the Warden has two holds on me.  Deputy Nobles should NOT be able to transfer me."  Doc. Ent. 33 ¶ 29.  Among plaintiff's paragraphs on conspiracy are his assertions that "Booker had an agreement with the U of M Professor not to transfer any participants in the Think Tank Program[,]" and that Booker directly authorized plaintiff's transfer, thereby removing the transfer hold.  Doc. Ent. 33 ¶¶ 44, 59; *see also* Doc. Ent. 33 ¶¶ 56-60.

In his January 5, 2011 affidavit, Booker attests, "plaintiff's contention that he had 'holds' preventing his transfer from RRF is false."  Doc. Ent. 39-1 ¶ 8.  However, plaintiff's response points to Professor Lempert's October 13, 2008 letter, wherein she states that the Warden "told [her] that he was eliminating the 'hold' on the Theory Group."  Doc. Ent. 43-1 at 20-21.

illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Weberg v. Franks*, 229 F.3d 514, 526 (6th Cir. 2000) (citing *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir.1985)). "Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, ... circumstantial evidence may provide adequate proof of conspiracy." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000) (citing *Bell v. City of Milwaukee*, 746 F.2d 1205, 1255 (7th Cir.1984)).

According to defendants, "plaintiff avers no facts showing a meeting of the mind or coordinated actions between the alleged co-conspirators. Instead, the plaintiff avers statements and actions by one of the defendants, and non-defendants, the fact of his transfer." Doc. Ent. 35 at 9. Citing certain paragraphs of plaintiff's amended complaint (Doc. Ent. 33 ¶¶ 5-18), defendants contend that plaintiff's allegations, at most, "might suggest problems between the plaintiff and Officer [Curenton] but make no showing of a meeting of the minds between [Curenton] and Defendants Booker, Nobles, and Wade or their commission of [an] act causing injury to the plaintiff." Doc. Ent. 35 at 9-10.

Nobles attests that "plaintiff's contention that he was transferred from RRF to [ARF] in October of 2008 as part of a conspiracy with other staff as an act of retaliation is false." Doc. Ent. 35-2 ¶ 4. Booker attests that he "did not conspire with anyone with respect to the plaintiff's transfer or his property." Doc. Ent. 39-1 ¶ 10.

In response, plaintiff questions "[w]hether defendants had a single plan to injure plaintiff by unlawful actions[.]" Doc. Ent. 43 at 5 ¶ 2. For example, plaintiff contends, "Nobles agreed

25

with Booker, Wade, and Atcher to transfer Plaintiff for his complaints to state lawmakers." Doc. Ent. 43 at 8; *see also* Doc. Ent. 43 at 9-11. Plaintiff also attaches the undated declaration of RRF prisoner Boone Bey, wherein he claims that in February 2009 he overheard Curenton admit to having plaintiff transferred from RRF. According to Boone Bey, Curenton "stated how she [fabricated] her fears of [plaintiff] and threatened ADW Chapman with paperwork if they didn't transfer [plaintiff]." Doc. Ent. 43 at 32 (Boone).

However, if the Court agrees with the other conclusions reached in this report, then it need not address plaintiff's conspiracy claims. This is so, because plaintiff "cannot succeed on a conspiracy claim because there was no underlying constitutional violation that injured [him]." *Wiley v. Oberlin Police Dept.*, 330 Fed.Appx. 524, 530 (6th Cir. 2009).

## ACCESS TO COURTS

The First Amendment sets forth "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. According to plaintiff, on October 3, 2008, he informed Atcher that he had "legal briefs that are time sensitive and need to be filed." Doc. Ent. 33 ¶ 32.

Plaintiff alleges that the retaliatory transfer and confiscation of his legal materials and religious property "deliberately placed Plaintiff in harm of . . . loss of appeal in his criminal conviction[.]" Doc. Ent. 33 ¶ 38. In Count III of his complaint, plaintiff claims that defendants Curenton, Ridley and Atcher were deliberately indifferent to plaintiff's constitutional rights "when they engaged in conduct causing the illegal transfer, and destroying Plaintiff's legal papers preventing his meaningful access to the Court and Religious items[,]" in violation of the

26

First Amendment.  Doc. Ent. 33 ¶ 83.  Later, plaintiff claims he "[s]uffered the loss of this criminal appeal in state and federal courts."  Doc. Ent. 33 ¶ 93.

According to defendants, "the only allegations remotely applicable to an access to the courts claim relate to the packing of the plaintiff's property[,]" and "[t]he only Defendant who was involved in the handling of the plaintiff's property was Defendant Atcher."  Doc. Ent. 35 at 13; Doc. Ent. 35-5.[24]  Also, defendants contend, "[t]here is no indication that any of the State Court proceedings were impacted by [plaintiff's] transfer from RRF to ARF[,]" and "plaintiff lacks standing to assert a First Amendment access to the courts claim because he has suffered no 'actual injury' to a non-frivolous action, as a result of any action by any of the defendants."  Doc. Ent. 35 at 14-15.

Plaintiff is currently serving life sentences for two January 28, 1984 murders in the first degree.  *See* www.michigan.gov/corrections, "Offender Search;" Case No. 84-0868 (Wayne County) and Case No. 84-62537-FC (Oakland County).  Plaintiff has filed petitions for writs of habeas corpus as to each of these cases:

1.  Plaintiff was sentenced in the Wayne County case on April 24, 1985. Case No. 84-0868.  He filed an appeal on May 20, 1985.  His conviction was affirmed on September 16, 1986.  Plaintiff filed a delayed application for leave to appeal on November 4, 1986.  The February 13, 1987 motion for reconsideration was denied on April 27, 1987.  Case No. 85031(Mich. App.), Case No. 79457 (Mich.).

---

[24]Nobles attests that he "had no involvement in processing, packing[,] itemizing, or transferring the plaintiff's property for the transfer, including any legal or religious materials."  Doc. Ent. 35-2 ¶ 7.  Booker similarly attests that he "had no involvement in processing, packing[,] itemizing, or transporting the plaintiff's property, including any religious materials[.]" Doc. Ent. 39-1 ¶ 10.  Likewise, Wade attests that he "had no involvement in the processing, searching, packing, withholding, or confiscation of the plaintiff's property for transfer."  Doc. Ent. 35-4 ¶ 6.  Finally, Ridley attests that he "did not have any role in processing, packing, moving, or other involvement regarding the plaintiff's property, including religious and/or legal property."  Doc. Ent. 35-6 ¶ 13.

On February 5, 1996, plaintiff filed a delayed application for leave to appeal regarding the January 10, 1996 order in the Wayne County case. The application was denied on May 22, 1996. On July 17, 1996, plaintiff filed a delayed application for leave to appeal in the Michigan Supreme Court. It appears to have been denied on April 25, 1997. *People v. Hudson*, Case No. 192446 (Mich. App.), Case No. 106832 (Mich.).

