UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID HUDSON (#179401),

                                            CASE NO. 5:09-CV-14109
                    Plaintiff,              JUDGE JOHN CORBETT O'MEARA
                                            MAGISTRATE JUDGE PAUL J. KOMIVES

v.

WRIGHT WADE, SCOTT NOBLES,
RAYMOND BOOKER, LOIS ATCHER,
THOMAS RIDLEY, SHERRI CURETON,[1]
MARK MACKINTOSH, THOMAS GOULD,
and RICHARD GOLDBERG,

                    Defendants,

_____/

## REPORT AND RECOMMENDATION REGARDING DEFENDANT CURENTON'S SEPTEMBER 19, 2011 MOTION FOR SUMMARY JUDGMENT (Doc. Ent. 49)

I.     RECOMMENDATION .......................................................................... 2

II.    REPORT ....................................................................................... 2
       A.  Plaintiff's Complaint Was Amended by Way of my January 13, 2011 Order. ..................... 2
       B.  Defendant Curenton's September 19, 2011 Motion for Summary Judgment ...................... 5
       C.  Analysis ................................................................................. 7
           1.   .................................................................................... 7
                Plaintiff's October 3, 2008 transfer from RRF to ARF ................................ 7
           2.   EXHAUSTION ...................................................................... 11
           3.   CONSPIRACY ...................................................................... 19
           4.   FIRST AMENDMENT ................................................................ 26
                a.   RETALIATION ............................................................... 26
                     I.    Protected conduct. .................................................... 27
                     ii.   Adverse action. ...................................................... 28
                     iii.  Causation. ........................................................... 33
                b.   ACCESS TO COURTS ........................................................ 46
           5.   EIGHTH AMENDMENT ............................................................... 52
           6.   QUALIFIED IMMUNITY ............................................................. 55
           7.   ELEVENTH AMENDMENT IMMUNITY .................................................... 58

III.   NOTICE TO PARTIES REGARDING OBJECTIONS ............................................... 59

_____

[1]The proper spelling of defendant's name is Sherry Curenton.  Doc. Ent. 46-3.

**I.**   **RECOMMENDATION:** The Court should grant defendant Curenton's September 19, 2011 motion for summary judgment (Doc. Ent. 49).

**II.**   **REPORT:**

**A.**   **Plaintiff's Complaint Was Amended by Way of my January 13, 2011 Order.**

**1.**   Plaintiff David K. Hudson Bey is currently incarcerated at Lakeland Correctional Facility (LCF) in Coldwater, Michigan where he is serving two life sentences for first-degree murder, Mich. Comp. Laws § 750.316.[2]  On October 19, 2009, while incarcerated at LCF, plaintiff filed a fee-paid prisoner civil rights complaint against nine (9) defendants:  Wade, Nobles, Booker, Atcher, Ridley and Cureton, apparently employees at the Ryan Correctional Facility (RRF) in Detroit, Michigan, and defendants Mackintosh, Gould and Goldberg, apparently employees at the Gus Harrison Correctional Facility (ARF) in Adrian, Michigan.  Doc. Ent. 1 at 1, 14-15.

Plaintiff's claims consist of (I) retaliation in violation of the First and Fourteenth Amendments; (II) defendants' personal participation in a 42 U.S.C. § 1983 conspiracy; (III) intentional and malicious denial of access to the court; (IV) First Amendment retaliation, including a claim that MDOC PD 03.03.105 ("Prisoner Discipline") is unconstitutional; (V) retaliation for exercising his First Amendment right to petition the government for a redress of grievances and continuing damages, and (VI) willful violation of a permanent injunction under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA)[3] and the First and Fourteenth Amendments.  Doc. Ent. 1 at 3-13.[4]

_____

[2]_See_ www.michigan.gov/corrections, "Offender Search," #179401.

[3]The Religious Land Use and Institutionalized Persons Act of 2000 is codified at 42 U.S.C. §§ 2000cc - 2000cc-5.

[4]Attached to the complaint are Exhibits A-J (Doc. Ent. 1 at 16-50; Doc. Ent. 1-2 at 1-10).

Judge O'Meara referred this case to me to conduct all pretrial proceedings.  Doc. Ent. 4.

On May 17, 2010, plaintiff filed a second amended complaint.  Doc. Entries 20 and 21.

Then, on June 10, 2010, eight (8) of the nine (9) defendants in this case filed a motion to

strike and dismiss the plaintiff's second amended complaint based on the plaintiff's

non-compliance with the applicable procedural rules; or alternatively for screening of the pro se

prisoner civil rights complaint under the provisions of the PLRA's screening provisions before

the defendants are required to file a responsive pleading.  Doc. Ent. 25.

Pursuant to my September 30, 2010 order (Doc. Ent. 32), plaintiff's June 18, 2010 (Doc.

Ent. 28) and July 23, 2010 (Doc. Ent. 31) amended complaints were stricken.  The order

provided, in part, that "[p]laintiff ha[d] thirty (30) days within which to file an amended

complaint which w[ould] supercede the original complaint and which may not incorporate by

reference a prior pleading." Doc. Ent. 32 at 12-13.

**2.**      By way of my January 13, 2011 order (Doc. Ent. 41) granting plaintiff's October 21,

2010 motion (Doc. Ent. 33 at 1-3) to amend his May 17, 2010 complaint (Doc. Entries 20 and

21), the Court acknowledged the October 21, 2010 complaint and Exhibits A-E (Doc. Ent. 33 at

4-42) as plaintiff's amended complaint.[5]

Plaintiff's verified, amended complaint lists seven (7) defendants - Gould, Wade, Nobles,

Curenton, Booker, Ridley and Archer - each of whom is sued in their individual and official

---

[5]Plaintiff has filed proofs of mailing with respect to the motion and the addendum.  Doc. Ent.
33 at 43, Doc. Ent. 34 at 4.  The addendum includes a list of previous lawsuits on the form "Prisoner
Civil Rights Complaint," including *Hudson-Bey v. Zimmerman, et al.*, Case No. 2:94-cv-00277-
RHB-TPG (W.D. Mich.); *Hudson-Bey, et al. v. McGinnis, et al.*, Case No. 1:98-cv-00722-RAE-
DAR (W.D. Mich.); and *Hudson-Bey v. Martin, et al.*, Case No. 1:00-cv-00389-RAE-ESC (W.D.
Mich.).  Doc. Ent. 34 at 2-3.  It also appears that plaintiff was a party to *Hudson-Bey v. Mohrman*,
Case No. 2:94-cv-00227-RHB-TPG (W.D. Mich.).

3

capacities.  Doc. Ent. 33 at 5-6, 6 ¶ 3, 19 ¶ 88, 21.  There are also seven (7) claims for relief and causes of action, including counts based upon First Amendment retaliation; First Amendment access to courts; conspiracy and RLUIPA.  Doc. Ent. 33 ¶¶ 81-87.  Plaintiff seeks injunctive, compensatory, and declaratory relief.  Doc. Ent. 33 at 21.

**3.**    On September 23, 2011, I entered an opinion and order (Doc. Ent. 50) denying plaintiff's December 30, 2010 motion (Doc. Ent. 38) for an enlargement of time within which to file a response and limited discovery and denying defendants January 7, 2011 motion to stay discovery (Doc. Ent. 40).

I also entered a report and recommendation (Doc. Ent. 51) regarding defendants Booker, Nobles, Wade, Ridley, Atcher, Mackintosh, Gould, and Goldberg's December 17, 2010 motion for summary judgment (Doc. Ent. 35).

**4.**    On September 29, 2011, Judge O'Meara entered two orders: **(a)** one (Doc. Ent. 53) adopting my September 13, 2011 report and recommendation (Doc. Ent. 48) regarding defendant Curenton's May 16, 2011 motion for summary judgment (Doc. Ent. 46) and **(b)** the other (Doc. Ent. 54) adopting my September 23, 2011 report and recommendation (Doc. Ent. 51) and granting defendants' December 17, 2010 motion for summary judgment (Doc. Ent. 35).[6]

In October 2011, plaintiff filed notices of appeal.  Doc. Entries 64 and 59.  He also filed an application to proceed in forma pauperis on appeal.  Doc. Ent. 60.  However, on December 19, 2011, the Sixth Circuit entered an order dismissing plaintiff's appeal.  Doc. Ent. 66 (6th Cir. Case No. 11-2313).

---

[6]On September 30, 2011 (Doc. Ent. 55) and on October 3, 2011 (Doc. Ent. 58), Hudson filed objections to my September 23, 2011 report and recommendation (Doc. Ent. 51) regarding defendants' December 17, 2010 motion for summary judgment (Doc. Ent. 35).

**5.**      As a result of the Court's September 29, 2011 order (Doc. Ent. 54), which granted

defendants' Booker, Nobles, Wade, Ridley, Atcher, Mackintosh, Gould, and Goldberg's

December 17, 2010 motion for summary judgment (Doc. Ent. 35), Curenton is the only

remaining defendant in this case.

**B.      Defendant Curenton's September 19, 2011 Motion for Summary Judgment**

My January 13, 2011 report (Doc. Ent. 48) recommended that the Court deny as moot but

without prejudice defendant Curenton's May 16, 2011 motion for summary judgment (Doc. Ent.

46).  Specifically, I recommended:

> Plaintiff's third amended complaint, filed on July 23, 2010 (Doc. Ent. 31), was
> stricken by my September 30, 2010 order (Doc. Ent. 32 at 13). Defendant
> Curenton's May 16, 2011 motion for summary judgment (Doc. Ent. 46) is based
> upon plaintiff's third amended complaint (Doc. Ent. 31). *See* Doc. Ent. 46 at n.1,
> n.2, n.27, n.33, n.44, n.45.
>
> Therefore, the Court should deny defendant Curenton's May 16, 2011 motion for
> summary judgment (Doc. Ent. 46) as moot but without prejudice to refiling her
> motion with respect to plaintiff's complaint as amended by my January 13, 2011
> order. Doc. Ent. 41 at 4; *see also* (Doc. Ent. 33 at 4-42).

Doc. Ent. 48 at 4.[7]  As noted above, Judge O'Meara adopted this report and recommendation on

September 29, 2011 (Doc. Ent. 53).

In the meantime - after I entered my report and recommendation but before Judge

O'Meara adopted it - defendant Curenton filed a September 19, 2011 motion for summary

judgment (Doc. Ent. 49).  Therein, Curenton argues that (I) "plaintiff has not exhausted

---

[7]On September 23, 2011, plaintiff filed an affidavit (Doc. Ent. 52) attesting that, on June 29,
2011, he mailed a response to defendant Curenton's May 16, 2011 motion for summary judgment
(Doc. Ent. 46).  Apparently, this response was not received by the Court.

his administrative remedies because he failed to name defendant Curenton in his Step I grievance[;]" (II) "plaintiff's transfer served a legitimate pen[o]logical interest and there was no conspiracy[;]" (III) "plaintiff has failed to meet the elements of retaliation and he cannot demonstrate defendant Curenton's personal involvement with his access to the courts claim[;]" (IV) "plaintiff cannot prove either component of a 'deliberate indifference' claim[;]" (V) "Defendant acted reasonably and did not violate a clearly established constitutional right[;]" and (VI) "Defendant is entitled to Eleventh Amendment immunity."  Doc. Ent. 49 at 12-17, 17-19, 19-23, 23-25, 25-27 and 27-28.[8]

Pursuant to my October 3, 2011 order (Doc. Ent. 56), plaintiff's response to this motion was due on or before October 31, 2011.  On October 3, 2011, plaintiff filed a response (Doc. Ent. 57), consisting of his verified response brief (Doc. Ent. 57 at 1-25) and Exhibits P-U (Doc. Ent. 57 at 26-43).[9]

**C.   Analysis**

**1.   Plaintiff's October 3, 2008 transfer from RRF to ARF**

By way of background, plaintiff is the President of the National Lifers of America, Inc., Chapter #1009 (NLA), which was apparently incorporated during the 1980s.  *See* Doc. Ent. 43-1 at 9-13.[10]  In Fall 2007, plaintiff participated in the Inside-Out Prison Exchange Program at RRF

---

[8]Attached to this motion is Curenton's April 8, 2011 affidavit.  Doc. Ent. 49-3.

[9]As noted above, Exhibits A-E are attached to plaintiff's amended complaint (Doc. Ent. 33 at 4-42), and plaintiff's attachments to his January 20, 2011 filing are labeled Exhibits F-O.  Doc. Ent. 43 at 30-31 (Index of Exhibits).

[10]The record of this case includes a NLA Excellence Award to Michigan State Senator Martha G. Scott.  Doc. Ent. 43-1 at 38.

taught by University of Michigan-Dearborn Professor Lora Lempert.[11]  Doc. Ent. 43-1 at 14.[12]
During April and May 2008, Professor Lempert and five (5) students wrote letters in support of
plaintiff's petition for commutation.  Doc. Ent. 43-1 at 24-37.[13]

On September 20, 2008, plaintiff "organized and sponsored a Legislative Townhall
Meeting with State Representative Alma Wheeler Smith,[14] Chairperson of [MDOC] Legislative
Committee; State Representative Paul Condino; State Senator Hansen Clarke; MDOC
Legislative Liaison Bryan Crenshaw; and *Second Chance for Youth* Director Felicia Tyson-
Waters at [RRF] in the gym with the general population of prisoners."  Doc. Ent. 33 ¶ 5.

According to plaintiff, Donald Corbin Bey (#136518) was to be the Master of Ceremony.
However, plaintiff "had to assume the position of Master of Ceremony just minutes prior to the
start of the event[,] because Officer Sherry [Curenton], the 300 building program officer[,] had
fabricated allegations against . . . Vice President Donald Corbin Bey . . . and had him placed in
segregation to impede the program's success."  Doc. Ent. 33 ¶ 6.  Plaintiff explains that "[o]n the
date of the program, Officer [Curenton] became aware that Prisoner Corbin Bey was the M.C. of
the event and she harassed all other prisoners who were on call for this event and threatened

---

[11]Plaintiff has provided correspondence from Professor Lempert dated May 9, 2007 (Doc.
Ent. 43-1 at 15), October 13, 2008 (Doc. Ent. 43-1 at 20-21); October 31, 2008 (Doc. Ent. 43-1 at
39).

[12]"College goes to prison", *Detroit Free Press*, Oct. 17, 2007.  Doc. Ent. 43-1 at 14.

[13]A July 14, 2008 Transfer Order indicates that plaintiff was transferred from RRF to
Michigan Reformatory in Ionia, MI (RMI), "to accommodate [an] incoming MPRI [Michigan
Prisoner ReEntry Initiative] prisoner."  Doc. Ent. 43-1 at 22.  Plaintiff contends that this transfer did
not go through and was based on the "fraudulent pretense of a 'dining hall protest'."  Doc. Ent. 43
at 9.