Plaintiff filed a petition for writ of habeas corpus on April 23, 1998. Case No. 2:98-cv-71756-AC-DAS. Ultimately, the petition was dismissed on June 17, 2005. The United States Supreme Court denied the petition for writ of certiorari on October 10, 2006.

On December 10, 2010, plaintiff filed a delayed application for leave to appeal regarding the October 1, 2010 order in the Wayne County case. *People v. Hudson*, Case No. 301529 (Mich. App.).

2.   Plaintiff was sentenced in the Oakland County case on February 27, 1986. Case No. 84-62537-FC. On September 16, 1987, the Michigan Court of Appeals affirmed Hudson's conviction. Case No. 92011 (Mich. App.). On November 1, 2007, the trial court denied Hudson's motions for relief from judgment, for an evidentiary hearing and for resentencing. On January 10, 2008, the trial court denied Hudson's motion for reconsideration.

On November 10, 2008, plaintiff filed a delayed application for leave to appeal.[25]  On November 21, 2008, the Court of Appeals informed plaintiff that his submission was defective. Doc. Ent. 43-1 at 49. On or about December 17, 2008, the Court of Appeals informed plaintiff that the copy of the prisoner account statement he had provided was too old. Doc. Ent. 43-1 at 50.[26]  On January 7, 2009, the Court of Appeals denied the motion to waive fees but provided for a reduced entry fee of $79. The reduced filing fee was received on or about January 28, 2009. By a letter dated February 20, 2009, the Michigan Court of Appeals informed plaintiff that the matter was filed. Doc. Ent. 43-2 at 1.

---

[25]Plaintiff has provided a copy of his November 6, 2008 MDOC Disbursement Authorization for legal postage to the Michigan Court of Appeals. Doc. Ent. 43-2 at 4.

[26]Plaintiff has provided a copy of his December 22, 2008 MDOC Disbursement Authorization for legal postage to mail an Account Statement to the Michigan Court of Appeals. Doc. Ent. 43-2 at 5.

On April 2, 2009, the Michigan Court of Appeals denied plaintiff's delayed application for leave to appeal and denied the motion to remand.  Doc. Ent. 43-2 at 2.  On May 12, 2009, the Michigan Court of Appeals denied the motion for reconsideration.  Doc. Ent. 43-2 at 3.  On January 29, 2010, the Michigan Supreme Court denied the application for leave to appeal.  On April 27, 2010, the Michigan Supreme Court denied the motion for reconsideration. Case No. 288872 (Mich. App.), Case No. 139122 (Mich.).

On May 13, 2010, plaintiff filed a petition for writ of habeas corpus in this Court with respect to his Oakland County conviction.  Doc. Ent. 35-7.  Judge Duggan entered judgment on June 6, 2011.  However, on June 28, 2011, Hudson filed a notice of appeal. *See Hudson v. Howes*, Case No. 2:10-cv-11937-PJD-CEB.

Plaintiff has also filed the instant prisoner civil rights case.  Case No. 5:09-cv-14109-JCO-PJK.

Plaintiff's October 21, 2010 complaint does not clarify which of plaintiff's criminal appeals were harmed by the transfer and property confiscation / destruction.  However, plaintiff's January 20, 2011 response clarifies that his access to courts claim is based upon his post-conviction efforts in the Oakland County case.  Plaintiff claims that RRF-00646 - which he initiated on October 5, 2008 (Doc. Ent. 39-1 at 5) - placed defendants on notice that plaintiff had a November 2008 legal deadline and that several items, including legal papers, were missing from plaintiff's property.  Apparently, plaintiff is taking issue with his November 10, 2008 delayed application for leave to appeal the trial court's November 1, 2007 order, which the Michigan Court of Appeals denied on April 2, 2009 (Doc. Ent. 43-2 at 2).  Doc. Ent. 43 at 18-19. In his January 20, 2011 response, plaintiff essentially argues that "defendants withheld and destroyed plaintiff's non frivolous legal material intentionally hindering and impeding his access to court, causing the dismissal for missing court deadline."  Doc. Ent. 43 at 5 ¶ 4.

"The tools [*Bounds v. Smith*, 430 U.S. 817 (1977)] requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Lewis v. Casey*, 518 U.S. 343, 355 (1996).

Here, although plaintiff has alleged a specific, litigation-related detriment resulting from defendants' alleged actions, the evidence does not support his allegations or indicate that plaintiff lost "a nonfrivolous, arguable, underlying claim," *Christopher*, 536 U.S. at 415, as a result of defendants' actions.  Plaintiff contends that his application for leave to appeal the denial of his motion for relief from judgment was the result of him not timely filing a prisoner account statement.  *See* Doc. Ent. 43 at 18-19.[27]  However, it is clear that the Michigan Court of Appeals, and the Michigan Supreme Court thereafter, denied plaintiff's applications for leave to appeal based on his "fail[ure] to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Hudson*, No. 288872 (Mich. App. Apr. 2, 2009); *People v. Hudson*, 485 Mich. 1074, 777 N.W.2d 176 (Jan. 29, 2010).[28]  Nothing in this language suggests that any

---

[27]Within the access to courts portion of plaintiff's January 20, 2011 response, he refers to his November 2008 disbursement authorization (Doc. Ent. 43-2 at 4); the Michigan Court of Appeals December 17, 2008 letter (Doc. Ent. 43-1 at 50); his December 2008 disbursement authorization (Doc. Ent. 43-2 at 5); the Michigan Court of Appeals letter dated February 20, 2009 (Doc. Ent. 43-2 at 1); the Michigan Supreme Court's April 2, 2009 order (Doc. Ent. 43-2 at 2); the Michigan Supreme Court's May 12, 2009 order (Doc. Ent. 43-2 at 3) with regard to his state court appeal.

Plaintiff also refers to the Sixth Circuit's November 23, 2010 order in Case No. 10-1893 dismissing the matter as moot pursuant to Judge Duggan's August 30, 2010 order in 10-11937 granting plaintiff's July 19, 2010 motion for relief from judgment (Doc. Ent. 43-1 at 47).

[28]Neither party has submitted the relevant state court documents.  However, the documents were submitted as part of the State's answer to plaintiff's habeas corpus petition filed in this Court, docketed as Case No. 2:10-cv-11937.  Pursuant to FED. R. EVID. 201 (court may take judicial notice of any fact "capable of accurate and ready determination by resort to sources whose accuracy cannot

30

procedural failure resulted in dismissal of plaintiff's appeal; rather, the appeal was denied because, in the court of appeals's view, plaintiff had not meet his burden of establishing his entitlement to relief from judgment. Thus, plaintiff has failed to establish that he suffered a specific, litigation related harm from defendants' alleged actions, and the Court should conclude that defendants are entitled to summary judgment on this claim.