[14]Plaintiff has provided correspondence from Representative Smith dated April 29, 2009
(Doc. Ent. 43-1 at 23); November 7, 2007 (Doc. Ent. 43-1 at 41).

them with major misconducts if they entered the gym and did not remain at the event the entire time.  Her conduct was contrary to normal practice regarding prisoner programming at [RRF]."  Doc. Ent. 33 ¶ 7.

Curenton is an RRF Corrections Officer.  Doc. Ent. 49-3 ¶ 1.  Plaintiff alleges that, prior to the start of the event, Curenton stated: "I'm tired of Hudson Bey and NLA inviting all these legislators in here making complaints about me and my coworkers.  Hudson Bey thinks he's important and [cannot] be transferred.  But I can get him transferred."  Doc. Ent. 33 ¶ 8.

During the meeting, plaintiff made complaints "concerning Parole Board Policies and conflicts of interest between Warden Booker and the Michgian Parole Board."  Doc. Ent. 33 ¶ 9.[15]  Prisoners Clarence Moore (#100886) and Ramon X "also voiced their complaints about Medical Treatment of Dialysis Patients, and the Michigan Prisoner ReEntry Initiative [MPRI]."  Doc. Ent. 33 ¶ 10.  Furthermore, plaintiff "continued to present statements and questions to State Lawmakers on matters of [p]ublic concern designed to urge a change in prison policy, practice and procedures."  Doc. Ent. 33 ¶ 11.  During the program, plaintiff was "summoned to Special Activities Director Steve Horton's location," who said among other things, "I am going to let the Warden and Deputy Nobles know that you are responsible for the complaints being made to the legislators. . . . We don't need this type of forum."  Doc. Ent. 33 ¶ 12.

On September 22, 2008, RRF Warden Booker electronically mailed RRF Deputy Warden Nobles, asking him to review an attachment and advise "whether there have been any rumors

_____

[15]In his complaint, plaintiff states that "Warden Booker's wife is/was a member of the Parole Board[,]" Doc. Ent. 33 ¶ 9, but "Sherri Booker resigned from the Michigan Parole Board in early October[.]"  Doc. Ent. 33 ¶ 41.

circulating at RRF regarding a protest about the reduction in tobacco products." The same day, Nobles replied. Doc. Ent. 35-2 at 4.

On or about September 23, 2008, plaintiff noticed a private conversation between ADW Willis Chapman and Officer Curenton in the 300 building downstairs doorway at RRF. Doc. Ent. 33 ¶ 14. According to plaintiff, Chapman observed plaintiff and stated: "I need to talk to you, but I'll call you out later[.]" Plaintiff nodded in affirmation while "Officer [Curenton] stared 'animus' at Plaintiff as he walked away." Doc. Ent. 33 ¶ 15.

Then, plaintiff contends, on September 24, 2008, Deputy Warden Nobles called the entire Warden's Forum membership to the Control Center regarding a surcharge on prisoner store items. During the meeting, Nobles told Warden's Forum Member Corbin-Bey (#136518)[16] that he (Nobles) and the Warden (Booker) had been "answering emails concerning the complaints made at your little townhall meeting all morning." Doc. Ent. 33 ¶¶ 6, 16.

On or about September 26, 2008, plaintiff saw Chapman on the walkway in front of RRF's 400 building and asked why "he had not called Plaintiff out as he previously indicated." ADW Chapman stated: "[I am] not getting involved. But Officer [Curenton] may talk to Wade or Nobles about you and the complaints made to the outside guest you had come in last Saturday." Doc. Ent. 33 ¶ 17.

---

[16]Corbin-Bey's January 1, 2009 affidavit is attached to plaintiff's January 20, 2011 response. Doc. Ent. 43 at 40. Corbin-Bey's June 1, 2011 affidavit is attached to plaintiff's October 3, 2011 response. Doc. Ent. 57 at 32-33.

On September 30, 2008, the SCC requested that plaintiff be transferred due to security concerns at RRF.  The transfer appears to have been ordered on October 1, 2008, and plaintiff was transferred to ARF on October 3, 2008.  Doc. Ent. 35-2 at 5.[17]

On October 3, 2008, plaintiff claims, he was awakened at 7:00 a.m. by Acting Sgt. Ridley and Officers Kirchoff and Smith, all of whom are Caucasian.  Doc. Ent. 33 ¶ 18; *see also* Doc. Ent. 35-6 at 5-6 (Log Book Excerpts).  While plaintiff was being held in isolation in the transportation tank, Officer Brown informed him, "the people up front are transferring you."  Doc. Ent. 33 ¶¶ 24-25.  Plaintiff mentioned his transfer holds, and Officer Brown stated, "I don't know what's going on, they just told me to bring your blues for transfer.  You know the whole Administration up front is corrupt.  Nobles and Wade is behind all this!"  Doc. Ent. 33 ¶¶ 26-27.

Plaintiff also mentioned his transfer holds to RUO Atcher, who replied, "obviously the Warden and Deputy [Nobles] want[] your ass out of here."  Doc. Ent. 33 ¶¶ 29-30.  Also, Atcher informed plaintiff, "we did not pack all your legal papers and books because Deputy Nobles and Inspector Wade want[] to look over them to see what you were up to.  You made too many complaints to those Senators, so we're sending them catch up after the Deputies and Inspector [are] finished.  They got your ass out of here so you couldn't use the phone to stop the transfer."  Doc. Ent. 33 ¶ 31.  Plaintiff informed Atcher that he (plaintiff) had time sensitive legal briefs which needed to be filed.  Doc. Ent. 33 ¶ 32.  Atcher replied, "too bad, you're out of here now, your shit is packed. . . . I gave your food and walkman to my buddies."  Doc. Ent. 33 ¶ 33.  *See also* Doc. Ent. 35-5 at 14 (10/3/08 Notice of Intent to Conduct an Administrative Hearing -

---

[17]The transfer order was prepared by Nowak.  The notes under "SPON" are crossed out and there is a handwritten note which states, "not for distribution to grievant[.]"  Doc. Ent. 35-2 at 5.

10

Excess Property, issued by RRF RUO L. Atcher); Doc. Ent. 35-5 at 15 (10/6/08 Notice of Intent

to Conduct an Administrative Hearing - Disposition of personal books, issued by RRF ARUS C.

White); Doc. Ent. 35-5 at 16 (10/6/08 Notice of Intent to Conduct an Administrative Hearing -

Catch-up personal property, issued by RRF RUO L. Atcher).

     Plaintiff was transferred to ARF around 4:30 p.m.  Doc. Ent. 33 ¶ 34.

     On October 5, 2008, while incarcerated at ARF, plaintiff completed a Step I grievance

form about his transfer from RRF (Grievance Identifier RRF-08-10-00646-19z).  He appealed

the grievance to Step II and Step III.  Warden Booker was the Step II grievance appeal

respondent. Doc. Ent. 33 at 25-32; Doc. Ent. 39-1 at 5-11.

     Plaintiff's initial program classification at ARF was signed on October 13, 2008.  Doc.

Ent. 43-1 at 43.

**2.**     **EXHAUSTION**

**a.**     **42 U.S.C. § 1997e ("Suits by prisoners")**

     "No action shall be brought with respect to prison conditions under section 1983 of this

title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional

facility until such *administrative remedies* as are *available* are *exhausted*."  42 U.S.C. §

1997e(a) ("Applicability of administrative remedies") (emphasis added).

     In *Woodford v. Ngo*, 548 U.S. 81 (2006), the United States Supreme Court considered

"whether a prisoner can satisfy the Prison Litigation Reform Act's exhaustion requirement, 42

U.S.C. § 1997e(a), by filing an untimely or otherwise procedurally defective administrative

grievance or appeal[,]" and held that "*proper* exhaustion of administrative remedies is

necessary." *Woodford*, 548 U.S. at 83-84 (emphasis added).  The following year, in *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court explained:

> In *Woodford*, we held that to properly exhaust administrative remedies prisoners must "complete the administrative review process in accordance with the applicable procedural rules," - rules that are defined not by the PLRA, but by the prison grievance process itself.  ***Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust."***  The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Jones*, 549 U.S. at 218 (internal citations omitted) (emphasis added).

**b.**      The record contains evidence of at least three RRF grievances:[18]

**RRF-08-10-00646-19z:**  On October 5, 2008, while incarcerated at ARF, plaintiff completed a Step I grievance form about his October 3, 2008 transfer from RRF to ARF (Grievance Identifier RRF-08-10-00646-19z).  Doc. Ent. 33 at 25.  Grievance Coordinator M. Myles responded to and ADW M. Grimes reviewed the grievance on November 12, 2008.  The response stated, "Your issue has been completely investigated.  The property and property receipts in question w[ere] sent catch-up property on [October 16, 2008].  Prisoner was transferred for administrative reasons."  Doc. Ent. 33 at 26.  Hudson appealed the grievance to Step II.  Doc. Ent. 33 at 27-28, 32.  Warden Booker was the Step II grievance appeal respondent. Doc. Ent. 33 at 29-30.  Hudson appealed the grievance to Step III, and the Third Step Grievance Response is dated February 18, 2009.  Doc. Ent. 33 at 27, 31.  *See also* Doc. Ent. 39-1 at 5-11.

---

[18]Attached to plaintiff's original complaint are documents concerning ARF-09-05-00846-19z (Doc. Ent. 1 at 49 - Doc. Ent. 1-2 at 5, Doc. Ent. 1-2 at 10) and ARF-09-07-01175-17z (Doc. Ent. 1-2 at 6-9).

12

**RRF-09-01-00032-27z:** On December 23, 2008, while incarcerated at ARF, plaintiff completed a Step I grievance form about his December 22, 2008 hearing at ARF on the major misconduct report written by Wade of RRF (RRF-09-01-00032-27z).  In the grievance, plaintiff alleges that Wade's December 18, 2008 major misconduct was issued in retaliation and that "the false misconduct [was issued] after his original complaint on defendants and other RRF staff on October 5, 2008 [RRF-00646], and one day after the [December 17, 2008] redress interview [with MDOC Internal Affairs Investigator Mane]."  Doc. Ent. 33 at 36.  Grievance Coordinator M. Myles responded to and ADW M. Grimes reviewed the grievance on January 22-23, 2009.  The response states that MDOC PD 03.02.130 "calls for grievances that are non-grievable not to be processed.  Your issue is the result of a major misconduct and therefore is being rejected."  Doc. Ent. 33 at 37.  On February 7, 2009, plaintiff completed a Step II grievance appeal form, wherein he claims to have recently learned that Curenton conspired with others "to falsif[y] an employee [SPON] on [plaintiff] . . . to get the 'Warden's Hold' removed to embellish the retaliatory transfer to a remote, increased security, psychiatric facility[,]" and that Curenton "has been bragging to other RRF staff and prisoners about her role in this conspiracy and parodying - in a degrading manner [plaintiff's] speech impediment[.]"  Doc. Ent. 33 at 38.  Apparently not having received a Step II grievance response, plaintiff completed a Step III grievance appeal on or about March 2, 2009.  Therein, he mentions the two NOI notices of intent issued on January 15, 2009, the day after Hearing Officer Falkenstein's January 14, 2009 dismissal of the December 17, 2008 major misconduct for insolence.  Doc. Ent. 33 at 38.  The Third Step Grievance Response is dated April 9, 2009.  Doc. Ent. 33 at 39.

**RRF-09-06-00424-17z:** On May 27, 2009, while incarcerated at ARF, plaintiff completed a Step I grievance form about notification he received on May 26, 2009 that Curenton "falsified, conspired, embellished, and abused her MDOC authority for personal gain to retaliate against this writer for exercising his First Amendment Right to Redress while at [RRF]." Doc. Ent. 57 at 26, 34. Grievance Coordinator M. Myles responded to and ADW M. Grimes reviewed the grievance on June 22, 2009. The response states, "Your issue has been completely investigated. There is not an Employee SPON [Special Problem Offender Notice[19]] in your file. You were transferred due to security concerns. Staff deny any retaliation against you. No violation of policy cited. Grievance denied." Doc. Ent. 57 at 27, 35. On June 27, 2009, plaintiff completed a Step II grievance appeal form. Doc. Ent. 57 at 28. Booker's Step II Grievance Appeal Response is dated August 19, 2009. Doc. Ent. 57 at 37-38. However, it appears to have been returned to Hudson on September 23, 2009. Then, on or about September 25, 2009, Hudson completed his Step III grievance appeal. Doc. Ent. 57 at 36. The Third Step Grievance Response is dated February 25, 2010. Doc. Ent. 57 at 29.

**c.** In his October 21, 2010 amended complaint, plaintiff cites RRF-00646 and states that "[e]ach defendant was made aware of Plaintiff's complaints through interviews." Doc. Ent. 33 ¶ 43. Plaintiff describes RRF-00646 as having been filed "against Inspector Wright Wade and Deputy Nobles, among other named [RRF] staff for Retaliation in violation of Plaintiff's First, Fourteenth and Eighth Amendment Rights." Doc. Ent. 33 ¶ 61. Plaintiff asserts that the

---

[19]*See* MDOC PD 05.01.140 ("Prisoner Placement and Transfer"), effective Oct. 10, 2011, ¶ H.

grievance was at Step II from December 2, 2008 to January, 2009 and that "[e]ach defendant had personal involvement and knowledge of Plaintiff's Complaints."  Doc. Ent. 33 ¶ 63.

Furthermore, plaintiff describes RRF-00032 as filed "against [Wade and Nobles of RRF] for Retaliation in violation of Plaintiff's First Amendment Rights to Free Speech/Freedom of Expression and Right to Redress."  Doc. Ent. 33 ¶ 68.

**d.**      Defendant Curenton argues that "plaintiff has not exhausted his administrative remedies because he failed to name defendant Curenton in his Step I grievance."  Doc. Ent. 49 at Doc. Ent. 49 at 12-17.  Citing ¶¶ P, R, V, BB and FF of MDOC PD 03.02.130, effective 07/09/2007 (Doc. Ent. 49 at 14-15), Curenton alleges that plaintiff has not properly exhausted against her under *Woodford*, because RRF-00032 **(a)** did not name Curenton in the initial, Step I grievance, and **(b)** was untimely, on the basis that the February 7, 2009 Step II grievance appeal which named Curenton "was not filed within five business days of trying to resolve the issue with her[.]"  Doc. Ent. 49 at 15-17.

**e.**      In response, plaintiff argues that he has exhausted his available administrative remedies. Doc. Ent. 57 at 9-11.