**ii.      Eighth Amendment.** Of the seven (7) counts in plaintiff's complaint, Counts II, III, IV and VI mention "deliberate indifference," "cruel and unusual punishment," and/or the Eighth Amendment. Doc. Ent. 33 ¶¶ 82, 83, 84, 86. Plaintiff's complaint describes the alleged circumstances of his preparation for transfer on October 3, 2008, including requests for use of the restroom, use of the term "black ass" by Ridley, Atcher and others' handling of plaintiff's property for transfer, Officer Brown's statement that the RRF Administration is corrupt and that "Nobles and Wade [are] behind all this[,]" Atcher's statement that Nobles and Wade wanted to look over plaintiff's property and that they "got [plaintiff's] ass out of here so [he] couldn't use the phone to stop the transfer." Doc. Ent. 33 ¶¶ 18-33.

As an initial matter, defendants point out that Nobles authorized plaintiff's transfer. Doc. Ent. 35-2 ¶ 5. Furthermore, defendants argue that plaintiff "avers no facts suggesting actions committed by [Atcher] that 'caused' [plaintiff's] transfer and no facts suggesting . . . Ridley's involvement in the handling of [plaintiff's] property." Also, citing the transfer order (Doc. Ent.

---

reasonably be questioned."), the Court may take judicial notice of its own records and those of sister courts. *See United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (court may take judicial notice of court order for purpose of recognizing "judicial act" which the order represents); *St. Louis Baptist Temple, Inc. v. Federal Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("Judicial notice is particularly applicable to the court's own records of prior litigation closely related to the case before it."); *Isaac v. Jones*, 529 F. Supp. 175, 179 n.2 (N.D. Ill. 1981).

35-2 at 5) and MDOC PD 05.01.140F (Doc. Ent. 35-4 at 11-13), defendants contend that "the allegations of a transfer to 'psychiatric facility' and a 'fabricated security classification' are simply false." Doc Ent. 35 at 15.

Next, defendants address plaintiff's claims that Ridley placed plaintiff in a dry tank and refused to give him access to the restroom on the morning of his October 3, 2008 transfer; plaintiff urinated on himself; and guards laughed at plaintiff. Doc. Ent. 35 at 15-16. That plaintiff's Eighth Amendment claim is based upon the alleged deliberate denial of his ability to use the bathroom is confirmed by his response to the instant motion. Doc. Ent. 43 at 20-23; *see also* Doc. Ent. 43 at 38-39 (Declaration of Leon Douglas (presumably #132125)).

The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates[.]'" *Farmer v. Brennan*, 511 U.S. 825, 832-833 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)).

Objectively, examples of conditions of confinement which would constitute cruel and unusual punishment include "deprivations of essential food, medical care, or sanitation[,]" or "increase violence among inmates or create other conditions intolerable for prison confinement." *Rhodes v. Chapman*, 452 U.S. 337, 348 (1981). Defendants argue that plaintiff has not made such a showing and that plaintiff's allegation that he had to urinate on himself cannot be sustained. Doc. Ent. 35 at 16. Here, defendants rely upon Ridley's affidavit, wherein Ridley claims to have escorted plaintiff to segregation on October 3, 2008 "to ensure that officers searched him prior to placing him in the intake area because he was transferring to another

32

facility." Doc. Ent. 35-6 ¶ 5; however, the log book indicates that CO Smith and CO Kirchoff

escorted plaintiff to segregation at 7:17 a.m. Doc. Ent. 35-6 at 5-6. In any event, it appears that

at 7:24 a.m. plaintiff was strip searched, no contraband was found, and he was placed in the

holding tank at Lt. Baraboll's direction. Doc. Ent. 35-6 ¶ 8; *see also* Doc. Ent. 35-6 at 5-6 (Log

Book). Here, defendants appear to rely upon Ridley's attestations that he "did not deny the

plaintiff access to a restroom on October 3, 2008 and did not make any of the statements

attributed to [Ridley] by the plaintiff[,]" Doc. Ent. 35-6 ¶ 9; "the holding tank has a toilet, so the

plaintiff could have used that toilet if he needed to urinate[,]" Doc. Ent. 35-6 ¶ 10; and "even if

the plaintiff had been placed in a 'dry cell' as alleged by him, he would have been able to use a

toilet to urinate, because a 'dry cell' is simply a prisoner room/cell with the water supply cut off.

All prisoner rooms/cells in segregation have a sink and toilet[,]" Doc. Ent. 35-6 ¶ 11. In

addition, Ridley attests that he "did not observe the plaintiff urinate on himself, nor did [Ridley]

laugh at him[,]" Doc. Ent. 35-6 ¶ 12.

Subjectively, "a prison official cannot be found liable under the Eighth Amendment for

denying an inmate humane conditions of confinement unless the official knows of and disregards

an excessive risk to inmate health or safety; the official must both be aware of facts from which

the inference could be drawn that a substantial risk of serious harm exists, and he must also draw

the inference. This approach comports best with the text of the Amendment as our cases have

interpreted it. The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it

outlaws cruel and unusual 'punishments.'" *Farmer*, 511 U.S. at 837.

The Court should agree with defendants that "plaintiff faced no excessive risk to his health or safety as a result of being transferred or from the handling of his personal property items and had access to a toilet on the morning of his transfer."  Doc. Ent. 35 at 16.

Furthermore, plaintiff's complaint describes ARF - the prison to which he was transferred.  Doc. Ent. 33 ¶¶ 34-37.  For example, plaintiff alleges, ARF houses mentally ill prisoners in the Secure Status Resident Treatment Program (SSRTP), as well as Outpatient Mental Health prisoners, and Residential Treatment Program prisoners.  Doc. Ent. 33 ¶ 34.

To the extent plaintiff's Eighth Amendment claim is based upon his description of life at ARF,[29] it is instructive to consider a Sixth Circuit case wherein an Eighth Amendment claim regarding the risk of a transfer was at issue.  In *Taylor v. Michigan Department of Corrections*, 69 F.3d 76 (6ᵗʰ Cir. 1995), plaintiff's Eighth Amendment claim alleged that the Warden of the State Prison of Southern Michigan "knew about the risk of sexual assault in the camp program to small, vulnerable-looking prisoners such as plaintiff and neither had a policy to identify and screen out those potential transferees who would not be safe in the camp nor created guidelines for prison staff to follow when screening inmates for transfer."  *Taylor*, 69 F.3d at 77. Ultimately, the Sixth Circuit concluded that "there [we]re disputed questions of material fact concerning whether Warden Foltz had any procedures in place to review transfer orders to insure that his authority over transfers was not being abused and to insure that inmates' files were being properly examined before transfer."  *Taylor*, 69 F.3d at 84.  The Court also concluded that

---

[29]Attached to plaintiff's response are several declarations / affidavits regarding plaintiff and/or conditions at ARF.  *See* Doc. Ent. 43 at 33 (Anthony LaCalamita #668596), Doc. Ent. 43 at 41 (James Alexander #136531); Doc. Ent. 43 at 42 (Ryan Cobley #214866); Doc. Ent. 43 at 43 (Dwane Collins #281113).

"[t]riable issues of fact [existed] as to whether plaintiff falls into that category of inmates especially vulnerable to sexual assault, whether plaintiff was subjected to a substantial risk of serious harm by his transfer to Camp Pugsley, whether Camp Pugsley was in fact more dangerous to prisoners like Taylor than Jackson Prison, and whether Warden Foltz knew of the risk that the camp presented but failed to take reasonable steps to insure that his vulnerable wards were not transferred there." *Id*.