Specifically, plaintiff claims to have filed RRF-00424, which he initiated on May 27, 2009, "as soon as he discovered that it was [indeed], defendant Curenton who initiated the scheme for the transfer process and conspired with other defendants by setting the chain reaction into effect when she lied and falsified a complaint on defendant to her supervisors and even threatened them with employee grievances if they did not transfer plaintiff for exercising his First Amendment Rights."  Doc. Ent. 57 at 9-10 (citing the June 18, 2010 amended complaint (Doc. Ent. 28), as well as Boone Bey's Declaration (Doc. Ent. 43 at 32 ¶ 4) and Plaintiff's

15

January 11, 2011 Declaration (Doc. Ent. 43 at 47 - Doc. Ent. 43-1 at 8, ¶¶ 77-79).[20]  And, plaintiff claims that the June 22, 2009 Step I response to RRF-00424 (Doc. Ent. 57 at 26-27) did not comply with MDOC PD 03.02.130 ¶ Y, which provides that "[i]f the grievant is not interviewed, the reason shall be included in the written response to the grievance."  Doc. Ent. 57 at 11.

Furthermore, plaintiff claims that grievance RRF-00646, which he initiated on October 5, 2008, two days after his transfer from RRF, mentioned John Does and a Jane Doe (Doc. Ent. 33 at 25-32; Doc. Ent. 39-1 at 5-11).  Plaintiff asserts that Curenton "was John or Jane Doe unknown at that time but clearly identified in this action now."  Doc. Ent. 57 at 10.

Also, citing ¶ P of MDOC PD 03.02.130, plaintiff claims that his retaliatory transfer to ARF is a circumstance which justifies the absence of his verbal attempt to resolve his grievance (RRF-00646) with Curenton.  Additionally, plaintiff relies upon the February 18, 2009 Step III grievance response in RRF-00646 (Doc. Ent. 1 at 25; Doc. Ent. 33 at 31; Doc. Ent. 39-1 at 11), which stated, "[t]his grievance was processed at the local level according to the provisions of [MDOC PD] 03.02.130 . . . and [MDOC OP] 03.02.130[.]"  Therefore, plaintiff argues, defendants "acknowledge[d] plaintiff's grievance was properly filed, timely, and appealed

---

[20]In further support of Boone Bey's declaration, the affidavit of Donald Corbin (#136518), who is currently incarcerated at RRF (Doc. Ent. 57 at 32-33), and the declaration of Antoine Thomas (#403217), who is currently incarcerated at Chippewa Correctional Facility (URF) in Michigan's Upper Peninsula (Doc. Ent. 57 at 39-40), plaintiff points to Nobles's November 30, 2010 affidavit and attached October 3, 2008 transfer order (Doc. Ent. 35-2), on which the notes under "SPON" are crossed out and there is a handwritten note which states, "not for distribution to grievant[,]" Doc. Ent. 35-2 at 5.  It is plaintiff's position that "[t]he handwritten note clearly indicates a collaboration to conceal and/or cover up the evidence plaintiff was seeking throughout the administrative grievance process [for] Grievance [RRF-00646]."  According to plaintiff, defendants "conspired to cover up their deliberate capricious and malicious violations of plaintiff's Constitutional Rights by refusing to send plaintiff's family this specific transfer order . . . back in 2009."  Doc. Ent. 57 at 10.

16

through all three steps.  No policy violations were raised, alleged, or preserved at the

administrative level."  Doc. Ent. 57 at 11.

**f.**      Plaintiff has exhausted his available administrative remedies in accordance with 42

U.S.C. § 1997e(a) with respect to his claims against Curenton.  Even assuming that RRF-00646

does not operate to exhaust plaintiff's claims against Curenton, RRF-00424 does.

The subject matter of RRF-00424, which is unaddressed by Curenton in her September

19, 2011 motion (Doc. Ent. 49), appears to encompass plaintiff's claims against Curenton in the

case at bar.[21]  However, RRF-00424 was initiated on May 27, 2009 (Doc. Ent. 57 at 26) and was

not completed until the February 25, 2010 Step III grievance response (Doc. Ent. 57 at 29).

Therefore, the Court should consider whether the instant case, filed on October 19, 2009 (Doc.

Ent. 1) was prematurely filed.  As the Sixth Circuit recently stated:

> Under the PLRA, a prisoner may not bring a federal action related to prison
> conditions "until such administrative procedures as are available are exhausted."
> 42 U.S.C. § 1997e(a). A grievant must undertake all steps of the MDOC process
> for his grievance to be considered fully exhausted. *Jones Bey v. Johnson*, 407
> F.3d 801, 803 n. 2 (6th Cir.2005) rev'd on other grounds, *Jones v. Bock*, 549 U.S.
> 199[] (2007). A prisoner must adhere to any time limitations that are part of the
> institutional grievance policy. *Risher*, 639 F.3d at 240 (citing *Woodford v. Ngo*,
> 548 U.S. 81, 90–91[] (2006)).

*Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. May 8, 2012); *see also Solomon v. Michigan Dept.*

*of Corrections*, 2012 WL 1522932, 3 (6th Cir. May 1, 2012) ("the district court did not err when

it concluded that Solomon was required to exhaust his administrative remedies against

[defendants] prior to filing his § 1983 complaint.").  In this regard, MDOC PD 03.02.130

---

[21]In fact, the February 25, 2010 Step III grievance response notes that "[t]he complaint that
[plaintiff] was transferred due to retaliation was the subject of a previous grievance [RRF-00646][,]"
and "[plaintiff] made similar allegations to the instant grievance in the Step II appeal of [RRF-
00032]."  Doc. Ent. 57 at 29.

provides, in part: "Complaints filed by prisoners regarding grievable issues as defined in this policy serve to exhaust a prisoner's administrative remedies only when filed as a grievance through all three steps of the grievance process in compliance with this policy."  MDOC PD 03.02.130, effective 07/09/07, ¶ B.

Considering the time line in detail, the Court should conclude that RRF-00424 does operate to exhaust plaintiff's claims against Curenton.  RRF-00424 was initiated on May 27, 2009 (Doc. Ent. 57 at 26), and plaintiff apparently mailed his Step III grievance on September 25, 2009 (Doc. Ent. 57 at 26).  The instant case was filed on October 19, 2009 (Doc. Ent. 1). The Step III response in RRF-00424 is dated February 25, 2010 (Doc. Ent. 57 at 29).  In other words, this case was filed in the midst of the grievance process for RRF-00424.

However, MDOC PD 03.02.130 provides in part that "[t]he total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved in writing by the Grievance Coordinator at Step I and/or Step II[,]" ¶ S; "[i]f a grievant chooses to pursue a grievance which has not been responded to by staff within required time frames, including any extensions granted, the grievant may forward the grievance to the next step of the grievance process within ten business days after the response deadline expired, including any extensions which have been granted[,]" ¶ T; and there does not appear to be a set due date for a Step III grievance response, ¶ GG.

Therefore, from its inception, plaintiff could reasonably have expected that the total grievance process for RRF-00424, initiated at Step I on May 27, 2009 (Doc. Ent. 57 at 26), would have been completed approximately 120 days later, on or about September 24, 2009.

18

Obviously, he knew this was unlikely once he received Booker's August 19, 2009 Step II response, allegedly on September 23, 2009, and then apparently mailed his Step III grievance appeal on September 25, 2009.  Still, it is fair to say that he did not preempt the Step III grievance response when he filed the instant case approximately three weeks later on October 19, 2009 (Doc. Ent. 1).

**3.      CONSPIRACY**

"A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Weberg v. Franks*, 229 F.3d 514, 526 (6th Cir. 2000) (citing *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir.1985)).  "Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, ... circumstantial evidence may provide adequate proof of conspiracy." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000) (citing *Bell v. City of Milwaukee*, 746 F.2d 1205, 1255 (7th Cir.1984)).

**Plaintiff's Claims**

Plaintiff's complaint describes "[d]efendants' individual participation in the 42 [U.S.C.] § 1983 conspiracy[.]"  Doc. Ent. 33 ¶¶ 44-60.[22]  Therein, plaintiff alleges that Curenton "conspired

---

[22]Plaintiff's complaint alleges that on October 3, 2008, he informed Officer Brown that he (plaintiff) "had transfer holds on him for the University of Michigan and Chance for Life Classes, by Warden Booker[.]" Doc. Ent. 33 ¶ 26.  According to plaintiff, on October 3, 2008, he informed

to embellish[,] falsif[y], and fabricate[] an employee's complaint against Plaintiff, in furtherance of assuring a retaliatory transfer to punish Plaintiff for inviting Politicians into [RRF] and for complaints against 'her superiors and coworkers'." Doc. Ent. 33 ¶ 54. Plaintiff claims that defendants' "acts and omissions, coupled with acts of commissions by all Defendants named above, impeded Plaintiff's [F]irst [A]mendment rights to redress, interfered with his access to the courts resulting in actual injury of dismissal of his criminal appeal, and transfer to a remote mental facility, was done in retaliation for Plaintiff's exercise of his valued constitutional rights to voice his concerns and to seek redress to lawmaking officials for the State of MIchgian." Doc. Ent. 33 ¶ 55. Also, plaintiff notes that "[i]n close proximity, after the complaints were logged at the legislative seminar that Plaintiff hosted, sponsored, and made public complaints, Plaintiff was transferred to a mental health facility, stigmatized as a mental health patient 'a bug', suffering the lost of his criminal appeal, ties with family and supporters for "Administrative Reasons[.]'" Doc. Ent. 33 ¶ 60 (citing RRF-08-10-00646-19z).

In his "Claims for Relief and Causes of Action," plaintiff alleges that defendants Booker, Nobles, Wade, and Curenton's acts and omissions "constitute[] a conspiracy to retaliate against Plaintiff, when they engaged in acts of commissions to set in motion the retaliatory transfer from [RRF] due to Plaintiff's involvement in the NLA's programming which sponsored State of

---

Atcher that "the Warden has two holds on me. Deputy Nobles should NOT be able to transfer me." Doc. Ent. 33 ¶ 29. Among plaintiff's paragraphs on conspiracy are his assertions that "Booker had an agreement with the U of M Professor not to transfer any participants in the Think Tank Program[,]" and that Booker directly authorized plaintiff's transfer, thereby removing the transfer hold. Doc. Ent. 33 ¶¶ 44, 59; *see also* Doc. Ent. 33 ¶¶ 56-60.

In his January 5, 2011 affidavit, Booker attests, "plaintiff's contention that he had 'holds' preventing his transfer from RRF is false." Doc. Ent. 39-1 ¶ 8. However, plaintiff's response points to Professor Lempert's October 13, 2008 letter, wherein she states that the Warden "told [her] that he was eliminating the 'hold' on the Theory Group." Doc. Ent. 43-1 at 20-21; Doc. Ent. 43 at 9.

Michigan Lawmakers on [September 20, 2008]."  Doc. Ent. 33 ¶ 81.  Furthermore, Count II

alleges that Booker, Nobles, Wade and Curenton conspired to transfer plaintiff to ARF,

described by plaintiff as "a mental facility known for its racism[,]" in violation of his Fourteenth

Amendment rights.  Doc. Ent. 33 ¶ 82.[23]

### Defendant Curenton's Arguments

Defendant argues that "plaintiff's transfer served a legitimate pen[o]logical interest and

there was no conspiracy."  Doc. Ent. 49 at 17-19.  According to Curenton, plaintiff cannot meet

the elements discussed in *Lepley v. Dresser*, 681 F.Supp. 418 (W.D.Mich.,1988).[24]  Doc. Ent. 49

at 17.  Citing *Moore v. City of Paducah*, 890 F.2d 831, 834 (6th Cir. 1989) ("there is no evidence

beyond mere conjecture and speculation that an agreement existed, thus, precluding a finding of

a conspiracy.") and *Pillette v. Detroit Police Dept.*, 661 F.Supp. 1145 (E.D.Mich. 1987)

(Gilmore, J.),[25] Curenton argues that "[o]ther than conclusory statements alleging conspiracy, the

record lacks a single fact supporting plaintiff's claim that [Curenton] acted in concert with other

MDOC employees with the purpose of depriving him of his rights under the Constitution."  It is

---

[23]Attached to plaintiff's amended complaint is a February 21, 2007 MDOC Memorandum
from Warden Frank Elo, apparently of ARF, regarding racist behavior.  Doc. Ent. 33 at 23.

[24]*Lepley*, 681 F.Supp. at 422 ("For a Section 1983 conspiracy to survive a motion for
summary judgment, specific facts showing either the existence or the execution of the claimed
conspiracy must be set forth by the plaintiff.  Furthermore, these facts must show overt acts related
to the promotion of the conspiracy and some link between the alleged conspirators.  Finally, plaintiff
must present facts that the conspirators agreed to commit an act which deprived the plaintiff of a
right, privilege or immunity secured by the Constitution or the laws of the United States.  It is
essential that the conspiratorial conduct in fact resulted in a violation of plaintiff's constitutional
rights.") (internal and external citations omitted).

[25]*Pillette*, 661 F.Supp. at 1149 ("plaintiff has failed to allege any facts that would support his
conclusory allegations of conspiracy. The vague and conclusory allegations of conspiracy cannot
withstand a motion to dismiss.").

Curenton's position that plaintiff's claimed observation of her September 23, 2008 "private conversation" with ADW Chapman, and claimed "funny look" at plaintiff by Curenton (*see* Doc. Ent. 33 ¶¶ 14-15), "at most, might suggest problems between the plaintiff and Curenton but make no showing of a meeting of the minds amongst defendants or their commission of an act causing injury to plaintiff." Doc. Ent. 49 at 18.

Furthermore, Curenton attests, she "cannot authorize prisoners to be placed in segregation[,]" and "[s]hift commanders are responsible for authorizing prisoners to be placed in segregation." Doc. Ent. 49-3 ¶ 4. Curenton further attests that she "do[es] not have any role in the transfer approval process[,]" "[t]he facility's Security Classification Committee initiates transfers of prisoners from RRF[,]" and "[she] [has] not, nor ha[s] [she] ever been, a member of the Security Classification Committee, nor did [she] speak to the committee regarding the transfer of the Plaintiff." Doc. Ent. 49-3 ¶ 6.

Then, citing *Ward v. Dyke*, 58 F.3d 271 (6ᵗʰ Cir. 1995),[26] defendant points to Nobles's affidavit, wherein he refers to the September 22, 2008 electronic mail (Doc. Ent. 35-2 at 4) and attests that he "authorized the plaintiff's transfer to ARF on October 3, 2008 due to security concerns after receiving information that indicated that the plaintiff was one of the organizers of a possible planned passive protest." Doc. Ent. 35-2 ¶ 5; Doc. Ent. 49 at 18-19. Again citing *Ward*,[27] defendant points to Nobles's affidavit, wherein he refers to the transfer order (Doc. Ent.