According to plaintiff, Nobles "was very familiar with the potential[ly] heightened dangers in transferring Plaintiff to a Mental Health Facility because he was employed at the Huron Valley Men's Facility [HVM] where the [ARF] Psychiatric SSRTP and RTP programs were being transferred." Doc. Ent. 43 at 8. Furthermore, citing *Nobles v. Brown*, 985 F.2d 234 (6th Cir. 1992),[30] plaintiff states: "Prison folklore bears that Nobles' wife was assaulted as a prison guard by a patient in the Huron Valley program. [Therefore, Nobles had] 'first hand knowledge' of the dangers he was exposing Plaintiff to by transferring him to ARF prior to trained HVM SSRTP staff arriving." Doc. Ent. 43 at 8 n.1.

However, there is no indication that defendants knew of a substantial risk of serious harm to plaintiff at ARF.

**iii.     Fourteenth Amendment.**  Plaintiff's Count IV is a Fourteenth Amendment due process claim against defendant Booker.  Doc. Ent. 33 ¶ 84.  Plaintiff claims that Booker denied plaintiff due process under the Fourteenth Amendment and subjected him to cruel and unusual

---

[30]The plaintiff in this case was Elizabeth K. Nobles, a corrections officer at the Huron Valley Correctional Facility. *Nobles*, 985 F.2d at 235. Among other things, the Court stated, "[h]owever derelict in their duties the defendant prison officials may have been here, it cannot be said that they deliberately decided to have plaintiff Nobles taken captive and raped[.]" *Id*. at 236.

punishment under the Eighth Amendment when Booker "engaged in conduct to cover up the acts of commissions of his junior staff [Nobles, Wade, Curenton and Ridley][.]" Also, plaintiff alleges that defendants "failed to take corrective action to prevent the unwarranted retaliatory tactics and fail[ed] to act, thereby resulting in suffering to Plaintiff and creat[ing] a chilling effect on his First Amendment Rights." Doc. Ent. 33 ¶ 89.

### SUPERVISORY LIABILITY / PERSONAL INVOLVEMENT

At the outset, I note the conclusory nature of this claim against Booker. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2004).

Furthermore, Booker attests that his "involvement in the incidents forming the basis of the claims asserted by the plaintiff in this action was limited to the investigation of and issuance of responses to Step II Grievance Appeals filed by the inmate and to ask staff to assess reported rumors of a planned protest by RRF prisoners." Doc. Ent. 39-1 ¶ 3.

To the extent Count IV is based upon Booker's December 31, 2008 Step II grievance appeal response, which denied in part and deemed resolved in part in RRF-08-10-00646-19z (Doc. Ent. 39-1 at 9-10) or Booker's March 31, 2009 Step II grievance appeal response, which denied RRF-09-01-00032-27z (Doc. Ent. 39-1 at 15-16), such claims fail to state a claim upon which relief may be granted. Where defendants' "only roles . . . involve the denial of administrative grievances or the failure to act . . . they cannot be liable under § 1983." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (on appeal from denial of dispositive motion based upon qualified immunity, "Shehee's only allegations against Crosley, Hambrick, Henry and

36

Miner involve their denial of his administrative grievances and their failure to remedy the alleged retaliatory behavior. With respect to Luttrell, Shehee's only claim is Luttrell's alleged failure to intervene on Shehee's behalf.").

Additionally, "Section 1983 liability must be premised on more than mere respondeat superior, the right to control one's employees. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir.1999). A supervisor is not liable under § 1983 for failing to train unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id*. (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir.1982))." *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).

In response to defendants' dispositive motion, plaintiff points out that Booker initiated the September 22, 2008 electronic mail, removed the "hold" on transferring plaintiff (which permitted Nobles to transfer plaintiff to ARF), and did not respond to plaintiff's letter asking Booker to rescind the transfer. Doc. Ent. 43 at 9, 13. However, even if Warden Booker removed the hold on the Theory group, as Professor Lempert stated in her October 13, 2008 letter (Doc. Ent. 43-1 at 20-21), these allegations do not show that Booker encouraged or directly participated in an incident of misconduct.

### PROCEDURAL DUE PROCESS

According to defendants, Atcher was the only defendant to handle plaintiff's property items. Doc. Ent. 35 at 16. According to plaintiff, on October 3, 2008, Atcher informed plaintiff,

"you're out of here now, your shit is packed. . . . I gave your food and walkman to my buddies." Doc. Ent. 33 ¶ 33.

Atcher attests that "[o]n October 3, 2008, [she] assisted Officer Blanchett in packing the plaintiff's property in accordance with MDOC [PD] 04.07.112, "Prisoner Personal Property," which limits prisoner property to the amount of property that can fit in one duffel bag and one footlocker." Doc. Ent. 35-5 ¶ 4; *see also* Doc. Ent. 35-5 at 5-13. According to Atcher, "plaintiff had property in excess of what is allowed by the policy." Doc. Ent. 35-5 ¶ 5. Atcher "separated the excess property from the property that was allowable and was required to examine the property to ensure the plaintiff's property contained no unauthorized/contraband." Doc. Ent. 35-5 ¶ 6.

Atcher explains that she prepared three (3) handwritten "Notices of Intent to Conduct an Administrative Hearing," on October 3, 2008 and October 6, 2008. According to Atcher, ARUS White "later repacked the property and retyped the three notices[,]" Atcher "inadvertently signed one of the notices dated October 6, 2008 in the wrong section, indicating that [she] personally gave the notice to the plaintiff on October 1,4 2008." Atcher explains that this was not so, because plaintiff had already transferred, and further explains that "October 14, 2008 is [the] date that ARUS White presented the typed notices dated October 6, 2008 to [Atcher]. [White] had signed the form in the section titled "Reporting Staff Member's Signature", although [Atcher's] name was in the section titled "Reporting Staff Member's Name (Print)[.]"" Doc. Ent. 35-5 ¶ 7; *see also* Doc. Ent. 35-5 at 2-4 [Atcher's Affidavit]; Doc. Ent. 35-5 at 14 (10/3/08 Notice of Intent to Conduct an Administrative Hearing - Excess Property, issued by RRF RUO L. Atcher); Doc. Ent. 35-5 at 15 (10/6/08 Notice of Intent to Conduct an Administrative Hearing

38

- Disposition of personal books, issued by RRF ARUS C. White); Doc. Ent. 35-5 at 16 (10/6/08 Notice of Intent to Conduct an Administrative Hearing - Catch-up personal property, issued by RRF RUO L. Atcher).

Atcher claims that, "[a]t no time did [she] reach the plaintiff's books or legal materials or destroy any of the plaintiff's property, personal, legal or otherwise[,]" and she "transported the plaintiff's property to the Property Room." Doc. Ent. 35-5 ¶¶ 8-9. Atcher further attests that "[a]t no time did [she] speak with the plaintiff about his transfer, his property, or anything else. All of the statements attributed to [her] by the plaintiff in his civil rights complaint are false." Doc. Ent. 35-5 ¶ 10.