---

[26]*Ward*, 58 F.3d at 275 ("Even if defendants' actions had some effect on Ward's future filing of grievances, his transfer is permissible where it serves a legitimate penological interest.").

[27]*Ward*, 58 F.3d at 274 ("The transfer here was to another level II facility; the fact that a prisoner may not like a certain prison location does not automatically transform a valid transfer into a constitutional violation. Ward has no constitutional right to remain at a specific facility or to prevent a transfer to another level II facility for a permissible reason.").

35-2 at 5) and attests that "Plaintiff was transferred from one Level II facility to another. [ARF] is not a disciplinary or mental health facility." Doc. Ent. 35-2 ¶ 6; Doc. Ent. 49 at 19.[28]

**Plaintiff's Response**

In response, plaintiff refers to the description set forth in his May 27, 2009 Step I grievance (RRF-00424, Doc. Ent. 57 at 26); his January 11, 2011 sworn declaration (Doc. Ent. 43 at 47 - Doc. Ent. 43-1 at 8), wherein he describes his conversation(s) with ADW Chapman at ARF (Doc. Ent. 43-1 at 4-5 ¶¶ 76-79); and the undated declaration of RRF prisoner Boone Bey, wherein he claims that in February 2009 he overheard Curenton admit to having played a role in plaintiff's transfer from RRF (Doc. Ent. 43 at 32 ¶ 1, 4). It is plaintiff's position that Curenton, Nobles, Wade and Booker "[a]ll had an active role in initiating the transfer process." Doc. Ent. 57 at 12.

Furthermore, plaintiff attacks Curenton's affidavit on the basis that she recalls the events of September 20, 2008 but does not recall seeing plaintiff on September 23, 2008, "as over two and one half years have elapsed since the alleged date of the occurrence[,]" Doc. Ent. 49-3 ¶¶ 5, 7. Referring to Curenton's attestations that "it appears that [ADW] Chapman was not present in my assignment area on September 23, 2008[,]" "[s]upervisors, including [ADWs], typically sign the assignment log books when they make rounds in an assignment area[,]" and "[ADW] Chapman did not sign the Gym Officer's log book between 6:00 AM and 2:00 PM on September 23, 2008[,]" Doc. Ent. 49-3 ¶ 7, plaintiff also contends that the events of September 20, 2008 are not reflected in the Gym Log Book (Doc. Ent. 49-3 at 6-7). Citing *Combs v. Wilkinson*, 315 F.3d

---

[28]Curenton's affidavit discusses the events of September 20, 2008 and September 23, 2008 (Doc. Ent. 49-3 ¶¶ 4, 5,7), attached to which are portions of the gym logbook (Doc. Ent. 49-3 at 6-9).

23

548, 558 (6th Cir. 2002),[29] plaintiff contends he "has shown that defendant Curenton at least implicitly initiated, approved, or knowingly acquiesced in the unconstitutional conduct of defendant[s] Nobles, Booker, and Wade."  Doc. Ent. 57 at 12.

Citing his complaint (Doc. Ent. 33 ¶ 34) and his declaration (Doc. Ent. 43 at 48 ¶ 7, Doc. Ent. 43-1 at 4-5 ¶¶ 76-78), plaintiff claims that Curenton "pursued her supervisor with threats of employee grievances if they did not remove the hold on Plaintiff so defendant Nobles could falsify a transfer order and transfer plaintiff to a Psychiatric Facility 77 miles from Detroit where he was subjected to an assault, continuous harassment and housed with mentally ill violent prisoners[.]" Doc. Ent. 57 at 13.

Citing Curenton's affidavit regarding the September 20, 2008 search (Doc. Ent. 49-3 ¶ 5), plaintiff claims that "the log book exhibit defendant Curenton attached to her sworn affidavit does not show that any such incident occurred."  Also, citing Curenton's affidavit regarding the alleged September 23, 2008 conversation with ADW Chapman (Doc. Ent. 49-3 ¶ 7), plaintiff claims that "Curenton **never** wrote in the official MDOC document of the log book that she did body searches on a massive amount of prisoners and called supervisory staff in her area to escort prisoner Corbin Bey to segregation."  According to plaintiff, "Prisoner searches (pat downs) are to [be] documented (especially by female officers performing a body search on male prisoners), and a shakedown log is maintained by correction officers daily."  Plaintiff continues, "[i]n accordance with MDOC Policy, these shakedown logs are to be turned in daily at the end of each

---

[29]"At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers. Supervisory liability under § 1983 cannot be based upon a mere failure to act but must be based upon active unconstitutional behavior."  *Combs*, 315 F.3d at 558 (internal citations and quotations omitted).

24

shift." It is plaintiff's position that "[t]he proof of the log book does not reflect the daily operations of supervisory staff in her area nor does her log book accurately prove[] the actual events of typical daily life in prison." Doc. Ent. 57 at 14.

Citing Nobles's November 30, 2010 affidavit (Doc. Ent. 35-2 at 2-3) and the September 22, 2008 electronic mail between Booker and Nobles (Doc. Ent. 35-2 at 4), Lara Lempert's October 13, 2008 letter (Doc. Ent. 32-1 at 20-21), his verified complaint (Doc. Ent. 33 ¶¶ 6, 12, 16, 30), Boone Bey's declaration (Doc. Ent. 43 at 32), Corbin's January 1, 2009 affidavit (Doc. Ent. 43 at 40 ¶ 8), and Corbin's June 1, 2011 affidavit (Doc. Ent. 57 at 32-33 ¶¶ 5-6), plaintiff contends he "has offered a causal connection that defendant Curenton personally participated in the alleged constitutional violation by initiating the supervisory complaints and threats which authorized the retaliatory acts against Plaintiff to originate." Doc. Ent. 57 at 14-15. Citing his declaration (Doc. Ent. 43 at 49-50 ¶¶ 18, 22-29 [July/August 2008], Doc. Ent. 43-1 at 4-5 ¶ 77 [2009]), plaintiff alleges that "Curenton directly participated when she complain[ed] to Nobles and effectuated, encouraged or threatened Warden Booker to participate[] in the specific transfer when he took the 'HOLD' off Plaintiff whereas defendant Curenton and Nobles could perfect their retaliatory scheme by transferring Plaintiff to a dangerous Psychiatric Facility that Curenton and Nobles was well abreast, created a great risk for Plaintiff." Citing his declaration (Doc. Ent. 43 at 49-50 ¶¶ 21, 25-30), Hudson maintains that Curenton learned of the transfer hold on plaintiff on July 14, 2008, when plaintiff's transfer was stopped. According to plaintiff, "Curenton knowing[ly] acquiesced in the unconstitutional conduct with defendant Nobles and encouraged the specific incident of the transfer[.]" Finally, citing Boone's declaration (Doc. Ent.

25

43 at 32), plaintiff contends that Curenton "bragged about her participation[.]"  Doc. Ent. 57 at
15.

**Conclusion**

My previous report and recommendation addressed the issue of conspiracy (Doc. Ent. 51
at 24-26) and noted that "if the Court agrees with the other conclusions reached in this report,
then it need not address plaintiff's conspiracy claims.  This is so, because plaintiff "cannot
succeed on a conspiracy claim because there was no underlying constitutional violation that
injured [him]."  *Wiley v. Oberlin Police Dept.*, 330 Fed.Appx. 524, 530 (6th Cir. 2009).  Doc.
Ent. 51 at 26.

Here, too, the Court need not address plaintiff's conspiracy claim against defendant
Curenton if the Court agrees with my conclusions that Curenton is entitled to summary judgment
on plaintiff's First Amendment retaliation, First Amendment access to courts and Eighth
Amendment claims against her.

**4.    FIRST AMENDMENT**

**a.    RETALIATION**

Plaintiff claims that, on September 20, 2008, Curenton "became aware that Prisoner
Corbin Bey was the M.C. of the event and she harassed all other prisoners who were on call for
this event and threatened them with major misconducts if they entered the gym and did not
remain at the event the entire time."  Plaintiff claims this conduct "was contrary to normal
practice regarding prisoner programming at [RRF]."  Doc. Ent. 33 ¶ 7.[30]

---

[30]In her April 8, 2011 affidavit, Curenton counters: "I did not harass any prisoners as alleged
in the complaint. . . . I did not threaten prisoners with misconducts.  Prisoners that attend programs
and activities are required to remain at the scheduled activity until the activity ends, unless control

Plaintiff contends that the administrative complaints he made at the September 20, 2008 meeting "were followed up with emails from the Regional Medical Administrators, and others, to several Defendants[] named in this complaint." Doc. Ent. 33 ¶ 40. Furthermore, he characterizes his October 5, 2008 grievance as filed against Wade, Nobles and other RRF staff "for [r]etaliation in violation of Plaintiff's First, Fourteenth and Eighth Amendment [r]ights." Doc. Ent. 33 ¶ 61; Doc. Ent. 33 at 25-32 (RRF-00646).

Count I of plaintiff's complaint alleges that plaintiff's October 3, 2008 transfer from RRF to ARF was in retaliation for "Plaintiff's involvement in the NLA's programming which sponsored State of Michigan Lawmakers on [September 20, 2008][.]" Doc. Ent. 33 ¶ 81; *see also* Doc. Ent. 33 ¶ 85 (Count V), Doc. Ent. 33 ¶ 86 (Count VI).

This report construes these claims as alleging a violation of plaintiff's First Amendment right against retaliation for engaging in protected conduct. "A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two-that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

I.      **Protected conduct.**  According to plaintiff, the NLA at RRF "is the first organization under the leadership of Plaintiff to hold a Townhall Meeting in a prison setting with Michigan Lawmakers[,]" "[t]here has not been any other forum of this kind for prisoners to directly

---

center staff authorizes a prisoner to leave the activity."  Doc. Ent. 49-3 ¶ 5.

address their complaints to policy and lawmakers[;]" and his transfer "has impeded and/or effectively ended this forum of redress at RRF."  Doc. Ent. 33 ¶ 42.

Plaintiff's alleged protected conduct is his "involvement in the NLA's programming which sponsored State of Michigan Lawmakers on [September 20, 2008][,]" (Doc. Ent. 33 ¶ 81) and complaining to state lawmakers on that occasion when they visited RRF (Doc. Ent. 33 ¶¶ 85-86; *see also* Doc. Ent. 33 ¶ 90).  *See Gibbs v. Ball*, No. 07-15462, 2009 WL 331604, 6 (E.D. Mich. Feb. 11, 2009) (Rosen, J., adopting report and recommendation of Whalen, M.J.) ("under the first prong of *Thaddeus-X*, filing legitimate grievances regarding prison conditions is protected conduct[.]"); *Reaves v. Caruso*, No. 05-73820, 2006 WL 3782834, 4 (E.D. Mich. Dec. 21, 2006) (Duggan, J., opinion and order concurring with the conclusions in report and recommendation of Whalen, M.J.) ("Plaintiff's complaints about prison conditions giving rise to the allegedly retaliatory transfer constitutes protected conduct.").[31]

**ii.    Adverse action.**[32]  Plaintiff describes ARF as a "remote[,] higher security [p]sychiatric [f]acility[,]" which is "known as a disciplinary facility, with less law library access, a documented racist history . . . where all the prisoner telephone calls are made outside the housing units in zero below weather, [and] minor rule violations are elevated to major misconduct reports

---

[31]Plaintiff's October 3, 2011 response confirms that the alleged protected activities at issue are the September 20, 2008 complaints about prison conditions and political activities within RRF. Doc. Ent. 57 at 19-20.

[32]In his amended complaint, plaintiff alleges that "[o]n the date of the program, Officer [Curenton] became aware that Prisoner Corbin Bey was the M.C. of the event and she harassed all other prisoners who were on call for this event and threatened them with major misconducts if they entered the gym and did not remain at the event the entire time.  Her conduct was contrary to normal practice regarding prisoner programming at [RRF]."  Doc. Ent. 33 ¶ 7.

As defendant Curenton recognizes in her motion brief, "it is not clear whether the[se] harassment allegations involve plaintiff or only the other inmates."  Doc. Ent. 49 at 19.

28

by staff[,]" Doc. Ent. 33 ¶¶ 34, 37; *see also* Doc. Ent. 33 ¶ 38 ("fabricated security classification, a campaign of harassment, major misconducts, loss of appeal in his criminal conviction and . . . discrimination as a M[u]sl[i]m.").

Plaintiff claims he was singled out as "a friend of the Legislator who controls the MDOC 2006-2010 budget, and [with] whom MDOC staffers were feuding[.]" Doc. Ent. 33 ¶ 39. Also, plaintiff claims he met with ARUS Mackintosh on January 15, 2009 regarding the notices of intent, and Mackintosh stated, "I have never heard of a Deputy and Inspector writing a misconduct and NOI for what someone may have [written] in a letter to another facility." Doc. Ent. 33 ¶¶ 73-75. Plaintiff claims he has "been subject[ed] to continued retaliatory harassment and false disciplinary charges although Plaintiff had been transferred from [RRF] for over 100 days." Doc. Ent. 33 ¶ 78.

In his October 3, 2011 response, plaintiff claims that "[a]lthough [he] has no history of mental illness, he was housed with Resident Treatment Patients [RTPs] and Secure Status Residential Treatment Program prisoners [SSRTPs] prescribed strong mood altering medications." Plaintiff claims SSRTP and RTP prisoners "have a history of assault." Doc. Ent. 57 at 7.

Plaintiff continues by describing ARF as "a multilevel psychiatric facility in a remote area with stricter rules and visitations, where plaintiff was deliberately placed at greater risk and eventually assaulted, subjected to fabricated major misconduct reports, intentional hindrance and malicious impediment to court access, confiscation and distribution of legal, religious property, letters from lawmakers all which were not returned, labeled a security threat, and continuous harassment at ARF." Also, he notes that LCF, where he is currently incarcerated, is "over 200

29

miles away from his family[.]"  Furthermore, citing the September 22, 2008 electronic mail and the October 1, 2008 transfer order (Doc. Ent. 35-2 at 4-5), plaintiff claims he was falsely labeled as a *Security Threat* to RRF, which will "**permanently prohibit**[] [him] from <u>ever</u> being housed within 50 miles of his wife, daughters, grand daughters and loved ones for the duration of his Natural Life Sentence."  Doc. Ent. 57 at 20.[33]

Petitioner cannot show that his transfer amounted to an adverse action.  While the adverse action inquiry is ordinarily a question of fact for the jury, some "adverse actions" are so *de minimis* that they fail to state a retaliation claim as a matter of law.  *See Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002); *Thaddeus-X*, 175 F.3d at 398-99.