Furthermore, citing M. Myles's November 12, 2008 Step I grievance response in RRF-08-10-00646-19z, defendants note that Hudson's property and property receipts were sent as catch-up property to ARF on October 16, 2008. Doc. Ent. 39-1 at 6. However, plaintiff supplies a handwritten prisoner kite dated October 28, 2008 to Mackintosh at ARF regarding the status of his catch-up property and KTV from RRF, including a handwritten notation - "I have not received notification that catch up property has been received. I will let you know when I do." Doc. Ent. 43-1 at 40.

The Fourteenth Amendment does not protect against all of the State's deprivations of life, liberty, or property. *Parratt v. Taylor*, 451 U.S. 527, 537 (1981). It protects against only those deprivations of life, liberty, or property that are "without due process of law." *Id*. Accordingly, the Supreme Court has recognized that the negligent deprivation of an inmate's property does not violate due process if the state provides an adequate remedy to redress the wrong. *Parratt*, 451 U.S. at 537, overruled in part by *Daniels v. Williams*, 474 U.S. 327, 328 (1986) (negligence does

39

not amount to a "deprivation" at all, thus the Due Process Clause is not implicated).  Likewise,

"an unauthorized intentional deprivation of property by a state employee does not constitute a

violation of the procedural requirements of the Due Process Clause of the Fourteenth

Amendment if a meaningful postdeprivation remedy for the loss is available."  *Hudson v.

Palmer*, 468 U.S. 517, 533 (1984).[31]  In asserting a violation of procedural due process, a

plaintiff must plead and prove that available state procedures for redressing the wrong are not

adequate.  *Vicory v. Walton*, 721 F.2d 1062, 1065-66 (6th Cir. 1983); *see also, Wilson v. Beebe*,

770 F.2d 578, 584 (6th Cir. 1985) (en banc).  "Although the state remedies may not provide the

respondent with all the relief which may have been available if he could have proceeded under §

1983, that does not mean that the state remedies are not adequate to satisfy the requirements of

due process."  *Parratt*, 451 U.S. at 544.

In response, plaintiff claims that RUM White, prisoner Johnson and others "were directly

observed helping themselves to Plaintiff's property."  Doc. Ent. 43 at 23-25; *see also* Doc. Ent.

43 at 38-39 (Declaration of Leon Douglas (presumably #132125)).  And, in responding to the

access to courts claim, plaintiff contends that Atcher violated MDOC PD 04.07.112.  Doc. Ent.

43 at 19.

To the extent plaintiff contends that the handling of his property violated his procedural

due process rights, this report and recommendation applies the analysis set forth in *Parratt*,

wherein the Supreme Court stated:

---

[31]*See also McGinnis v. Woods*, No. 87-2080, 1988 WL 23713, 1 (6th Cir. Mar. 16, 1988)
("Plaintiff[']s claim that he was wrongfully deprived of his state-created property interest in his
prison laundry job is also without merit because plaintiff failed to plead and prove the inadequacy
of state remedial procedures for the alleged random and unauthorized deprivation.") (referencing
*Hudson*, 468 U.S. at 531-533, and *Joyce v. Mavromatis*, 783 F.2d 56, 57 (6th Cir. 1986)).

> The justifications which we have found sufficient to uphold takings of property without any predeprivation process are applicable to a situation such as the present one involving a tortious loss of a prisoner's property as a result of a random and unauthorized act by a state employee. In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. The loss of property, although attributable to the State as action under "color of law," is in almost all cases beyond the control of the State. Indeed, in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation. That does not mean, of course, that the State can take property without providing a meaningful postdeprivation hearing. The prior cases which have excused the prior-hearing requirement have rested in part on the availability of some meaningful opportunity subsequent to the initial taking for a determination of rights and liabilities.

*Parratt*, 451 U.S. at 541.[32]

To the extent plaintiff alleges that defendants did not comply with MDOC policy and procedure when they confiscated his property, "[t]he state simply has no 'federal due process obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and would not be administrable.'"  *Jackson v. Hamlin*, 61 Fed.Appx. 131, 132 (6th Cir. 2003) (quoting *Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir.1993)[33]).

To the extent that plaintiff alleges that he was deprived of his property by prison officials, Michigan's three-step grievance system provides state prisoners with an adequate procedure to challenge actions taken by prison officials.  An inmate may file a written grievance (Step I); if its resolution by the grievance coordinator is unsatisfactory to plaintiff, he may then seek sequential

---

[32]In *Daniels v. Williams*, 474 U.S. 327 (1986), the Supreme Court reconsidered its statement in *Parratt* that "'the alleged loss, even though negligently caused, amounted to a deprivation.'"  *Daniels*, 474 U.S. at 328 (citing *Parratt*, 451 U.S. at 536-537).  The Court held that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."  *Daniels v. Williams*, 474 U.S. 327, 328 (1986).

[33]*Levine* was overruled on other grounds by *Thompson v. Keohane*, 516 U.S. 99 (1995).

41

evaluation of its disposition by supervisory staff, such as the warden or designated deputy

warden (Step II) and the Grievance and Appeals Section on the MDOC Director's behalf (Step

III). *See* MDOC PD 03.02.130 ("Prisoner/Parolee Grievances"), effective 07/09/07, ¶¶ V-GG.

Furthermore, if these levels prove insufficient, Michigan law allows for judicial review of

administrative decisions in the state courts. *DeWalt v. Warden, Marquette Prison*, 112 Mich.

App. 313, 315 N.W.2d 584, 585 (1982); *see* Mich. Comp. Laws §§ 791.251 et seq. Additionally,

Michigan's state remedies have been held to be adequate under federal due process standards.

*Copeland v. Machulis*, 57 F.3d 476, 480 (6th Cir. 1995); *Branham v. Spurgis*, 720 F. Supp. 605,

608 (W.D. Mich. 1989). "[R]edress for most prisoner actions, including alleged constitutional

violations, is available under the extensive process provided by Michigan state law. Michigan

provides several adequate post-deprivation remedies, including Michigan Court Rule 3.105 that

allows an action for claim and deliver, Mich. Comp. Laws § 600.2920 that provides for a civil

action to recover possession of or damages for goods and chattels unlawfully taken or detained,

and Mich. Comp. Laws § 600.6401, the Michigan Court of Claims Act, which establishes a

procedure to compensate for alleged unjustifiable acts of state officials." *Copeland*, 57 F.3d at

480. "Furthermore, as a state agency subject to the Michigan Administrative Procedures Act,

Mich. Comp. Laws §§ 24.201-.403, the Department of Corrections is subject to numerous state

laws relating to prisoner grievances. Mich. Comp. Laws §§ 791.251-.255. . . . The Sixth Circuit

has squarely held that the appeal of administrative decisions to the state circuit court provides an

adequate remedy for violations of due process for purposes of *Parratt v. Taylor*." *Copeland*, 57

F.3d at 480. Also, plaintiff may seek reimbursement for property loss under MDOC PD

04.02.110 ("Prisoner Benefit Fund")[34] or MDOC PD 04.07.112 ("Prisoner Personal Property").[35]

Furthermore, plaintiff could bring a state action for conversion of personal property. *See Lawrence v. Department of Corrections*, 81 Mich.App. 234, 240, 265 N.W.2d 104, 107 (1978) ("Plaintiff is charging that prison employees stole his property. Such conversion is an intentional tort. The commission of an intentional tort is not a governmental function.").