"[A] transfer does not constitute an adverse action since a transfer is merely an ordinary incident of prison life."  *Siggers-El v. Barlow*, 412 F.3d 693, 704 (6th Cir. 2005).  A transfer or threat to transfer constitutes an adverse action only where the transfer will result in foreseeable negative consequences, such as more restrictive living conditions or impeding access to courts. *See Hill v. Lappin*, 630 F.3d 468, 474-75 (6th Cir. 2010); *Hix v. Tennessee Dep't of Corrections*, 196 Fed. Appx. 350, 358 (6th Cir. 2006); *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005).

---

[33]Plaintiff supports his argument that he has been subjected to adverse action by citing his October 21, 2010 amended complaint (Doc. Ent. 33 ¶¶ 18-42, 80, 93-94); his January 11, 2011 declaration (Doc. Ent. 43-1 at 2-5 ¶¶ 45-86); the declaration of Anthony LaCalamita #668596 (Doc. Ent. 43 at 33 ¶ 12); his statement of disputed factual issues (Doc. Ent. 43 at 44-46 ¶ 8); the declaration of Ryan Cobley #214866 (Doc. Ent. 43 at 42); the declaration of Dwane Collins #281113 (Doc. Ent. 43 at 43); and *Herron v. Harrison*, 203 F.3d 410, 416 (6th Cir. 2000), wherein the Sixth Circuit addressed "Herron's right to pursue his own grievances," and "Herron's right to provide legal assistance to others[,]" *Herron*, 203 F.3d at 415-417.  Doc. Ent. 57 at 20-21.

Plaintiff has presented no evidence to support his claim that ARF is a "disciplinary/mental" facility, other than his averment that ARF is "known as" being more restrictive. *See*, *i.e.*, Doc. Ent. 33 ¶¶ 34, 37, 38; Doc. Ent. 43 at 17, 34 (MDOC PD 05.01.140C, effective June 29, 2009).[34]  He also contends that Curenton had "previous experience with supervising mentally ill prisoners through [her] past employment at Western [Wayne] Correctional Facility[.]" As a result, plaintiff claims, Curenton "knew and [was] personally well aware of these mentally ill prisoner[s'] potential for assault on general population prisoners[.]" Doc. Ent. 57 at 15.  Still, these allegations are insufficient to show that plaintiff's transfer, at the time it was made, would result in foreseeable negative consequences.

To be sure, I note plaintiff's allegation in his amended complaint that he "was transferred to a mental health facility, stigmatized as a mental health patient 'a bug,' suffer[ed] the los[s] of his criminal appeal, ties with family and supporters for 'Administrative Reasons[.]'" Doc. Ent. 33 ¶ 60.  Furthermore, plaintiff alleges that he has suffered and is still suffering "from the retaliatory transfer to a harsher mental health facility where racism was rampant[,]" and claims to have suffered "the loss of valued constitutional rights by Defendants' callous disregard of those rights [which has] created a chilling effect on his right to seek redress."  Doc. Ent. 33 ¶ 93.

---

[34]MDOC PD 05.01.140 ("Prisoner Placement and Transfer"), effective Oct. 10, 2011, has attachments listing Reception Facilities (MDOC PD 05.01.140A); Level V facilities (MDOC PD 05.01.140B); Level IV facilities (MDOC PD 05.01.140C); Level II facilities (MDOC PD 05.01.140D), Secure Level I facilities (MDOC PD 05.01.140E), Level I facilities (MDOC PD 05.01.140F) and In-Reach Facilities (MDOC PD 05.01.140G).

ARF is listed as being a Level IV, Level II, Secure Level I, Level I and an In-Reach Facility. Also, according to these attachments, there are Residential Treatment Programs (RTPs) at ARF, Macomb Correctional Facility (MRF), Women's Huron Valley Correctional Facility (WHV), Mound Correctional Facility (NRF), and Richard A. Handlon Correctional Facility (MTU).

The Sixth Circuit has stated:

> . . . Conerly's actions, as alleged by Pasley, could constitute "adverse action" under the precedent of this court. Pasley alleges that after he mentioned the possibility of filing a grievance, Conerly made two immediate threats: first, to have him moved out of the unit so that he would lose his job and, second, **to use her influence with a warden to have him moved to a location where his family would not be able to visit him.** These threats could be "capable of deterring a person of ordinary firmness" from exercising protected rights, the standard for adverse action set forth in *Thaddeus-X*. 175 F.3d at 398. We held in *Siggers-El v. Barlow*, 412 F.3d 693, 701-02 (6th Cir.2005), that a retaliatory transfer to another institution was an adverse action if it resulted in foreseeable, negative consequences to the prisoner, such as loss of his high-paying job and reduced ability to meet with his lawyer. This court has also noted that a mere threat is actionable if it otherwise meets the standard that it would deter a person of ordinary firmness from engaging in a protected activity. *See Smith v. Yarrow*, 78 Fed.Appx. 529, 543 (6th Cir.2003).

*Pasley v. Conerly*, 345 Fed.Appx. 981, 985 (6th Cir. 2009) (emphasis added).

However, plaintiff Hudson has not alleged that Curenton threatened to transfer plaintiff a great distance from his family.  And, it appears that RRF and Mound Correctional Facility (NRF) are the only MDOC prisons located in Wayne County.  *See* www.michigan.gov/corrections, "Prisons."  As a result, any transfer other than to NRF would likely lengthen the distance plaintiff's family has to travel for visitation.  Furthermore, it appears that there is at least one NLA chapter in a Michigan prison other than RRF.[35]  As a result, it cannot be said that a transfer from ARF was synonymous with a lack of access to NLA programming.  Likewise, it may be the case that plaintiff's resulting removal from the Inside-Out Prison Exchange Program at RRF taught by a University of Michigan Dearborn professor could be substituted with a similar program at another MDOC facility.  Accordingly, as was the case with the alleged consequences

---

[35]According to the Merrill Palmer Skillman Institute's website (http://mpsi.wayne.edu/outreach/index.php), the program *Parenting from Prison* is sponsored by Chapter 1011 of the National Lifers of America, Inc. at NRF in Wayne County, Detroit, Michigan.

of transfer mentioned in my September 23, 2011 report and recommendation, *see* Doc. Ent. 51 at 16, this report treats the distance from family and the absence of plaintiff's access to NLA and/or the Inside-Out Prison Exchange Program at RRF as consequences of the transfer and not independent adverse actions.[36]

**iii.    Causation.**  Plaintiff contends that he "was the first and only prisoner participant in these programs [Chance for Life, U of M Inside Out Think Tank, Wayne County Community College Program] who was mysteriously transferred without having violated any rules, policies, or infringed any security mechanism of [RRF]."  Doc. Ent. 33 ¶¶ 56, 58.

Even assuming that plaintiff's transfer from RRF to ARF constituted an adverse action, plaintiff has not shown a causal connection between the alleged adverse action and his protected activity.  If the "defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment."  *Thaddeus-X*, 175 F.3d at 399.

**Curenton's Argument**

Curenton attests that she "cannot authorize prisoners to be placed in segregation[,]" and she does not "have any role in the transfer approval process."  Doc. Ent. 49-3 ¶¶ 4, 6.  She also claims that she "would have taken the same actions despite the plaintiff having engaged in a protected activity."  Doc. Ent. 49 at 20-21.  In this regard, she attests that she "did not harass any prisoners as alleged in the complaint[,]" she "did search prisoners before the program started[,]"

---

[36]Other considerations to prisoner security classification include program classification, including the conditions of lateral transfers.  *See* MDOC 05.01.130 ("Prisoner Security Classification"), effective 10/10/11, ¶¶ T-U.  For example, a prisoner involved in an education program shall only be laterally transferred "when necessary and only with the approval of the Warden or designee[.]" *See* MDOC PD 05.01.130 ¶ U(3),(4).

33

"[p]risoner searches are a part of [her] daily responsibilities, as indicated in [MDOC PD] 04.04.110, "Search and Arrest in Correctional Facilities", and in the assignment post orders[,]" and she "recall[ed] seeing one prisoner pass something to another prisoner on September 20, 2008 before the aforementioned program was scheduled to begin."  Doc. Ent. 49-3 ¶ 5.  Citing *Hartman v. Moore*, 547 U.S. 250, 260 (2006),[37] defendant Curenton claims "the inmates would have been searched despite any participation in the NLA conference, since she observed two prisoners passing something amongst themselves."  Doc. Ent. 49 at 21.

Furthermore, Curenton points to Nobles's affidavit, wherein he refers to the September 22, 2008 electronic mail (Doc. Ent. 35-2 at 4) and attests that he "authorized the plaintiff's transfer to ARF on October 3, 2008 due to security concerns after receiving information that indicated that the plaintiff was one of the organizers of a possible planned passive protest[,]" Doc. Ent. 35-2 ¶ 5.  In other words, Curenton summarizes, "plaintiff would have been transferred despite his role in the NLA conference[.]"  Doc. Ent. 49 at 22.

It is Curenton's position that "[p]laintiff cannot show that he would not have been transferred or searched 'but for' having participated in the NLA conference[,]" while "defendant has shown evidence that plaintiff would have been transferred and that inmates would have been searched based on similar circumstances."  Furthermore, Curenton asserts that plaintiff "has

---

[37]*Hartman* was "a Bivens action against criminal investigators for inducing prosecution in retaliation for speech."  The Supreme Court considered "whether the complaint states an actionable violation of the First Amendment without alleging an absence of probable cause to support the underlying criminal charge[,]" and held that "want of probable cause must be alleged and proven."  *Hartman*, 547 U.S. at 252.  Among other things, the Supreme Court stated: "If there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind."  *Hartman*, 547 U.S. at 260.

34

failed to present any evidence demonstrating that the alleged protected conduct was a factor in defendant's actions in this matter."  Doc. Ent. 49 at 22.

### Plaintiff's Response

In response, plaintiff claims there was no penological interest.  Doc. Ent. 57 at 16-21.  In support of his claim that there is a genuine issue of material fact as to causation, he refers to his verified complaint, Boone Bey's declaration (Doc. Ent. 43 at 32), and Thomas's declaration (Doc. Ent. 57 at 39-40) and states, "with the suspect timing of the transfer and [Curenton's] attempts to solicit ADW Chapman into the conspiracy, [it] certainly raises a triable issue of fact regarding whether the motive to transfer plaintiff was retaliatory."  Plaintiff claims that sworn pleadings show "that the motive to transfer Plaintiff to a Psychiatric facility had absolutely nothing to do with alleged security concerns."[38]  Then, based upon Moore's attestation that he, Corbin Bey and plaintiff, "NEVER discussed any plans or events to protest against any prison condition," Doc. Ent. 57 at 31 ¶ 3; Corbin's attestation that he did not "discuss plans for any type of protest regarding prison conditions, Commissary taxes or the removal of tobacco products[,]" Doc. Ent. 57 at 33 ¶ 10; and the fact that Corbin and Moore are still incarcerated at RRF, plaintiff claims that "[t]here could not have been any genuine security concerns[.]" Doc. Ent. 57 at 16.  According to plaintiff, "[t]he conspiracy to fabricate a transfer order and falsify official MDOC documents in violation of plaintiff's First Amendment Rights to Redress, was a

---

[38]Here, plaintiff refers to his verified complaint; his January 11, 2011 sworn declaration (Doc. Ent. 43-1 at 1 - 5, ¶¶ 41, 76-80); Thomas's declaration (Doc. Ent. 57 at 39-40); Boone's declaration (Doc. Ent. 43 at 32 ¶¶ 1-5); a declaration by Leon Douglas (presumably #132125) (Doc. Ent. 43 at 38-39); the affidavit of Clarence Moore (#100885), who is currently incarcerated at RRF (Doc. Ent. 57 at 31); and Corbin Bey (Doc. Ent. 43 at 40 [January 1, 2009 affidavit], Doc. Ent. 57 at 32-33 [June 1, 2011 affidavit]).

collaborative effort of all the defendants named, partially beginning with Sherry Curenton." Doc. Ent. 57 at 17.

According to plaintiff, his January 20, 2011 response (Doc. Ent. 43) argued that defendants' actions "were retaliatory and were arbitrary and capricious." Therefore, citing his complaint, his affidavit, and also the affidavits of Corbin (Doc. Ent. 43 at 40 [January 1, 2009 affidavit], Doc. Ent. 57 at 32-33 [June 1, 2011 affidavit]), Thomas (Doc. Ent. 57 at 39-40), Moore (Doc. Ent. 57 at 31), Boone (Doc. Ent. 43 at 32) and Douglas (Doc. Ent. 43 at 38-39), plaintiff contends he has "sufficiently alleged that the retaliatory acts were not a reasonable exercise of prison authority and that they did not serve any legitimate correctional goal." Doc. Ent. 57 at 17.

Citing *Cornell v. Woods*, 69 F.3d 1383, 1388 -1389 (8th Cir. 1995) (retaliatory transfer); *Woods v. Smith*, 60 F.3d 1161, 1165 (5th Cir. 1995) ("An action motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, when taken for a different reason, might have been legitimate."); and *Smith v. Maschner*, 899 F.2d 940, 948-949 (10th Cir. 1990),[39] plaintiff contends that "prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when

---

[39]"We think Smith's evidence is sufficient to support an inference by a fair-minded jury that defendants took disciplinary action against him based at least in part on improper motives. Smith has supported his allegations of retaliation by the only means available to him—circumstantial evidence of the suspicious timing of his discipline, coincidental transfers of his witnesses and assistants, and an alleged pattern by defendants of blocking his access to legal materials and assistance.

Precisely because the ultimate fact of retaliation turns on defendants' state of mind, it is particularly difficult to establish by direct evidence." *Maschner*, 899 F.2d at 949.

there is a genuine issue of material fact as to whether the actions described were taken in retaliation for the exercise of a constitutional right[.]" Doc. Ent. 57 at 17.

Plaintiff claims that defendant Curenton and the other defendants were "fully aware of Plaintiff's First Amendment activities on September 20-24, 2008," and also claims that Nobles "made it clear to Corbin Bey, Clarence Moore, and the other Warden's Forum's Representatives that he and *other* RRF staff were not elated by the interest the Legislators had shown regarding Plaintiff's complaints."[40]  Citing his own declaration (Doc. Ent. 43-1 at 4-5 ¶¶ 76-80), plaintiff asserts that "Curenton was the officer in charge of the event in the gymnasium and was able to report directly to defendant Nobles when her request to have plaintiff transferred w[as] not collaborated by ADW Chapman[,] [w]ho chose not to get involved."  Doc. Ent. 57 at 17.