In short, "plaintiff has not shown that no adequate postdeprivation state remedy was available," and therefore he has not alleged a violation of his procedural due process rights so as to enable him to state a § 1983 claim. *Barnier v. Szentmiklosi*, 810 F.2d 594, 600 (6th Cir. 1987).

### SUBSTANTIVE DUE PROCESS

Count II alleges that defendants transferred plaintiff "to a mental facility known for its racism." Doc. Ent. 33 ¶ 82. State created liberty interests "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

___

[34]"A PBF shall be used to fund only those services, equipment, and supplies that provide a direct benefit to the prisoner population and are solely for prisoner use or which are contributions to charitable organizations approved by the Warden or designee. The PBF shall not be used to fund an activity or program that is necessary to institutional operations. Expenditures may include, but are not limited to . . . [p]risoner compensation for verified property losses where the prisoner was not negligent[.]" MDOC PD 04.02.110, effective 07/21/2008, ¶ H3.

[35]"If the prisoner incurs a loss through no fault of his/her own, s/he may petition the institution's Prisoner Benefit Fund, as provided in PD 04.02.110 "Prisoner Benefit Fund", or request reimbursement through the State Administrative Board, in accordance with OP 03.02.130-A "State Administrative Board Prisoner Property Reimbursement"." MDOC PD 04.07.112, ¶ B.

*Sandin v. Conner*, 515 U.S. 472, 484 (1995). The Court should agree with defendants that "[a] transfer from one facility to another is one of the ordinary incidents of prison life." Doc. Ent. 35 at 18. *Olim v. Wakinekona*, 461 U.S. 238, 244 ("an intrastate prison transfer does not directly implicate the Due Process Clause of the Fourteenth Amendment.") (referencing *Meachum v. Fano*, 427 U.S. 215 (1976) and *Montanye v. Haymes*, 427 U.S. 236 (1976)).

Furthermore, to the extent plaintiff's substantive due process claim is based on the veracity of the major misconduct report for insolence, the Sixth Circuit has stated that "a prisoner has no constitutional right to be free from false accusations of misconduct." *Jackson v. Hamlin*, 61 Fed.Appx. 131, 132 (6th Cir. 2003) (referencing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir.1986) ("The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.")).

**iv.    RLUIPA.** 42 U.S.C. § 2000cc-1 provides, in part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).

Plaintiff contends that defendants Atcher, Ridley, Nobles, Wade and Booker "deliberately and maliciously confiscated and destroyed Plaintiff's religious material . . . during the shakedown and transfer from [RRF] to [ARF]." Doc. Ent. 33 ¶ 79. Plaintiff's Count VII is an alleged violation of RLUIPA (Doc. Ent. 33 ¶ 87). Therein, plaintiff alleges that defendants

44

have "intentionally and willfully deprived Plaintiff of his prayer rug, dikr beads, and religious Koran, Quran, pins, and literature, etc., effectively and substantially burdening [his] ability to exercise his Islamic beliefs."  Plaintiff specifically mentions defendants "Atcher, 'John Doe' Shakedown Officers(s), Nobles, and Wade," claiming they "have substantially prevented Plaintiff from adhering to the tenets of fasting during the month of Ramadan impeding Plaintiff's daily prayer and meditation which is a Central tenet of Plaintiff's religious belief system."  And, plaintiff contends, "[t]he unnecessary burden on Plaintiff's substantial religious beliefs has affected Plaintiff's rehabilitation."  Doc. Ent. 33 ¶ 87.

In this count, plaintiff refers to *Hudson-Bey, et al. v. McGinnis, et al.*, Case No. 1:98-cv-00722-RAE-DAR (W.D. Mich.), wherein, on April 5, 2000, Judge Hillman granted plaintiffs a permanent injunction requiring that defendants permit plaintiffs to possess, in a manner which does not jeopardize the security of the institution or safety of its inhabitants, the following items: (1) prayer rug, (2) dikr beads, (3) star and crescent pendant, (4) prophet badge, (5) flag pins, and (6) religious wedding bands.  Doc. Ent. 43-1 at 42.

In their motion for summary judgment, defendants claim that "[a]n inmate cannot maintain an individual capacity claim for monetary damages under the RLUIPA."  Doc. Ent. 35 at 18-19.  The Sixth Circuit has noted:

> With respect to Heard's RLUIPA claim against defendants in their official capacities, Heard may seek only declaratory or injunctive relief and not monetary relief. *See Cardinal v. Metrish*, 564 F.3d 794, 798-801 (6th Cir.2009) (holding that the doctrine of sovereign immunity bars the recovery of monetary damages under RLUIPA when state officials are sued in their official capacities). This court has not ruled, however, on whether RLUIPA authorizes suits for monetary damages against state officials in their individual capacities. *See Nelson v. Miller*, 570 F.3d 868, 885-89 (7th Cir.2009) (discussing split of authority on issue; holding that RLUIPA does not subject state officials to suit in their individual capacities).

45

*Heard v. Caruso*, 351 Fed.Appx. 1, 13 (6th Cir. 2009).

In his response, plaintiff essentially argues that he is "entitled to damages for violation of his ability to practice significant tenets of his Religious belief regarding previous injunctive relief order[ed] by a Federal District court."  Doc. Ent. 43 at 5 ¶ 5; *see also* Doc. Ent. 43 at 26, Doc. Ent. 43-1 at 42 (April 5, 2000 Order (Case No. 1:98-cv-00722-RAE-DAR (W.D. Mich.))), Doc. Ent. 43 at 38-39 (Declaration of Leon Douglas (presumably #132125)).

To the extent plaintiff seeks relief under RLUIPA against defendants in their individual capacities, defendants are not amenable to suit.  Because RLUIPA was enacted pursuant to Congress's power under the Spending Clause, and because individual state officials do not receive federal funds, they are not subject to suit in their individual capacities under RLUIPA. *See Nelson v. Miller*, 570 F.3d 868, 885-89 (7th Cir. 2009).  Although a number of courts of appeals, including the Sixth Circuit, have declined to reach this question, *see Hall v. Ekpe*, ___ Fed. Appx. ___, 2011 WL 2600514, at *1 (2d Cir. July 1, 2011); *Kuperman v. Wrenn*, 645 F.3d 69, 79 (1st Cir. 2011); *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 n.3 (9th Cir. 2011); *Heard v. Caruso*, 351 Fed. Appx. 1, 13 n.5 (6th Cir. 2009), every court of appeals that has actually considered the question has reached this conclusion.  *See Nelson*, 570 F.3d at 885-89; *Rendelman v. Rouse*, 569 F.3d 182, 187-89 (4th Cir. 2009); *Sossamon v. Texas*, 560 F.3d 316, 327-29 (5th Cir. 2009), *aff'd on other grounds*, 131 S. Ct. 1651 (2011); *Smith v. Allen*, 502 F.3d 1255, 1271-75 (11th Cir. 2007).  Accordingly, the Court should grant summary judgment to defendants on plaintiff's RLUIPA claims.