Plaintiff then attacks Curenton's affidavit (Doc. Ent. 49-3 at 2-4 ¶¶ 5, 7) and notes that her logbook (Doc. Ent. 49-3 at 6-9) "is void of any such event [on September 20, 2008] as mandated by MDOC Policy."  Here, plaintiff appears to refer to his allegation that Curenton stated, "I'm tired of Hudson Bey and NLA inviting all these legislators in here making complaints about me and my coworkers.  Hudson Bey thinks he's important and [cannot] be transferred.  But I can get him transferred[,]" Doc. Ent. 33 ¶ 8,[41] and suggests that Curenton shared her sentiment with Nobles and Wade.  Plaintiff also notes Boone's declaration that, around February 2009, he heard Curenton state to another officer, "I'm the one who had Hudson Bey . . . road out with [h]is stuttering ass.  He thought he was somebody big around here by

_____

[40]Here, plaintiff refers to his complaint and the affidavits/declarations of Corbin (Doc. Ent. 43 at 40 ¶ 8); Boone (Doc. Ent. 43 at 32 ¶¶ 1-5); and Moore (Doc. Ent. 57 at 31 ¶¶ 4-7).

[41]Both Corbin (Doc. Ent. 57 at 32 ¶ 5) and Thomas (Doc. Ent. 57 at 39 ¶ 8) declare to have personal knowledge of this statement by Curenton.

having different State Representatives complaining about other officers.  The [explitive] somehow got the first transfer blocked, but I got his dumb ass this time[,]" Doc. Ent. 43 at 32 ¶ 1.  Plaintiff also notes Boone's declaration that, "Curenton plainly expressed in her own words . . . which I overheard that she personally falsely petitioned [RRF] staff to have prisoner transferred in retaliation for bringing in State Representatives as guests within the facility, for prisoners to voice their grievances about staff, medical treatment and prisoner programming.  She also stated that if they didn't transfer him that she was going to file paperwork on them and that she had a SPON placed in his file so that he could never return back to [RRF][,]" Doc. Ent. 43 at 32 ¶ 4, as well as Boone's declaration that Curenton stated that she fabricated her fears of plaintiff and "threatened ADW Chapman with paperwork if they didn't transfer [plaintiff][,]" Doc. Ent. 43 at 32 ¶ 5.  According to plaintiff, "[t]his sworn testimony clearly shows Curenton's direct involvement and precludes summary judgment."  Doc. Ent. 57 at 18.

    In support of his claim that there were no legitimate security concerns, plaintiff notes that Moore and Corbin Bey are still located at RRF, despite Nobles September 22, 2008 electronic mail to Booker that "[o]rganizers were said to be prisoners Moore[,] Hudson-Bey[,] and Corbin-Bey[,]" Doc. Ent. 35-2 at 4.  Also, noting Nobles's statement that "Prisoners have been discussing a planned "passive" protest to occur on [October 1, 2008][,]" Doc. Ent. 35-2 at 4, plaintiff points out that Nobles "did not authorize the retaliatory transfer **until TWO days AFTER the false passive protest.**"  Plaintiff argues that "a manufactured assumption of *security*  [cannot] justify the constitutional violations of Plaintiff's rights."  Furthermore, it is plaintiff's position that Corbin Bey's (Doc. Ent. 57 at 32 ¶ 7) and Thomas's (Doc. Ent. 57 at 39-40) affidavits prove that "searching prisoners was not a regular routine during programming with

38

outside guest[s] in the gymnasium." Doc. Ent. 57 at 18.  Also, plaintiff points out that the gym logbook (Doc. Ent. 49-3 at 6-9) contains no record of any "massive prisoner search or two prisoners *passing something*[.]"  Doc. Ent. 57 at 18-19.  Therefore, he claims, "[t]here was no legitimate interest in the searches other than harassment."  Doc. Ent. 57 at 19.

Plaintiff avers that "[d]uring the transfer initiated by defendant Nobles on July 14, 2008, defendant Curenton expressed to the yard officer [CO Fears] that she was upset because plaintiff was able to have his transfer stopped.  Curenton conveyed that she felt plaintiff thinks he is too powerful and can't be touched."[42]  According to plaintiff, "[o]nce [he] resumed his position as the NLA President and continued to bring in State Representatives, Curenton devised her cabal on Sept. 20, 2008."[43]  Additionally, plaintiff claims "there was no planned passive protest or legitimate security concerns."[44]  It is plaintiff's position that, "[t]he simpl[e] fact that Nobles transferred Plaintiff two days AFTER the alleged passive protest proves there was not [a] legitimate security interest[,]" and that his protected activities were the motive.  Doc. Ent. 57 at 20.

Specifically, plaintiff claims that following approximately "10-15 days of Plaintiff's complaints to the Michigan State Legislators, and other adverse actions herein, defendants transferred him to a higher multi-secure level Psychiatric facility [ARF] 77 miles from Detroit[,]

---

[42]In support of this statement, plaintiff refers to his January 11, 2011 sworn declaration (Doc. Ent. 43 at 47 - Doc. Ent. 43-1 at 8) and Boone's declaration (Doc. Ent. 43 at 32).  Doc. Ent. 57 at 20.

[43]Here, plaintiff relies upon his January 11, 2011 sworn declaration (Doc. Ent. 43 at 49 ¶¶ 20-23).

[44]Here, plaintiff relies upon the affidavits of Moore (Doc. Ent. 57 at 31) and Corbin (Doc. Ent. 43 at 40 [January 1, 2009], Doc. Ent. 57 at 32-33 [June 1, 2011]).

while similar[ly] situated alleged co-conspirator prisoners Moore and Corbin Bey remain[] at RRF enjoying programs, visitation, etc." Doc. Ent. 57 at 21.[45]

## Conclusion

Upon consideration, I reach the same conclusion with respect to the cause of plaintiff's transfer to ARF as I did in my September 23, 2011 report and recommendation. *See* Doc. Ent. 51 at 16-20. Therein, I noted that "the September 22, 2008 electronic mail, the September 30, 2008 transfer order and Nobles's affidavit suggest that plaintiff's participation in the protected conduct of September 20, 2008 at RRF was not the impetus for plaintiff's October 3, 2008 transfer to ARF. Instead, it appears that the news of the purported October 1, 2008 passive protest was the impetus to plaintiff's transfer." Doc. Ent. 51 at 18. Then, citing *Hewitt v. Helms*, 459 U.S. 460, 474 (1983), I noted that "even though there may be a connection between learning of the purported October 1, 2008 passive protest, which this report assumes was protected conduct, and the ultimate October 3, 2008 transfer, there may have been an overriding security concern. In other words, plaintiff may have been transferred because, notwithstanding the assumed protected activity of planning a passive protest, a security concern was presented." Doc. Ent. 51 at 19. Finally, I observed:

> . . . to the extent plaintiff asserts that he was not involved in such a protest and that no protest actually happened (Doc. Ent. 43 at 11-12), for purposes of plaintiff's retaliation claim it is irrelevant whether defendant Nobles was correct in concluding that plaintiff was involved in a planned protest. All that matters is that this was Nobles' subjective motivation. Plaintiff's "conclusory allegations of

_____

[45]Here, plaintiff relies upon his verified complaint; his January 11, 2011 sworn declaration (Doc. Ent. 43 at 49 to Doc. Ent. 43-1 at 3, ¶¶ 20-66); the October 13, 2008 letter from Lara Lempert (Doc. Ent. 43-1 at 20-21); Boone's declaration (Doc. Ent. 43 at 32 ¶¶ 1-5); and Corbin's January 1, 2009 affidavit (Doc. Ent. 43 at 40 ¶¶ 7-8), as well as the affidavits of Moore (Doc. Ent. 57 at 31) and Corbin (Doc. Ent. 57 at 32-33). Doc. Ent. 57 at 21.

retaliatory motive unsupported by material facts [are] not . . . sufficient" to defeat
defendants' motion for summary judgment. *Harbin-Bey v. Rutter*, 420 F.3d 571,
580 (6th Cir. 2005) (internal quotation omitted); *see also*, *Cox v. Jackson*, 579 F.
Supp. 2d 831, 848 (E.D. Mich. 2008) (Rosen J., adopting Report of Komives,
M.J.).

Doc. Ent. 51 at 19-20.

The same is true here.  It does not appear that **(a)** whatever action defendant Curenton
allegedly took on September 20, 2008 (Doc. Ent. 33 ¶¶ 6-8), including plaintiff's allegation that
Curenton said before the event, "I can get him transferred[,]" (Doc. Ent. 33 ¶ 8); or **(b)** whatever
defendant Curenton allegedly said to ADW Chapman on September 23, 2008 or however
defendant Curenton allegedly looked at plaintiff on that date (Doc. Ent. 33 ¶¶ 14-15), or **(c)**
ADW Chapman's alleged September 26, 2008 statement to plaintiff that Curenton "may talk to
Wade or Nobles about you and the complaints made to the outside guest you had come in last
Saturday[,]" (Doc. Ent. 33 ¶ 17) were the impetus for Plaintiff's October 3, 2008 transfer to
ARF.   Instead, it appears that the September 22, 2008 news from Nobles to Booker of the
purported October 1, 2008 passive protest (Doc. Ent. 35-2 at 4) was the impetus to plaintiff's
transfer order, which was prepared and dated by Nowak on September 30, 2008, apparently
ordered on October 1, 2008, and executed on October 3, 2008 (Doc. Ent. 35-2 at 5).  As Nobles
attested, he "authorized the plaintiff's transfer to ARF on October 3, 2008 due to security
concerns after receiving information that indicated that the plaintiff was one of the organizers of
a possible planned passive protest[,]" Doc. Ent. 35-2 ¶ 5 (citing the September 22, 2008
electronic mail).[46]

---

[46]Apparently in an effort to attack the veracity of Nobles's November 30, 2010 affidavit
(Doc. Ent. 35-2 at 2-3), plaintiff attaches the September 22, 2011 declaration of Willie Merriweather
(#131483), who is currently incarcerated at LCF (Doc. Ent. 57 at 41-43).  Therein, Merriweather

My conclusion that the September 22, 2008 news was the impetus for plaintiff's transfer order is unchanged by plaintiff's observation that the planned "passive" protest was purported to occur on October 1, 2008, yet he was not transferred until October 3, 2008, or that Moore and Corbin Bey remain incarcerated at RRF.  *See Hewitt*, 459 U.S. at 474 ("the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution."). And, to the extent plaintiff claims there was no planned passive protest or legitimate security concern (Doc. Ent. 57 at 20), my September 23, 2011 report and recommendation acknowledged that, for purposes of plaintiff's retaliation claim, it is irrelevant whether defendant Nobles was correct in concluding that plaintiff was involved in a planned protest. All that matters is that this was Nobles' subjective motivation.  *See* Doc. Ent. 51 at 19.

Furthermore, it does not appear that Curenton was personally involved in the initiation or preparation of plaintiff's transfer order.  For example, the Transfer Order's notation that "SCC requests transfer due to security concerns at RRF[,]" Doc. Ent. 35-2 at 5, is consistent with MDOC Policy, which provides that "[t]ransfers shall be initiated by a Security Classification Committee (SCC) except as otherwise provided in this policy."  MDOC PD 05.01.140 ("Prisoner Placement and Transfer"), effective 10/10/11, ¶ C.  The SCC is described as follows:

> Each institution shall have at least one Security Classification Committee (SCC) which shall be responsible for ensuring proper prisoner placement at that institution. SCC members shall be appointed by the Warden and include at least two command staff supervisors at level 13 or above, one of whom must be of the rank of Assistant Deputy Warden or above. Whenever possible, SCC shall include

---

attests that Nobles was employed at RRF many years before September 18, 2007.  *Compare* Doc. Ent. 35-2 ¶ 3, Doc. Ent. 57 at 41 ¶ 3.   Also, Merriweather cites Nobles's testimony in Merriweather's Case No. 94-11475 (Wayne County Recorder's Court) (Doc. Ent. 57 at 41 ¶ 2, 42), and attests that "[i]t is my personal knowledge that Scott Nobles has [a] history of lying and fabricating evidence against Black prisoners in the [MDOC]."  Doc. Ent. 57 at 41 ¶ 5.

> staff representative of custody, programs, and housing. A Qualified Mental Health
> Professional (QMHP) also shall be included if the prisoner has a history of mental
> illness during his/her incarceration; at a reception facility, a QMHP shall be
> included if the prisoner has been identified as being in need of mental health
> services.

MDOC PD 05.01.130 ("Prisoner Security Classification"), effective 10/10/11, ¶ G.  While the members of RRF's SCC are not clear, defendant Curenton has attested that she "do[es] not have any role in the transfer approval process.  The facility's [SCC] initiates transfers of prisoners from RRF.  I am not, nor have I ever been, a member of the Security Classification Committee, nor did [she] speak to the committee regarding the transfer of the Plaintiff."  Doc. Ent. 49-3 ¶ 6.

My conclusion that Curenton was not personally involved with the initiation or preparation of plaintiff's transfer order is unchanged by plaintiff's belief that defendant Curenton participated in the transfer by contacting Nobles.  For example, I note **(a)** plaintiff's claims that, in conversations he had with ADW Chapman after Chapman's May / June 2009 transfer to ARF, plaintiff learned that Curenton attempted to employ Chapman to transfer plaintiff after the September 20, 2008 event; Chapman revealed that Curenton may have gone to Nobles; plaintiff learned that Nobles's transfer of plaintiff was not for security reasons; Chapman conveyed that there was a hold on plaintiff for programs and transfer coordinator Nowak knew not to transfer plaintiff; and, apparently, Chapman assured plaintiff that Nobles must have ordered Nowak to process plaintiff's transfer (Doc. Ent. 43-1 at 4-5 ¶¶ 76-77); **(b)** plaintiff's  argument that Curenton "was able to report directly to defendant Nobles when her request to have plaintiff transferred w[as] not collaborated by ADW Chapman[,]" Doc. Ent. 57 at 17; and (c) plaintiff's claim in his verified response that Curenton insisted to Nobles and Wade that "plaintiff felt he was too important and should be transferred for bringing in politicians," Doc. Ent. 57 at 18

43

(perhaps referring to Doc. Ent. 33 ¶ 8). However, none of this is evidence that Curenton actually contacted Nobles.

Furthermore, my conclusion is unchanged by plaintiff's reliance upon Boone's declaration, wherein Boone describes a February 2009 conversation he heard at RRF between Curenton and Officer Shipp, during which Curenton admitted to having a role in plaintiff's transfer from RRF; stated that she falsely petitioned RRF staff to have plaintiff transferred; threatened paperwork if plaintiff was not transferred; stated she had a SPON placed in plaintiff's file so that he could not return to RRF; and stated that she fabricated her fears of plaintiff (Doc. Ent. 43 at 32 ¶¶ 1, 3, 4, 5). Plaintiff identified this document as the declaration of Victor Boone Bey. *See* Doc. Ent. 43 at 30 (Index of Exhibits). However, even though it is arguably signed under penalty of perjury, it is not dated, it is not notarized, the 6-digit MDOC Offender Number is illegible, and the Court could not located a Victor Boone in the MDOC's Offender Tracking Information System (www.michigan.gov/corrections, "Offender Search").