Finally, to the extent plaintiff seeks relief based on defendants' alleged violation of an injunction issued by the Western District of Michigan in Case No. 1:98-CV-722, the appropriate

46

place for plaintiff to seek such relief is in the Western District.  "A district court in one

jurisdiction does not have the authority to enforce an injunction issued by a district court in

another jurisdiction."  *O'Rourke v. Duncan*, No. 4:10-CV-1957, 2011 WL 1297546, at *4 (E.D.

Mo. Mar. 31, 2011); *see also*, *Baker v. General Motors Corp.*, 522 U.S. 222, 236 (1998)

("Sanctions for violations of an injunction . . . are generally administered by the court that issued

the injunction.").  Thus, any relief for defendants' alleged violation of the injunction must be

had, if at all, in an action to enforce the injunction brought in the Western District of Michigan.

**v.**     **Qualified Immunity.**  Plaintiff's complaint argues that defendants are not entitled to

qualified immunity.  Doc. Ent. 33 ¶¶ 91-92.

Defendants argue that they are entitled to summary judgment and qualified immunity.

Doc. Ent. 35 at 8-19.  Plaintiff responds that defendants' Wade, Nobles, Booker, Ridley, Atcher

and Gould's actions denied plaintiff his constitutional rights, precluding their entitlement to

qualified immunity.  Doc. Ent. 43 at 8.

As the United States Supreme Court has stated, "government officials performing

discretionary functions generally are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 817-818 (1982).[36]

The Sixth Circuit has stated that the qualified immunity inquiry requires a three-step

analysis: "First, we determine whether a constitutional violation occurred; second, we determine

whether the right that was violated was a clearly established right of which a reasonable person

---

[36]Furthermore, "[u]ntil this threshold immunity question is resolved, discovery should not
be allowed."  *Harlow*, 457 U.S. at 818-819.

would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and

supported the allegations by sufficient evidence, to indicate that what the official allegedly did

was objectively unreasonable in light of the clearly established constitutional rights." *Williams*

*v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (citing *Dickerson v. McClellan*, 101 F.3d 1151,

1157-58 (6th Cir.1996)).[37]  *See also Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that

the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306,

311 (6th Cir. 2006) (citing *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th

Cir.2004)).

Importantly, the defense of qualified  immunity is best addressed after determining

whether plaintiff has stated a constitutional claim upon which relief can be granted.  "[T]he

better approach to resolving cases in which the defense of qualified immunity is raised is to

determine first whether the plaintiff has alleged a deprivation of a constitutional right at all.

Normally, it is only then that a court should ask whether the right allegedly implicated was

---

[37]*See also Saucier v. Katz*, 533 U.S. 194 (2001), wherein the Supreme Court stated, "A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier*, 533 U.S. at 201 (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201.  *See also Drogosch v. Metcalf*, 557 F.3d 372, 377 (6th Cir. Feb. 25, 2009) (citing *Saucier*, 533 U.S. at 201).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

Earlier this year, the Supreme Court stated, "[a]lthough we now hold that the *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that *it is often beneficial*." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (Jan. 21, 2009) (emphasis added).

clearly established at the time of the events in question." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5 (1998), citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).

Having concluded that RRF defendants Wade, Nobles, Curenton, Booker, Ridley and Archer are entitled to summary judgment on the claims against them, the Court need not address whether they are entitled to qualified immunity.

**b.     ARF defendants Mackintosh, Gould and Goldberg**

According to defendants, "plaintiff avers no facts and asserts no claims against Defendants Mackintosh, Gould, or Goldberg in his seven causes of action, entitling these defendants to dismissal under Rule 12(b)(6) for failure to state a claim." Doc. Ent. 35 at 19.

I note that plaintiff's amended complaint lists only seven (7) defendants: Gould at ARF, as well as Wade, Nobles, Curenton, Booker, Ridley and Archer at RRF.  Doc. Ent. 33 at 6. "[A]n amended complaint supercedes all prior complaints." *Drake v. City of Detroit, Michigan*, 266 Fed.Appx. 444, 448 (6th Cir. 2008).  Therefore, Mackintosh and Goldberg are not defendants in this case.[38]  Plaintiff admits as much in his January 20, 2011 response, stating that he "voluntarily dismissed Mackintosh and Goldberg from this action in his Court Ordered amended Complaint dated October 13, 2010."  Doc. Ent. 43 at 28.

As for claims against Gould, the parties agree that he is an ARF property room officer. Doc. Ent. 33 at 6, Doc. Ent. 35 at 6.  Plaintiff's amended complaint alleges that, at ARF, "Gould destroyed Plaintiff[']s property."  Doc. Ent. 33 ¶ 79.  Furthermore, attached to plaintiff's

---

[38]Defendant Mackintosh is specifically mentioned in the amended complaint.  Doc. Ent. 33 ¶¶ 73-75.  On January 15, 2009, ARF ARUS Mackintosh completed two (2) notices of intent to conduct an administrative hearing.  Each noted that "[d]isciplinary action [would] be taken if Hudson continue[d] to engage in the derogatory or slanderous communication described."  One concerned Nobles and the other concerned Wade.  Doc. Ent. 33 at 41-42.

amended complaint is a February 23, 2009 MDOC Memorandum from Gould to plaintiff,

wherein Gould notified plaintiff of the intent to dispose of a weight belt, KTV and excess legal

property on March 9, 2009.  Doc. Ent. 33 at 34.

> In response, plaintiff states:
>
> Defendant[s] Atcher, Ridley, [and] Gould [are] directly responsible for the
> confiscation, destruction, and pilferage of Plaintiff[']s court order[ed] dikr beads,
> prayer rug and religious material.  The affidavits of Plaintiff's witness Thomas
> attest to the defendant's handling of plaintiff's personal and legal property during
> the retaliatory transfer.  Defendant Gould, [ARF] was responsible for receiving
> and processing Plaintiff's property if it was shipped catch on October 16, 2008, as
> [defendants] alleged.

Doc. Ent. 43 at 26 (citing Gould's February 23, 2009 Memorandum (Doc. Ent. 33 at 34) and

January 4, 2009 affidavit of Antoine Thomas (#403217) (Doc. Ent. 43 at 35)).