Finally, I recognize plaintiff's allegation that Curenton played a role in embellished, falsified or fabricated documents, as well as plaintiff's allegation that Curenton threatened other MDOC employees. For example, plaintiff mentions (a) a fabricated security classification (Doc. Ent. 33 ¶ 38, Doc. Ent. 57 at 20); (b) embellishment, falsification and fabrication of an employee's complaint against plaintiff (Doc. Ent. 33 ¶ 54); (c) falsification of a complaint on defendant to her supervisors (Doc. Ent. 57 at 9); (d) a fabricated transfer order and falsification of official MDOC documents (Doc. Ent. 57 at 17); and (e) Curenton's threats to file employee grievances, apparently against her supervisor(s) (Doc. Ent. 57 at 9, 13, 14, 15).

44

However, plaintiff has not identified the allegedly embellished, falsified and/or fabricated complaint, whether by an MDOC employee against plaintiff (Doc. Ent. 33 ¶ 54) or by Curenton against a defendant to supervisors (Doc. Ent. 57 at 9). The closest plaintiff comes to detail is his allegation that RRF Corrections Officer Curenton complained to RRF Deputy Warden Nobles and "effectuated, encouraged or threatened Warden Booker to participate[] in the specific transfer when he [Booker] took the 'HOLD" off Plaintiff whereas defendant Curenton and Nobles could perfect their retaliatory scheme by transferring Plaintiff to a dangerous Psychiatric Facility that Curenton and Nobles were well [aware], created a great risk for Plaintiff." Doc. Ent. 57 at 13.[47] And, to the extent plaintiff is alleging that the Transfer Order (CSJ-134) falsely

---

[47]Plaintiff's reference for this statement seems to be a comparison between **(a)** RRF Warden Booker's January 2011 affidavit, where he attested, "plaintiff's contention that he had 'holds' preventing his transfer from RRF is false[,]" Doc. Ent. 39-1 at 3 ¶ 8; **(b)** plaintiff's declaration that "the original members of the Theory Group[,] [of] which [he] and Corbin Bey were a part[,] had Warden's *hold* on us not to be transferred[,]" Doc. Ent. 43 at 49 ¶ 18; **(c)** plaintiff's declaration that, "[o]n July 14, 2008, while awaiting in the transfer area to be transported, ADW Crittenton notice[d] me and ordered my transfer cancel[l]ed. She said Warden Booker has a HOLD on you for the U of M Program[,]" Doc. Ent. 43 at 49 ¶ 22; and **(d)** plaintiff's declaration that, during conversations at ARF, Chapman informed plaintiff there had been a hold on him at RRF for programs, Doc. Ent. 43-1 at 4-5 ¶ 77. *See also* Doc. Ent. 43-1 at 20 (the October 13, 2008 letter from University of Michigan-Dearborn's Lempert, wherein she states that "[i]n the course of [her] meeting [with the warden], he told [her] that he was eliminating the 'hold' on the Theory Group.").

Plaintiff also refers to an August 2008 search of his cell, ordered by Nobles, and the resulting conversation with Nobles and Wade, during which they questioned plaintiff extensively about the Inside Out Program and vigorously tried to recruit plaintiff as their informant, but plaintiff refused and Officer Brown was paged to escort plaintiff to segregation, Doc. Ent. 43 at 49-50 ¶¶ 23-26; Plaintiff's declaration describes Nobles's tirade and alleges that Nobles told plaintiff he "could not run the program or participate without [Nobles's] approval[,]" Doc. Ent. 43 at 50 ¶¶ 26-27; and claims he was later told by Nobles, "be careful on the yard and enjoy what little time [you] ha[ve] left[,]" after which Nobles allowed plaintiff to return to his cell and told plaintiff he would be hearing from him (Nobles), Doc. Ent. 43 at 50 ¶¶ 28. Plaintiff believes that Nobles has "a strong racial bias against prisoners and black prisoners in particular." Doc. Ent. 43 at 50 ¶ 29.

Finally, plaintiff refers to his conversations with ADW Chapman after Chapman's transfer to ARF in May/June 2009, through which plaintiff learned that Curenton attempted to recruit Chapman to transfer plaintiff after the September 20, 2008 event and that Curenton may have gone

represented his security classification, *see* Doc. Ent. 35-2 at 5, there is no indication that RRF performed a Security Classification Screen - Review - Male Prisoners Only form (CSJ-481), *see* MDOC PD 05.01.130 ("Prisoner Security Classification"), effective 10/10/11, ¶ I(2).[48]

**b.     ACCESS TO COURTS**

**i.**     The First Amendment sets forth "the right of the people . . . to petition the Government for a redress of grievances."  U.S. Const. Amend. I.  According to plaintiff, on October 3, 2008, he informed Atcher that he had "legal briefs that are time sensitive and need to be filed."  Doc. Ent. 33 ¶ 32.

Plaintiff alleges that "RUO Atcher and several 'John Doe' officers, searched, read, seized, destroyed, and began to pack Plaintiff's legal, religious, and personal property for transfer from housing Unit 4D where Plaintiff was, or had been assigned."  Doc. Ent. 33 ¶ 23.  Plaintiff also alleges that the retaliatory transfer and confiscation of his legal materials and religious property "deliberately placed Plaintiff in harm of . . . loss of appeal in his criminal conviction[.]"  Doc. Ent. 33 ¶ 38.

In Count III of his complaint, plaintiff claims that defendants Curenton, Ridley and Atcher were deliberately indifferent to plaintiff's constitutional rights "when they engaged in conduct causing the illegal transfer, and destroying Plaintiff's legal papers preventing his

---

to Nobles.  Plaintiff also claims to have learned that Nobles's transfer of plaintiff was not for security reasons and to have been assured that Nobles must have required Nowak to process plaintiff's transfer (Doc. Ent. 43-1 at 4-5 ¶ 77).

[48]"Prisoners shall be rescreened for security classification . . . if any of the following occur: . . . The prisoner is being transferred to a different security level or to a different institution and it has been at least 60 calendar days since the prior screening or the prisoner has incurred a Class I or Class II misconduct since the prior screening. This does not apply to temporary transfers for medical, psychiatric, or other treatment unrelated to security needs."  MDOC PD 05.01.130, ¶ I(2).

meaningful access to the Courts and Religious items[,]" in violation of the First Amendment. Doc. Ent. 33 ¶ 83.  Later, plaintiff claims he "[s]uffered the loss of this criminal appeal in state and federal courts."  Doc. Ent. 33 ¶ 93.

According to defendant Curenton, "the only allegations remotely applicable to an access to the courts claim relate to the packing of the plaintiff's property[,]" and "officers Atcher and Blanchett were the only two officers involved with the handling of plaintiff's property."  Doc. Ent. 49 at 23; Doc. Ent. 35-5 ¶ 4 (Atcher Affid.).[49]  Defendant Curenton contends she "was not personally involved."  Doc. Ent. 49 at 23.

**ii.**     Plaintiff is currently serving life sentences for two January 28, 1984 murders in the first degree.  *See* www.michigan.gov/corrections, "Offender Search;" Case No. 84-0868 (Wayne County) and Case No. 84-62537-FC (Oakland County).  Plaintiff has filed petitions for writs of habeas corpus as to each of these cases:

1.     Plaintiff was sentenced in the Wayne County case on April 24, 1985. Case No. 84-0868.  He filed an appeal on May 20, 1985.  His conviction was affirmed on September 16, 1986.  Plaintiff filed a delayed application for leave to appeal on November 4, 1986.  The February 13, 1987 motion for reconsideration was denied on April 27, 1987.  Case No. 85031(Mich. App.), Case No. 79457 (Mich.).

On February 5, 1996, plaintiff filed a delayed application for leave to appeal regarding the January 10, 1996 order in the Wayne County case.  The application was denied on May 22, 1996.  On July 17, 1996, plaintiff filed a delayed application for leave to appeal in the Michigan Supreme Court.  It appears to have been denied on April 25, 1997.  *People v. Hudson*, Case No. 192446 (Mich. App.), Case No. 106832 (Mich.).

---

[49]In her December 3, 2010 affidavit, RRF RUO Lois Atcher attested that "[o]n October 3, 2008, [she] assisted Officer Blanchett in packing the plaintiff's property in accordance with [MDOC PD 04.07.112][.]"  Doc. Ent. 35-5 ¶ 4.

Plaintiff filed a petition for writ of habeas corpus on April 23, 1998. **Case No. 2:98-cv-71756-AC-DAS.** Ultimately, the petition was dismissed on June 17, 2005. The United States Supreme Court denied the petition for writ of certiorari on October 10, 2006.

On December 10, 2010, plaintiff filed a delayed application for leave to appeal regarding the October 1, 2010 order in the Wayne County case. *People v. Hudson*, Case No. 301529 (Mich. App.).

2.     Plaintiff was sentenced in the Oakland County case on February 27, 1986. Case No. 84-62537-FC. On September 16, 1987, the Michigan Court of Appeals affirmed Hudson's conviction. Case No. 92011 (Mich. App.). On November 1, 2007, the trial court denied Hudson's motions for relief from judgment, for an evidentiary hearing and for resentencing. On January 10, 2008, the trial court denied Hudson's motion for reconsideration.

On November 10, 2008, plaintiff filed a delayed application for leave to appeal.[50] On November 21, 2008, the Court of Appeals informed plaintiff that his submission was defective. Doc. Ent. 43-1 at 49. On or about December 17, 2008, the Court of Appeals informed plaintiff that the copy of the prisoner account statement he had provided was too old. Doc. Ent. 43-1 at 50.[51] On January 7, 2009, the Court of Appeals denied the motion to waive fees but provided for a reduced entry fee of $79. The reduced filing fee was received on or about January 28, 2009. By a letter dated February 20, 2009, the Michigan Court of Appeals informed plaintiff that the matter was filed. Doc. Ent. 43-2 at 1.

On April 2, 2009, the Michigan Court of Appeals denied plaintiff's delayed application for leave to appeal and denied the motion to remand. Doc. Ent. 43-2 at 2. On May 12, 2009, the Michigan Court of Appeals denied the motion for reconsideration. Doc. Ent. 43-2 at 3. On January 29, 2010, the Michigan Supreme Court denied the application for leave to appeal. On April 27, 2010, the Michigan Supreme Court denied the motion for reconsideration. Case No. 288872 (Mich. App.), Case No. 139122 (Mich.).

---

[50]Plaintiff has provided a copy of his November 6, 2008 MDOC Disbursement Authorization for legal postage to the Michigan Court of Appeals. Doc. Ent. 43-2 at 4.

[51]Plaintiff has provided a copy of his December 22, 2008 MDOC Disbursement Authorization for legal postage to mail an Account Statement to the Michigan Court of Appeals. Doc. Ent. 43-2 at 5.

On May 13, 2010, plaintiff filed a petition for writ of habeas corpus in this Court with respect to his Oakland County conviction. Doc. Ent. 35-7. On July 8, 2010, Judge Duggan transferred the case to the Sixth Circuit. On July 19, 2010, plaintiff informed this Court that he had not filed a petition for writ of habeas corpus with respect to his Oakland County conviction and sentence. On August 30, 2010, Judge Duggan entered an order reinstating the petition. On November 23, 2010, the Sixth Circuit dismissed Case No. 10-1893 as moot.[52] Judge Duggan entered judgment on June 6, 2011. However, on June 28, 2011, Hudson filed a notice of appeal. On February 22, 2012, the Sixth Circuit entered an order denying the application for certificate of appealability and denying as moot the motion to proceed in forma pauperis. *See Hudson v. Howes*, **Case No. 2:10-cv-11937-PJD-CEB, Appeal Case No. 11-1839**.

Plaintiff has also filed the instant prisoner civil rights case. Case No. 5:09-cv-14109-JCO-PJK.

**iii.** Plaintiff's October 21, 2010 complaint mentions impediments to his appeal, his Commutation Petition and complaints against MDOC officials. Doc. Ent. 33 ¶ 52. He also mentions impediments to his "[F]irst [A]mendment rights to redress," and "access to the courts resulting in actual injury of dismissal of his criminal appeal[.]" Doc. Ent. 33 ¶ 55. Additionally, plaintiff mentions "the loss of this criminal appeal in state and federal courts." Doc. Ent. 33 ¶ 93.

However, the amended complaint does not clarify which of plaintiff's criminal appeals were harmed by the transfer and property confiscation / destruction. Fortunately, plaintiff's October 3, 2011 response clarifies that his access to courts claim is based upon his post-conviction efforts in the Oakland County case (Case No. 84-62537-FC). Doc. Ent. 57 at 21-23; *see also* Doc. Ent. 43-1 at 5-7 ¶¶ 87-109 (Plaintiff's January 11, 2011 Declaration).

---

[52]*See* Doc. Ent. 43-1 at 47.

For example, plaintiff claims that RRF-00646 - which he initiated on October 5, 2008 (Doc. Ent. 39-1 at 5) - placed defendants on notice that plaintiff had a November 2008 legal deadline and that several items, including legal papers, were missing from plaintiff's property. Doc. Ent. 57 at 21.  Apparently, plaintiff is taking issue with his November 10, 2008 delayed application for leave to appeal the trial court's November 1, 2007 order, which the Michigan Court of Appeals denied on April 2, 2009 (Doc. Ent. 43-2 at 2).  Doc. Ent. 57 at 22; *see also* Doc. Ent. 43-1 at 50 - Doc. Ent. 43-2 at 5 (Mich. App. 288872).  Plaintiff claims that "[t]he State court briefs (in question) were held by defendants, attributing to Plaintiff's lost state court of appeal review[,]" and that "Plaintiff's Motion for Relief from Judgment suffered several setbacks, delays and was rejected by the Michigan Court of Appeals after being assigned to a panel of judges and orders rescinded for the prosecution to respond.  This can only be attributed to the delay in reaching the filing date caused by Defendants' withholding Plaintiff's briefs[.]"  Doc. Ent. 57 at 22.

"The tools [*Bounds v. Smith*, 430 U.S. 817 (1977)] requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration."  *Lewis v. Casey*, 518 U.S. 343, 355 (1996).