Plaintiff's statement that, at ARF, Gould destroyed his property (Doc. Ent. 33 ¶ 79) and

that Gould was responsible for receiving plaintiff's property at ARF that was allegedly shipped

from RRF on October 16, 2008 is conclusory.  Therefore, while defendant Gould is not entitled

to dismissal of the claims against him on the basis that plaintiff avers no facts against Gould, the

claim as stated does not state a claim upon which relief may be granted.

**c.      Eleventh Amendment immunity and Fed. R. Civ. P. 12(b)(2)**

The caption of plaintiff's amended complaint states that the seven (7) defendants are sued

in their individual and official capacities.  Doc. Ent. 33 at 4-5; *see also* Doc. Ent. 33 at 19 ¶ 88.

Furthermore, plaintiff's seeks monetary, declaratory and injunctive relief. Doc. Ent. 33 at 21.

The Court should grant summary judgment to all defendants to the extent plaintiff is

suing them in their official capacities.  The Eleventh Amendment provides that "[t]he Judicial

power of the United States shall not be construed to extend to any suit in law or equity,

commenced or prosecuted against one of the United States  by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.  Although the amendment expressly prohibits only suits against states by citizens of other states, the Supreme Court has long held that the Eleventh Amendment also bars suits by citizens of the state being sued.  *See Hans v. Louisiana*, 134 U.S. 1 (1890); *Welch v. Texas Dep't of Highways and Public Transp.*, 483 U.S. 468, 472-73 (1987) (plurality opinion).  Further, as the Supreme Court made clear in *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989), the Eleventh Amendment bars suits against state officials sued in their official capacity.  *See id.* at 71; *McKay v. Thompson*, 226 F.3d 752, 757 (6th Cir. 2000).  The Eleventh Amendment does not bar suit when a state consents to suit in federal court, and a state may do so by accepting federal funds pursuant to a federal statute which unequivocally subjects a state to suit for monetary damages.  However, the Supreme Court recently held that RLUIPA does not meet this stringent test, and thus acceptance of federal funds does not subject a state, and by extension its officials acting in their official capacities, to suit for monetary damages.  *See Sossamon v. Texas*, 131 S.Ct. 1651, 1658-61 (2011)

Notwithstanding the Eleventh Amendment's bar on claims which seek damages against state actors in their official capacities, defendants correctly point out that "a prisoner's claim for declaratory or injunctive relief is rendered moot when he has been transferred to another facility."  Doc. Ent. 35 at 20; *see Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) ("to the extent Kensu seeks declaratory and injunctive relief his claims are now moot as he is no longer confined to the institution that searched his mail.").

To be sure, plaintiff's response seeks injunctive relief in the form of transfer back to RRF "with a 7-10 year injunctive moratorium not to be housed [anywhere] outside 50 miles of the Detroit area." At RRF, plaintiff claims, he will be able to continue his position in RRF's "Inside Out Program," and defendants should be "restrained from any further acts of retaliation or harassment against Plaintiff once he is replaced at the point of the [alleged] Constitutional violations." *See* Doc. Ent. 43 at 27.

However, defendants in this case are associated with either RRF or ARF, and plaintiff is currently confined at LCF. Therefore, any claims against these seven defendants for injunctive or declaratory relief are moot.

**4.      Summary**

**a.**      With respect to RRF defendants Wade, Nobles, Curenton, Booker, Ridley and Archer, there is no genuine issue of material fact that plaintiff's involvement in the NLA's September 20, 2008 program and his complaints to state lawmakers when they visited RRF is protected conduct. Plaintiff cannot show that his transfer from RRF to ARF amounted to an adverse action, because he has not shown that it would result in foreseeable negative consequences. However, the issuance of a major misconduct constitutes an adverse action for purposes of the First Amendment retaliation analysis. Still, plaintiff cannot show a causal connection between either the transfer or the issuance of the misconduct ticket and his protected activity, because (1) it appears that the news of the purported October 1, 2008 passive protest was the impetus to plaintiff's transfer, (2) there may have been an overriding security concern and (3) plaintiff has no basis for his belief that Wade would not have issued the December 17, 2008 insolence misconduct ticket to plaintiff on December 18, 2008 in the absence of plaintiff's

52

September 20, 2008 protected conduct, or even in the absence of plaintiff's prosecution of his November 24, 2008 Step II Grievance Appeal in RRF-00646.  Furthermore, the RRF defendants are entitled to summary judgment on plaintiff's First Amendment access to courts claim, because plaintiff has not established that he suffered a specific, litigation related harm from defendants' alleged actions.  *See* Section II.C.3.a.i.

Defendants are entitled to summary judgment on plaintiff's Eighth Amendment claim, because plaintiff did not face an excessive risk to his health or safety as a result of being transferred or from the handling of his personal property items and had access to a toilet on the morning of his transfer.  Furthermore, there is no indication that defendants knew of a substantial risk of serious harm to plaintiff at ARF.  *See* Section II.C.3.a.ii.

With respect to the Fourteenth Amendment, plaintiff cannot bring a supervisory liability claim against Booker based solely upon his Step II grievance appeal responses in RRF-00626 or RRF-00032, nor do plaintiff's allegations show that Booker encouraged or directly participated in an incident of misconduct.  Also, a procedural due process claim alleging that defendants did not comply with MDOC policy and procedure when they confiscated his property fails, because Michigan does not have a federal due process obligation to follow its procedures, and plaintiff has not shown that Michigan does not have an adequate postdeprivation remedy available. Plaintiff's substantive due process claim does not survive summary judgment, because a transfer from one prison to another is an ordinary incident of prison life and an inmate does not have a constitutional right to be free from a false accusation of misconduct.  *See* Section II.C.3.a.iii.

To the extent plaintiff seeks relief under RLUIPA against these defendants in their individual capacities, they are not amenable to suit.  Additionally, to the extent plaintiff seeks

relief based on defendants' alleged violation of the injunction issued in Case No. 1:98-cv-722 (W.D. Mich), it should be sought in the Western District.  *See* Section II.C.3.a.iv.

Finally, because these defendants are entitled to summary judgment on the claims against them, the Court need not address whether they are entitled to qualified immunity (Section II.C.3.a.v).

**b.**    As to the ARF defendants, Mackintosh and Goldberg are not defendants in this case.  Also, plaintiff has not stated a claim upon which relief may be granted as to Gould.  *See* Section II.C.3.b.

**c.**    All defendants are entitled to summary judgment to the extent plaintiff is suing them for damages in their official capacities.  Furthermore, plaintiff's claims against the RRF or ARF defendants for injunctive or declaratory relief are moot based on his current confinement at LCF.  *See* Section II.C.3.c.

## III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v.*

*Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to

E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

      Within fourteen (14) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than five (5) pages in length

unless by motion and order such page limit is extended by the Court.  The response shall address

specifically, and in the same order raised, each issue contained within the objections.

                        s/Paul J. Komives                           
                        PAUL J. KOMIVES
                        UNITED STATES MAGISTRATE JUDGE

Dated:9/23/11


CERTIFICATE OF SERVICE


The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or

parties of record by electronic means or U.S. Mail on September 23, 2011.

                        s/Susan Jefferson                     

                        Deputy Clerk