Here, although plaintiff has alleged a specific, litigation-related detriment resulting from defendants' alleged actions, the evidence does not support his allegations or indicate that plaintiff lost "a nonfrivolous, arguable, underlying claim," *Christopher v. Harbury*, 536 U.S. 403, 415 (2002), as a result of defendants' actions.  To be sure, plaintiff alleges that Curenton

"has failed to offer any evidence [defendants] returned plaintiff's legal or religious property,

followed basic MDOC policy and properly served Plaintiff with the Property Receipts and

Notices.  This implies these retaliatory acts w[ere] intended to limit Plaintiff's right to access to

court and infringe on his significant religious practices."  More specifically, plaintiff appears to

suggest that the April 2, 2009 denial of his November 10, 2008 application for leave to appeal

the denial of his state court motion for relief from judgment was the result of him not timely

filing a prisoner account statement.  *See* Doc. Ent. 57 at 22.[53]

However, it is clear that the Michigan Court of Appeals, and the Michigan Supreme

Court thereafter, denied plaintiff's applications for leave to appeal based on his "fail[ure] to meet

the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. Hudson*, No.

288872 (Mich. App. Apr. 2, 2009); *People v. Hudson*, 485 Mich. 1074, 777 N.W.2d 176 (Jan.

29, 2010).[54]  Nothing in this language suggests that any procedural failure resulted in dismissal

---

[53]Within the access to courts portion of plaintiff's October 3, 2011 response (Doc. Ent. 57 at 21-23), plaintiff refers to certain matters in his appeal (Mich. App. Case No. 288872) of the Oakland County matter (Case No. 84-062537):  his November 2008 disbursement authorization (Doc. Ent. 43-2 at 4); the Michigan Court of Appeals December 17, 2008 letter (Doc. Ent. 43-1 at 50); his December 2008 disbursement authorization (Doc. Ent. 43-2 at 5); the Michigan Court of Appeals letter dated February 20, 2009 (Doc. Ent. 43-2 at 1); the Michigan Supreme Court's April 2, 2009 order (Doc. Ent. 43-2 at 2); the Michigan Supreme Court's May 12, 2009 order (Doc. Ent. 43-2 at 3) with regard to his state court appeal. Doc. Ent. 57 at 22.
Plaintiff also refers to the Sixth Circuit's November 23, 2010 order in Case No. 10-1893 dismissing the matter as moot pursuant to Judge Duggan's August 30, 2010 order in 10-11937 granting plaintiff's July 19, 2010 motion for relief from judgment (Doc. Ent. 43-1 at 47). Doc. Ent. 57 at 22.
Furthermore, plaintiff refers to the "Access to Courts" section of his January 11, 2011 declaration (Doc. Ent. 43-1 at 5-7 ¶¶ 87-112). Doc. Ent. 57 at 22.

[54]Neither party has submitted the relevant state court documents for Michigan Supreme Court Case No. 139122.  However, the documents were submitted as part of the State's answer to plaintiff's habeas corpus petition filed in this Court, docketed as Case No. 2:10-cv-11937 (Doc. Entries 10-14, 10-15).  Pursuant to FED. R. EVID. 201 (court may take judicial notice of any fact "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably

of plaintiff's appeal; rather, the appeal was denied because, in the court of appeals's view, plaintiff had not meet his burden of establishing his entitlement to relief from judgment. Thus, plaintiff has failed to establish that he suffered a specific, litigation related harm from defendants' alleged actions, and the Court should conclude that defendants are entitled to summary judgment on this claim.

**5.    EIGHTH AMENDMENT**

**a.**    Of the seven (7) counts in plaintiff's complaint, Counts II, III, IV and VI mention "deliberate indifference," "cruel and unusual punishment," and/or the Eighth Amendment. Doc. Ent. 33 ¶¶ 82, 83, 84, 86.

Plaintiff's complaint describes the alleged circumstances of his preparation for transfer on October 3, 2008, including requests for use of the restroom, use of the term "black ass" by Ridley, Atcher and others' handling of plaintiff's property for transfer, Officer Brown's statement that the RRF Administration is corrupt and that "Nobles and Wade [are] behind all this[,]" Atcher's statement that Nobles and Wade wanted to look over plaintiff's property and that they "got [plaintiff's] ass out of here so [he] couldn't use the phone to stop the transfer." Doc. Ent. 33 ¶¶ 18-33.

Furthermore, plaintiff's complaint describes ARF - the prison to which he was transferred. Doc. Ent. 33 ¶¶ 34-37. For example, plaintiff alleges, ARF houses mentally ill

---

be questioned."), the Court may take judicial notice of its own records and those of sister courts. *See United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (court may take judicial notice of court order for purpose of recognizing "judicial act" which the order represents); *St. Louis Baptist Temple, Inc. v. Federal Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("Judicial notice is particularly applicable to the court's own records of prior litigation closely related to the case before it."); *Isaac v. Jones*, 529 F. Supp. 175, 179 n.2 (N.D. Ill. 1981).

prisoners in the Secure Status Resident Treatment Program (SSRTP), as well as Outpatient

Mental Health prisoners, and Residential Treatment Program prisoners.  Doc. Ent. 33 ¶ 34.

**b.**      Curenton first argues that "plaintiff fails to show . . . that defendant injured plaintiff in

any way or that defendant knowingly and unreasonably disregarded an objectively intolerable

risk of harm."  Doc. Ent. 49 at 24.  Next, Curenton argues that "plaintiff has not provided

sufficient evidence to satisfy the subjective element of an Eighth Amendment deliberate

indifference claim because he has not demonstrated a 'culpable state of mind' necessary to prove

'deliberate indifference' against defendant."  Doc. Ent. 49 at 24-25.

**c.**      By his October 3, 2011 response, plaintiff claims the danger in which defendants placed

him was transfer "to a Psychiatric Multilevel Facility where assaultive prisoners are held[.]"

Doc. Ent. 57 at 23.  This report assumes that any Eighth Amendment claim against defendant

Curenton is based upon the conditions to which plaintiff is subjected as the result of his transfer

to ARF.

The Eighth Amendment "imposes duties on [prison] officials, who must provide humane

conditions of confinement; prison officials must ensure that inmates receive adequate food,

clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety

of the inmates[.]'"  *Farmer v. Brennan*, 511 U.S. 825, 832-833 (1994) (quoting *Hudson v.*

*Palmer*, 468 U.S. 517, 526-527 (1984)).

Objectively, examples of conditions of confinement which would constitute cruel and

unusual punishment include "deprivations of essential food, medical care, or sanitation[,]" or

"increase violence among inmates or create other conditions intolerable for prison confinement."

*Rhodes v. Chapman*, 452 U.S. 337, 348 (1981).  Subjectively, "a prison official cannot be found

53

liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  This approach comports best with the text of the Amendment as our cases have interpreted it.  The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'"  *Farmer*, 511 U.S. at 837.

**d.**      To the extent plaintiff's Eighth Amendment claim against Curenton is based upon plaintiff's description of life at ARF,[55] it is instructive to consider a Sixth Circuit case wherein an Eighth Amendment claim regarding the risk of a transfer was at issue.  In *Taylor v. Michigan Department of Corrections*, 69 F.3d 76 (6th Cir. 1995), plaintiff's Eighth Amendment claim alleged that the Warden of the State Prison of Southern Michigan "knew about the risk of sexual assault in the camp program to small, vulnerable-looking prisoners such as plaintiff and neither had a policy to identify and screen out those potential transferees who would not be safe in the camp nor created guidelines for prison staff to follow when screening inmates for transfer." *Taylor*, 69 F.3d at 77.  Ultimately, the Sixth Circuit concluded that "there [we]re disputed questions of material fact concerning whether Warden Foltz had any procedures in place to review transfer orders to insure that his authority over transfers was not being abused and to insure that inmates' files were being properly examined before transfer."  *Taylor*, 69 F.3d at 84.

---

[55]Attached to plaintiff's January 20, 2011 filing are several declarations / affidavits regarding plaintiff and/or conditions at ARF.  *See* Doc. Ent. 43 at 33 (Anthony LaCalamita #668596), Doc. Ent. 43 at 41 (James Alexander #136531); Doc. Ent. 43 at 42 (Ryan Cobley #214866); Doc. Ent. 43 at 43 (Dwane Collins #281113).

54

The Court also concluded that "[t]riable issues of fact [existed] as to whether plaintiff falls into that category of inmates especially vulnerable to sexual assault, whether plaintiff was subjected to a substantial risk of serious harm by his transfer to Camp Pugsley, whether Camp Pugsley was in fact more dangerous to prisoners like Taylor than Jackson Prison, and whether Warden Foltz knew of the risk that the camp presented but failed to take reasonable steps to insure that his vulnerable wards were not transferred there." *Id.*

According to plaintiff, Curenton was "very familiar with the potential heightened dangers in transferring [him] to a Mental Health Facility[,] because she was employed at the Western Wayne Men's Facility . . . where the Huron Valley and Gus Harrison [ARF] Psychiatric SSRTP [Secure Status Residential Treatment Program] and RTP [Residential Treatment Program] were partially implemented in the mid to late 1980's." Doc. Ent. 57 at 23; *see also* Doc. Ent. 57 at 23-24.

However, there is no indication that Curenton knew of a substantial risk of serious harm to plaintiff at ARF. *Farmer*, 511 U.S. at 837; *Taylor*, 69 F.3d at 84.[56]

## 6.    QUALIFIED IMMUNITY

Plaintiff's complaint argues that defendants are not entitled to qualified immunity. Doc. Ent. 33 ¶¶ 91-92.

As the United States Supreme Court has stated, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their

---

[56]My September 23, 2011 report and recommendation also discussed the Fourteenth Amendment (Doc. Ent. 51 at 35-44) and RLUIPA (Doc. Ent. 51 at 44-47). However, this report and recommendation, which concerns Curenton (the only remaining defendant), omits discussion of such claims, as the Fourteenth Amendment and RLUIPA do not appear to be the bases for plaintiff's claims against Curenton.

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817-818 (1982).[57]

The Sixth Circuit has stated that the qualified immunity inquiry requires a three-step analysis: "First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Williams v. Mehra*, 186 F.3d 685, 690 (6ᵗʰ Cir. 1999) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir.1996)).[58] *See also Higgason v. Stephens*, 288 F.3d 868, 876 (6ᵗʰ Cir. 2002). "Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306,

---

[57]Furthermore, "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." *Harlow*, 457 U.S. at 818-819.

[58]*See also Saucier v. Katz*, 533 U.S. 194 (2001), wherein the Supreme Court stated, "A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier*, 533 U.S. at 201 (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201. *See also Drogosch v. Metcalf*, 557 F.3d 372, 377 (6ᵗʰ Cir. Feb. 25, 2009) (citing *Saucier*, 533 U.S. at 201). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

Also, the Supreme Court has stated, "[a]lthough we now hold that the *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that *it is often beneficial*." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (Jan. 21, 2009) (emphasis added).

311 (6th Cir. 2006) (citing *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th Cir.2004)).

Importantly, the defense of qualified  immunity is best addressed after determining whether plaintiff has stated a constitutional claim upon which relief can be granted.  "[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question."  *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5 (1998), citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).

Defendant Curenton argues that she "acted reasonably and did not violate a clearly established constitutional right."  Therefore, she "is entitled to Qualified Immunity."  Doc. Ent. 49 at 25-27.  Specifically, Curenton asserts, "plaintiff cannot prove the violation of a constitutional right since he failed to exhaust his administrative remedies and since he has failed to meet the elements of Conspiracy, Retaliation, Access to the Courts and Eighth Amendment Deliberate Indifference."  Also, Curenton argues that plaintiff does not have a Fourteenth Amendment equal protection claim, because "plaintiff has offered no evidence that defendants discriminated against him based on his race[,]" and "plaintiff's transfer was reasonably related to a legitimate penological interest."  Furthermore, Curenton refers to her affidavit regarding the September 20, 2008 pre-program search (Doc. Ent. 49-3 ¶ 5) and asserts, "that her actions were objectively reasonable under the circumstances, since the prisoner search was necessary to fulfill her duties after she saw two inmates pass something between each other."  Doc. Ent. 49 at 27.

Plaintiff responds that Curenton's conduct "denied plaintiff his constitutional rights precluding qualified immunity." Doc. Ent. 57 at 23-24. However, having concluded that RRF defendant Curenton is entitled to summary judgment on plaintiff's First Amendment retaliation, First Amendment access to courts and Eighth Amendment claims against Curenton, the Court need not address whether she is entitled to qualified immunity.

## 7.   ELEVENTH AMENDMENT IMMUNITY

The caption of plaintiff's amended complaint states that the seven (7) defendants are sued in their individual and official capacities. Doc. Ent. 33 at 4-5; *see also* Doc. Ent. 33 at 19 ¶ 88. Furthermore, plaintiff's seeks monetary, declaratory and injunctive relief. Doc. Ent. 33 at 21.

Defendant Curenton argues that she is entitled to Eleventh Amendment immunity. Doc. Ent. 49 at 27-28. Specifically, she states that she "is a former employee of the State of Michgian who acted in her official capacity." Further, she states, "[t]he State of Michigan has not consented to suit, and [she] enjoys Eleventh Amendment immunity in her official capacity." Doc. Ent. 49 at 28.

The Court should grant summary judgment to defendant Curenton to the extent plaintiff is suing her in her official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States  by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although the amendment expressly prohibits only suits against states by citizens of other states, the Supreme Court has long held that the Eleventh Amendment also bars suits by citizens of the state being sued. *See Hans v. Louisiana*, 134 U.S. 1 (1890); *Welch v. Texas Dep't of Highways and Public Transp.*,

483 U.S. 468, 472-73 (1987) (plurality opinion).  Further, as the Supreme Court made clear in *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989), the Eleventh Amendment bars suits against state officials sued in their official capacity.  *See id.* at 71; *McKay v. Thompson*, 226 F.3d 752, 757 (6th Cir. 2000).  The Eleventh Amendment does not bar suit when a state consents to suit in federal court, and a state may do so by accepting federal funds pursuant to a federal statute which unequivocally subjects a state to suit for monetary damages.  However, the Supreme Court recently held that RLUIPA does not meet this stringent test, and thus acceptance of federal funds does not subject a state, and by extension its officials acting in their official capacities, to suit for monetary damages.  *See Sossamon v. Texas*, 131 S.Ct. 1651, 1658-61 (2011)

Notwithstanding the Eleventh Amendment's bar on claims which seek damages against state actors in their official capacities, plaintiff's claims for declaratory and injunctive relief[59] against RRF defendant Curenton were rendered moot by plaintiff's transfer from RRF.  *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) ("to the extent Kensu seeks declaratory and injunctive relief his claims are now moot as he is no longer confined to the institution that searched his mail.").  Defendant Curenton is associated with RRF (Doc. Ent. 49-3 ¶ 1), and plaintiff is currently confined at LCF.

## III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific

---

[59]*See* Doc. Ent. 33 at 21, Doc. Ent. 57 at 25 ¶ 2.

objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231, American Federation of Teachers, AFL-CIO*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: August 30, 2012                    s/ Paul J. Komives
                                          PAUL J. KOMIVES
                                          UNITED STATES MAGISTRATE JUDGE

60